UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ARKAN MOHAMMED ALI, THAHE MOHAMMED SABAR, SHERZAD KAMAL KHALID, ALI H., NAJEEB ABBAS AHMED, MEHBOOB AHMAD, SAID NABI SIDDIQI, MOHAMMED KARIM SHIRULLAH, and HAJI ABDUL RAHMAN,<br><br>       Plaintiffs,<br>    v.<br><br>THOMAS PAPPAS,<br>       Defendant. | No. 05-cv-1377 (TFH) |
| ARKAN MOHAMMED ALI, THAHE MOHAMMED SABAR, SHERZAD KAMAL KHALID, ALI H., NAJEEB ABBAS AHMED, MEHBOOB AHMAD, SAID NABI SIDDIQI, MOHAMMED KARIM SHIRULLAH, and HAJI ABDUL RAHMAN,<br><br>       Plaintiffs,<br>    v.<br><br>DONALD H. RUMSFELD,<br>       Defendant. | No. 05-cv-1378 (TFH) |
| ARKAN MOHAMMED ALI, THAHE MOHAMMED SABAR, SHERZAD KAMAL KHALID, ALI H., NAJEEB ABBAS AHMED, MEHBOOB AHMAD, SAID NABI SIDDIQI, MOHAMMED KARIM SHIRULLAH, and HAJI ABDUL RAHMAN,<br><br>       Plaintiffs,<br>    v.<br><br>JANIS KARPINSKI,<br>       Defendant. | No. 05-cv-1379 (TFH) |
| ARKAN MOHAMMED ALI, THAHE MOHAMMED SABAR, SHERZAD KAMAL KHALID, ALI H., NAJEEB ABBAS AHMED, MEHBOOB AHMAD, SAID NABI SIDDIQI, MOHAMMED KARIM SHIRULLAH, and HAJI ABDUL RAHMAN,<br><br>       Plaintiffs,<br>    v.<br><br>RICARDO SANCHEZ,<br>       Defendant. | No. 05-cv-1380 (TFH) |

**CONSOLIDATED AMENDED COMPLAINT
FOR DECLARATORY RELIEF AND DAMAGES**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................................ 5

III. PARTIES ............................................................................................................... 5

    A.   PLAINTIFFS .............................................................................................. 5

    B.   DEFENDANTS ......................................................................................... 10

IV.  LEGAL FRAMEWORK .................................................................................... 12

V.   FACTUAL ALLEGATIONS .............................................................................. 14

    A.   GENERAL ALLEGATIONS ................................................................... 14

    B.   DEFENDANTS' ACTIONS AND FAILURES OF COMMAND ...................... 18

        1.   DEFENDANTS' INTERROGATION ORDERS, POLICIES AND PRACTICES ...................................................................................... 18

        2.   DEFENDANTS' OTHER ORDERS AND AUTHORIZATIONS. ......... 28

    C.   DEFENDANTS' KNOWLEDGE OF TORTURE AND ABUSE OF DETAINEES ............................................................................................ 32

        1.   KNOWLEDGE AND REASON TO KNOW ........................................... 33

        2.   FAILURE TO PREVENT OR PUNISH ABUSE AND TORTURE ....... 43

    D.   CONSEQUENCES OF DEFENDANTS' CONDUCT ........................................ 47

        1.   PLAINTIFFS INJURED IN AFGHANISTAN AND IRAQ BY DEFENDANTS' ACTIONS AND DERELICTIONS ............................. 47

        2.   DEFENDANTS' POLICIES, PATTERNS OR PRACTICES CAUSED WIDESPREAD TORTURE AND ABUSE OF DETAINEES IN AFGHANISTAN AND IRAQ ................................................................. 68

        3.   DEFENDANTS' POLICIES, PATTERNS AND PRACTICES CONTINUE ......................................................................................... 75

## TABLE OF CONTENTS
### (continued)

**Page**

VI.    CLAIMS ..................................................................................................... 77

First Cause of Action Violation of Fifth Amendment Due Process Clause ................................. 77

Second Cause of Action Violation of the Fifth and Eighth Amendment Prohibition on Cruel and Unusual Punishment .......................................................................................... 78

Third Cause of Action Torture in Violation of the Law of Nations ............................................ 80

Fourth Cause of Action Cruel, Inhuman or Degrading Treatment in Violation of the Law of Nations ..................................................................................................... 80

Fifth Cause of Action Violation of the Geneva Conventions ...................................................... 81

Sixth Cause of Action Declaratory Relief for Violation of the Law of Nations, of the Geneva Conventions and of the Constitution.................................................................... 82

VII.   PRAYER FOR RELIEF ......................................................................................... 82

VIII.  JURY DEMAND ................................................................................................ 84

Pursuant to an order of the Judicial Panel on Multidistrict Litigation, 28 U.S.C. § 1407, for pretrial and discovery purposes only, Plaintiffs file this Consolidated Amended Complaint for Declaratory Relief and Damages.

## I.     INTRODUCTION

1.     Plaintiffs are individuals who were detained in U.S. military custody in Iraq or Afghanistan where they were subjected to torture and other cruel, inhuman or degrading treatment or punishment, including severe and repeated beatings, cutting with knives, sexual humiliation and assault, confinement in a wooden box, forcible sleep and sensory deprivation, mock executions, death threats, and restraint in contorted and excruciating positions. They were eventually released from detention and never charged with any crime or wrongdoing.

2.     The Plaintiffs are among the unknown number of U.S. detainees in Iraq and Afghanistan who have suffered torture and other cruel, inhuman or degrading treatment. All of the plaintiffs bring this action against Defendant Donald H. Rumsfeld, the U.S. Secretary of Defense. Plaintiffs Arkan Mohammed Ali, Thahe Mohammed Sabar, Sherzad Kamal Khalid, Ali H., and Najeeb Abbas Ahmed also bring this action against high-ranking U.S. Army officers Ricardo Sanchez, Janis Karpinski and Thomas Pappas.

3.     This lawsuit seeks redress from Defendants because they bear legal responsibility for the policies, patterns, practices, derelictions of duty and command failures that caused Plaintiffs to suffer abuse and physical and psychological injuries.

4.     Official government reports have documented, and military officials have acknowledged, the scope and severity of abuses inflicted on detainees in U.S. custody. Such torture and other cruel, inhuman or degrading treatment or punishment of detainees in U.S. custody violates the U.S. Constitution, U.S.-ratified treaties including the Geneva Conventions, military rules and guidelines, the law of nations, and our fundamental values as a nation.

5.      The prohibitions against torture and other cruel, inhuman or degrading treatment are absolute, non-discretionary and subject to no exception.  They are designed not only to safeguard the security and dignity of every human being in times of armed conflict, but also to ensure the humane treatment of U.S. soldiers when they are captured on the battlefield by enemy forces.

6.      For generations, U.S. civilian and military leaders have sought to ensure that U.S. soldiers comply with legal mandates prohibiting torture and abuse under all circumstances and at all times regardless of whether our enemies respect the same principles. Numerous U.S. military rules, regulations, statutes and manuals governing Plaintiffs' detention and interrogation unequivocally state that binding international treaties and U.S. law and policy forbid mistreatment.  For example, the Army Field Manual governing interrogation "expressly prohibit[s] acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or aid to interrogation.  Such illegal acts are not authorized and will not be condoned by the U.S. Army."  Military rules specifically define torture to include "infliction of pain through chemicals or bondage," "forcing an individual to stand, sit or kneel in abnormal positions for prolonged periods of time," "food deprivation," and "any form of beating."

7.      In stark contrast to these mandates and our traditions, the public record shows that detainees in U.S. custody in Iraq and Afghanistan were subjected to unlawful torture and abuse.  Those abuses, which pervaded multiple U.S. detention centers in two countries over substantial periods of time, did not spring from the spontaneous acts of individual soldiers.  As the official report of former Defense Secretary James Schlesinger concluded, the abuses were "widespread," and "were not just the failure of some individuals to follow known standards, and

they are more than the failure of a few leaders to enforce proper discipline. There is both institutional and personal responsibility at higher levels."

8.     This suit alleges that widespread abuse was caused by the orders and derelictions of Defendant Rumsfeld and high-level commanders. First, Defendant Rumsfeld authorized an abandonment of our nation's inviolable and deep-rooted prohibition against torture and other cruel, inhuman or degrading treatment or punishment of detainees in U.S. military custody. His actions, orders and authorizations relating to interrogation precipitated further violations of law and caused an unlawful policy, pattern or practice of torture and other cruel, inhuman or degrading treatment of detainees, which was furthered and implemented by Defendants Sanchez, Karpinski and Pappas and which caused the torture and abuse of Plaintiffs as part of the widespread pattern of abuse of countless other detainees in Iraq and Afghanistan.

9.     In addition to their liability for torture and other abuse caused by their affirmative orders and authorizations, Defendants are also liable on the independent ground that they violated their legal duty to prevent and prohibit torture and other cruel, inhuman or degrading treatment by subordinates when they knew and had reason to know of it. Despite numerous credible reports of torture issued by governmental and non-governmental sources beginning in January 2002 and continuing throughout 2003, 2004, and thereafter, Defendants failed to take the reasonable, necessary, timely or adequate measures against subordinates to prohibit and prevent abuses as required by law. The vast majority of key command officials responsible for widespread and systemic torture and abuse have not been disciplined to this day. Defendants' failures violate their legal obligations as military commanders. Defendants acted with deliberate indifference to and conscious disregard of the high likelihood that Plaintiffs would be injured.

10.     The abuses at issue here had their genesis in and were continually reinforced by policies, patterns or practices deliberately formulated and adopted in the United States over long periods of time, were inflicted in numerous places over lengthy periods, and injured an unknown number of innocent civilian detainees, including Plaintiffs, who posed no threat to U.S. forces.  Plaintiffs, among many others, were injured as a direct and proximate result of Defendants' conduct.

11.     The abuse and torture of Plaintiffs did not occur in the heat of battle or under exigent circumstances.  Nor was torture deployed only against carefully selected individuals who possessed critical intelligence information.  To the contrary, the International Committee of the Red Cross reported estimates by military intelligence that 70 to 90% of persons detained in Iraq had "been arrested by mistake"; the Army Inspector General estimated that 80% of detainees in Iraq "might be eligible for release" if their cases had been properly reviewed, and an internal military report cited estimates from the field that 85 to 90% of detainees at Abu Ghraib "were of no intelligence value."  U.S. Army officers and assessment teams have variously concluded that 80% of detainees at one facility were "unnecessarily detained and were probably just victims of circumstance"; that detainees "happened to be in the wrong place at the wrong time," or were "randomly accused of crimes by vindictive neighbors and enemies"; and that U.S. military personnel "were picking up people for anything, just the drop of a hat."

12.     The Defendants' unlawful policies and practices at issue in this suit, which caused Plaintiffs' injuries, continue.  Thousands of Iraqi and Afghan civilians remain in U.S. military custody or control, and remain subject to the policies and practices at issue here.

13.    Defendants have not been held legally accountable for their acts, omissions and failures of command.  Plaintiff have received no redress for their injuries and hence seek (1) a declaration that Defendants' acts alleged herein are unlawful, and that Defendant Rumsfeld and other Defendants are legally responsible for the violations of law that caused Plaintiffs' injuries, and (2) damages for the injuries Plaintiffs suffered.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1350 (the Alien Tort Statute), and directly under the Constitution.

15.    Venue is proper in the original District Courts in which this action was filed, pursuant to 28 U.S.C. § 1391(b)(1)-(2) and (e).  This matter was consolidated and transferred to this Court by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, by an order dated June 17, 2005.

## III.    PARTIES

### A.    Plaintiffs

16.    The Plaintiffs in this action are all former detainees of U.S. military forces in either Afghanistan or Iraq.  Each of the Plaintiffs was tortured and subjected to cruel, inhuman or degrading treatment while in U.S. military custody.  Each of the Plaintiffs was eventually released from U.S. custody without ever being prosecuted for any wrongdoing, and without ever receiving any redress for the injuries he suffered as a result of torture and other mistreatment.

17.    Plaintiff Arkan Mohammed Ali, age 28, is a citizen of Iraq who was detained by the U.S. military at various locations in Iraq for almost one year, from approximately July 2003 to June 2004.  The U.S. military assigned to Plaintiff Arkan M. Ali detainee number 115319.  As further detailed below, during his detention by the U.S. military, Plaintiff Arkan M.

Ali was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to severe beatings to the point of unconsciousness, stabbing and mutilation, isolation while naked and hooded in a wooden phone booth-sized box, prolonged sleep deprivation enforced by beatings, deprivation of adequate food and water, mock execution and death threats. During relevant time periods, Plaintiff Arkan M. Ali was under the control and authority of Defendants Rumsfeld, Sanchez, Karpinski and Pappas and their subordinates.

18.    Plaintiff Thahe Mohammed Sabar, age 37, is a citizen of Iraq who was detained by the U.S. military for about six months from approximately July 2003 to January 2004 at various locations in Iraq. The U.S. military assigned to Mr. Sabar detainee numbers 12538 and 116676. As further detailed below, during his detention by the U.S. military, Plaintiff Sabar was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to severe beatings, sexual assault and humiliation, deprivation of adequate food and water, intentional prolonged exposure to dangerously high temperatures, mock executions and death threats. During relevant time periods, Plaintiff Sabar was under the control and authority of Defendants Rumsfeld, Sanchez, Karpinski and Pappas and their subordinates.

19.    Plaintiff Sherzad Kamal Khalid, age 35, is a citizen of Iraq who was detained by the U.S. military at various locations in Iraq for about two months from approximately July 2003 through September 2003. The U.S. military assigned to Plaintiff Khalid detainee number 12537. As further detailed below, during his detention by the U.S. military, Plaintiff Khalid was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to frequent and severe beatings, sexual abuse involving assault and threats of anal rape, deprivation of adequate food and water, mock executions, death threats, intentional exposure to dangerously high temperatures, and prolonged sleep deprivation

enforced by beatings. During relevant time periods, Plaintiff Khalid was under the control and authority of Defendants Rumsfeld, Sanchez and Karpinski and their subordinates.

20. Plaintiff Ali H., age 20, is a citizen of Iraq who was detained by the U.S. military at various locations in Iraq for about four weeks from August to September 2003. At the time of his detention, Plaintiff Ali H. was a minor and high school student. The U.S. military assigned to Plaintiff Ali H. detainee number 14358. As further detailed below, during his detention by the U.S. military, Plaintiff Ali H. was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to intentional withholding and delay of necessary medical treatment to cause pain, fear, suffering and humiliation; intentional infliction of pain after surgery by dragging him from one location to another and forcefully ripping away the surgical dressing, and by exposing him to infection by leaving his surgical wound half-bandaged; and intentional deprivation of adequate food and water. During relevant time periods, Plaintiff Ali H. was under the control and authority of Defendants Rumsfeld, Sanchez and Karpinski and their subordinates.

21. Plaintiff Najeeb Abbas Ahmed, age 61, is a citizen of Iraq who was detained on two separate occasions by the U.S. military at various locations in Iraq. His first detention lasted from approximately May 2003 to July 2003. His second detention lasted from approximately July 2003 through December 2003. The U.S. military assigned Plaintiff Ahmed detainee numbers 0406855, 16763, and 150533. As further detailed below, during his detention by the U.S. military, Plaintiff Ahmed was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to: holding a gun to his head; threatening him with death and with life imprisonment at Guantanamo; sexual assault; stepping and sitting on his body while he was in extreme restraints and humiliating him by chanting racial epithets while

videotaping and photographing him; keeping him in an outdoor cage at temperatures exceeding approximately 120 degrees Fahrenheit despite his suffering from chest pains; intentionally depriving him of sleep for long periods of time; and confiscating medications for his high blood pressure and heart disease and intentionally depriving him of medical care even after he suffered more than one heart attack and a possible stroke in detention. During relevant time periods, Plaintiff Ahmed was under the control and authority of Defendants Rumsfeld, Sanchez, Karpinski and Pappas, and their subordinates.

22.    Plaintiff Mehboob Ahmad, approximate age 36, is a citizen of Afghanistan who was detained by the U.S. military at various locations in Afghanistan for approximately five months from June to November 2003. The U.S. military assigned Plaintiff Ahmad detainee number 655 at a detention facility at the U.S. Air Base in Bagram. As further detailed below, during his detention by the U.S. military, Plaintiff Ahmad was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to directly and deliberately inflicted pain, placement in restraints and positions calculated to cause pain (including suspension from the ceiling by his limbs), intimidation with a vicious dog, questioning while naked, threats directed at his family, and sensory deprivation. During relevant time periods, Plaintiff Ahmad was under the control and authority of Defendant Rumsfeld and his subordinates.

23.    Plaintiff Said Nabi Siddiqi, approximate age 49, is a citizen of Afghanistan who was detained by the U.S. military at various locations in Afghanistan for nearly two months, from July to August 2003. The U.S. military assigned Plaintiff Siddiqi detainee number 261 at the U.S. detention facility in Kandahar and number 676 at the Bagram detention facility. As further detailed below, during his detention by the U.S. military, Plaintiff Siddiqi

was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to beatings, placement in restraints and positions calculated to cause pain, verbal abuse of a sexual nature, humiliation by being photographed while naked, denial of water, intentional deprivation of necessary medication exacerbated by physical abuse, intentional and prolonged exposure to dangerous temperature extremes, and sleep deprivation.  During relevant time periods, Plaintiff Siddiqi was under the control and authority of Defendant Rumsfeld and his subordinates.

24.     Plaintiff Mohammed Karim Shirullah, approximate age 46, is a citizen of Afghanistan who was detained by the U.S. military at various locations in Afghanistan for approximately six months, from December 2003 to June 2004.  The U.S. military assigned Plaintiff Shirullah detainee number 821 at the Bagram detention facility.  As further detailed below, during his detention by the U.S. military, Plaintiff Shirullah was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to beatings, placement in restraints and positions calculated to cause pain, humiliation by being interrogated and photographed while naked, sensory deprivation and solitary confinement for an extended period, intentional denial of medical care for injuries caused by abuse, intentional and prolonged exposure to dangerous temperature extremes, dousing with cold water, and sleep deprivation. During relevant time periods, Plaintiff Shirullah was under the control and authority of Defendant Rumsfeld and his subordinates.

25.     Plaintiff Haji Abdul Rahman, approximate age 49, is a citizen of Afghanistan who was detained by the U.S. military at various locations in Afghanistan for approximately five months, from December 2003 to May 2004.  Plaintiff Abdul Rahman was assigned detainee number 819 at the Bagram detention facility.  As further detailed below,

during his detention by the U.S. military, Plaintiff Abdul Rahman was subjected to torture and other cruel, inhuman or degrading treatment, including but not limited to directly and deliberately inflicted pain, humiliation by being questioned and photographed while naked, complete sensory deprivation for 24 hours, solitary confinement, and sleep deprivation. During relevant time periods, Plaintiff Abdul Rahman was under the control and authority of Defendant Rumsfeld and his subordinates.

      **B.**    **<u>Defendants</u>**

      26.    Defendants Rumsfeld, Sanchez, Karpinski and Pappas are, or were at relevant times, high-ranking civilian officials or military officers of the United States. Defendants are liable for the injuries suffered by Plaintiffs on two independent grounds. Defendants (1) formulated or implemented policies and practices that caused the torture and other cruel, inhuman or degrading treatment of Plaintiffs; and (2) had effective command and control of U.S. military personnel in Iraq and/or Afghanistan and knew and had reason to know of torture and abuse by their subordinates and failed to promptly and effectively prohibit, prevent and punish unlawful conduct.

      27.    Defendant Donald H. Rumsfeld is, and was at all relevant times, the Secretary of Defense, the highest-ranking civilian official in the U.S. Department of Defense. He exercises command and control over all members of the U.S. military, including all individual military personnel with direct contact with or responsibility for detainees in Iraq and Afghanistan. As Secretary of Defense, Defendant Rumsfeld has command and control of all functions, in the United States and abroad, of the Department of Defense and its component services and agencies, including the Departments of the Army, Navy (including the U.S. Marine Corps) and Air Force, and the Inspector General and General Counsel of the Department of

Defense.  Defendant Rumsfeld is a citizen of the United States and a resident of Illinois, where he maintains his primary residence.  He is sued in his individual and official capacities.

28.    Defendant Lieutenant General Ricardo Sanchez, of the U.S. Army, served as Commander of the Coalition Joint Task Force-7 ("CJTF-7"), the U.S.-led military coalition in Iraq, from June 2003 to July 2004.  As such, he was the highest-ranking U.S. military official in Iraq, with command and control over all U.S. military personnel serving there, including all individual military personnel with direct contact with or responsibility for detainees in Iraq.  Lieutenant General Sanchez is a citizen of the United States and maintains his primary residence in Texas.  He is sued in his individual capacity for damages.

29.    Defendant Janis Karpinski served as the commander of the 800th Military Police Brigade, the unit of the U.S. Army responsible for detention facilities in Iraq, from approximately June 2003 to May 2004.  During that time period, she held the rank of Brigadier General in the U.S. Army.  She supervised and commanded all U.S. military police personnel in Iraq responsible for the care and control of detainees in U.S. military custody.  Defendant Karpinski is a citizen of the United States and maintains her primary residence in South Carolina.  She is sued in her individual capacity for damages.

30.    Defendant Colonel Thomas Pappas, of the U.S. Army, was at relevant times the commander of the 205th Military Intelligence Brigade, the unit of the U.S. Army responsible for intelligence gathering in Iraq.  He took command of the 205th Military Intelligence Brigade on July 1, 2003.  In November 2003, he was given command of the Joint Interrogation and Debriefing Center ("JIDC") at Abu Ghraib.  As commander of the 205th Military Intelligence Brigade, Defendant Pappas supervised and commanded all military personnel at Abu Ghraib, including individual military personnel responsible for the

interrogation of detainees.  Defendant Pappas is a citizen of the United States and maintains his primary residence in Connecticut.  He is sued in his individual capacity for damages.

## IV.    LEGAL FRAMEWORK

31.    Torture and other cruel, inhuman or degrading treatment of detainees are universally prohibited by the laws of all civilized societies.  The prohibition against torture is a peremptory *jus cogens* norm from which no derogation is allowed and it is universally recognized and binding on all persons under all circumstances.  As U.S. courts have recognized, the torturer, "like the pirate and slave trader before him," is "*hostis humanis generis*, an enemy of all mankind."  *Filartiga v. Pena-Irala*, 630 F. 2d 876, 890 (2d Cir. 1980).  The international law provisions forbidding torture include the Geneva Conventions and the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85, ratified by the United States in 1994.  The U.S. Supreme Court recently reaffirmed that torture is among the gravest violations of the law of nations.  *Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2763 (2004).

32.    U.S. military law and regulations incorporate these international and domestic prohibitions against the use of torture and other cruel, inhuman or degrading treatment, and obligate U.S. military personnel to abide by those binding norms.  During the periods of time relevant to this suit, the governing provisions of the Uniform Code of Military Justice, the Army Field Manual on Intelligence Interrogation, Army Regulations, the Military Police Leaders' Handbook, and the 2004 Interim Field Manual on Counterinsurgency Operations all prohibited torture and abuse of prisoners and banned many of the specific practices and policies that caused Plaintiffs' injuries.  The universal condemnations of torture have been reiterated by President Bush, who has declared that "the values of this country are such that torture is not a part of our soul and our being."

33.     No circumstance excuses torture or other cruel, inhuman or degrading treatment.  In 1999, the United States declared in its initial report to the U.N. Committee Against Torture:

> Torture … is categorically denounced as a matter of policy and as a tool of state authority.…  No official of the Government, federal or state, civilian or military, is authorized to commit or to instruct anyone else to commit torture.  Nor may any official condone or tolerate torture in any form.  No exceptional circumstances may be invoked as a justification of torture.  United States law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on ground of exigent circumstances … or on orders from a superior officer or public authority, and the protective mechanism of an independent judiciary are not subject to suspension.

34.     The U.S. government has regularly taken official positions condemning the abusive practices suffered by Plaintiffs and has denounced many of the practices as torture. For example, a December 2004 memorandum by the Office of Legal Counsel of the Justice Department emphasized that "[t]orture is abhorrent both to American law and values and to international norms," and endorsed court decisions that define torture to include many of the abuses to which Plaintiffs were subjected as a result of Defendants' actions and omissions.  The international Convention Against Torture to which the United States is a party defines torture to include many of the abuses suffered by Plaintiffs.  The U.S. Department of State has regularly condemned other countries for abuse of prisoners and has identified such practices as beatings, blindfolding, denials of food and water, dog attacks, use of forced painful positions, mock executions, slapping, sleep deprivation, solitary confinement, stripping, exposure to extreme temperatures, and threats of sexual abuse as serious violations of human rights.  The United States has condemned as torture the following acts, among others, of the Saddam Hussein regime: denial of food and water, threats to rape or otherwise harm family members and

relatives, pulling out of fingernails, extended solitary confinement in dark and extremely small compartments, and beatings.

35.      In order to ensure that the fundamental protections against torture are enforced, U.S. law, the law of nations, and binding treaty provisions provide for the liability of military or civilian commanders who authorize their subordinates to commit torture or other cruel, inhuman or degrading treatment of prisoners.  U.S. civilian and military commanders and officials are liable for injuries caused by their policies and practices.  The Fifth and Eighth Amendments to the U.S. Constitution prohibit both torture and other abuse of detainees that shocks the conscience.

36.      The law of nations and U.S. law also impose liability on superior officers for the acts of their subordinates under the doctrine of command responsibility as recognized by the U.S. Supreme Court since at least *In re Yamashita*, 327 U.S. 1 (1946).  Commanders are liable for the human rights violations of their subordinates in the chain of command if they (1) exercised effective control over those subordinates; (2) knew or had reason to know of their subordinates' unlawful conduct; and (3) despite such knowledge, failed to take reasonable and necessary measures to prevent their subordinates' conduct.

V.      **FACTUAL ALLEGATIONS**

A.      **General Allegations**

37.      The torture and other cruel, inhuman or degrading treatment suffered by Plaintiffs and set forth in this complaint occurred in enclaves and facilities under the exclusive and/or effective jurisdiction and control of the United States.  At all times relevant to this action, Plaintiffs were detained under the jurisdiction and control of the U.S. military.  Access to detainees by any person including agents or employees of other governments and other U.S. government agencies was and is only with the express or tacit permission of the U.S. military.

38.    During the periods of Plaintiffs' detention and abuse, the United States and the U.S. military under the command of Defendant Rumsfeld exercised control and authority over Iraq and Afghanistan, including under authority conferred by domestic and international law.  The U.S. military continues to exercise control over detainees in U.S. military custody in Afghanistan, under authority including an agreement between the U.S. and Afghanistan governing U.S. military operations.  The U.S. military continues to exercise control over detainees in U.S. military custody in Iraq, including pursuant to its assertion of legal authority to detain Iraqi nationals on security-related grounds.

39.    Defendant Rumsfeld exercised authority over the Coalition Provisional Authority ("CPA") governing Iraq during periods relevant to this suit.  The CPA possessed legislative, executive, and judicial authority in Iraq from April 15, 2003 through at least June 28, 2004, and CPA Administrator Paul Bremer reported to Defendant Rumsfeld.  Pursuant to CPA directive, for time periods relevant to this suit and continuing throughout the U.S. military operations in Iraq, U.S. military personnel in Iraq are immunized from legal process in Iraqi courts.

40.    Defendant Rumsfeld issued orders, adopted policies, and granted authorizations that foreseeably led to the widespread torture and abuse of detainees, including Plaintiffs.  In doing so, he authorized a deviation from the U.S. Armed Forces' longstanding policies and practices prohibiting torture and other mistreatment.  Defendant Rumsfeld also failed to take action to stop and prevent torture and other abuses after he had knowledge that his subordinates were committing or permitting such acts.  Through his actions and derelictions, Defendant Rumsfeld expressly permitted cruel, inhuman or degrading treatment or punishment and tolerated or authorized torture.  This conduct occurred in the United States.

41.     As a direct and foreseeable result of Defendant Rumsfeld's policies, practices and authorizations, the U.S. military engaged in practices that violated the absolute prohibition against torture and other cruel, inhuman or degrading treatment that caused the torture and other abuse of Plaintiffs.

42.     As a consequence of Defendant Rumsfeld's actions and on his own initiative, Defendant Sanchez initiated and issued policies and authorizations that expressly permitted cruel, inhuman or degrading treatment and that tolerated or authorized torture. Defendant Sanchez personally promulgated and implemented policies causing, allowing, and failing to prevent or stop torture and abuse in Iraq.  He knew and had reason to know of torture and abuse of detainees by his subordinates, but failed to prevent and adequately punish such conduct.

43.     As a consequence of Defendant Rumsfeld's and Defendant Sanchez's actions and on her own initiative, Defendant Karpinski, who was in command of military police in Iraq, personally executed unlawful policies, patterns or practices causing torture and abuse. She knew and had reason to know of torture and abuse of detainees by her subordinates, but failed to prevent and punish such conduct.

44.     As a consequence of Defendant Rumsfeld's and Defendant Sanchez's actions and on his own initiative, Defendant Pappas personally executed unlawful policies, patterns or practices causing torture and abuse and personally authorized detainee abuse.  He knew and had reason to know of torture and abuse of detainees by his subordinates, but failed to prevent and punish such conduct.

45.     Each of the Defendants knew and had reason to know that his or her actions and failures of duty would foreseeably lead the U.S. military to violate the laws against torture and other cruel, inhuman or degrading treatment.

46.     Defendants' actions and omissions were the proximate cause of the torture and other cruel, inhuman or degrading treatment of Plaintiffs and other detainees in U.S. military custody in Iraq and/or Afghanistan.  In that conduct, Defendants acted under color of law beyond the scope of their lawful and delegated authority.  In carrying out his or her unlawful policies, patterns, practices and procedures, and in his or her other actions and omissions described above, each of the Defendants violated clearly established constitutional rights and other domestic and international laws, and knew that he or she was doing so.

47.     Defendants' subordinates maliciously and sadistically inflicted unnecessary pain and harm on detainees including Plaintiffs.  Defendants could foresee these actions by their subordinates because they had notice that their subordinates in the U.S. military already had been engaging in torture and other cruel, inhuman or degrading treatment before Plaintiffs suffered their injuries.  Defendants thus acted with conscious disregard of an excessive risk of harm to Plaintiffs.

48.     Defendants' policies, practices and procedures remain in effect and continue to govern or determine the detention and treatment of detainees in Iraq and Afghanistan.  The specific number of detainees presently in U.S. military custody is unknown but is estimated to exceed 14,000 in Iraq and 500 in Afghanistan.  The U.S. military continues to seize, detain and interrogate Iraqi and Afghan civilians pursuant to the policies, practices, procedures and omissions of Defendant Rumsfeld and other military personnel under his command that are at issue in this case.

**B.**     **Defendants' Actions and Failures of Command**

**1.**     **Defendants' Interrogation Orders, Policies and Practices**

49.     Defendant Rumsfeld and other high-ranking military leaders began to abandon the absolute prohibition against torture soon after the military conflict in Afghanistan began.  Defendant Rumsfeld's policies and practices authorized the use of unlawful interrogation techniques on detainees in U.S. custody in Guantanamo and Afghanistan.  Through policies, practices and derelictions of duty that extended those illegal techniques to Iraq, Defendants Rumsfeld, Sanchez, Karpinski and Pappas further violated the prohibitions against torture and other cruel, inhuman or degrading treatment.

50.     Defendants are or were at all relevant times personally responsible for developing, authorizing, supervising, and/or implementing the policies, patterns or practices governing the detention and interrogation of detainees in Afghanistan and/or Iraq during the time that Plaintiffs were in the custody of the U.S. military.  Defendants authorized interrogation techniques that caused torture and abuse of numerous detainees including Plaintiffs.  Defendants adopted policies and practices that allowed or encouraged subordinates to engage in torture and cruel, inhuman or degrading treatment.  Defendants instituted or allowed other practices and procedures that foreseeably caused systemic abuses of detainees, including Plaintiffs.

51.     Defendant Rumsfeld was directly involved in setting interrogation policies that were contrary to law and military doctrine as early as November 2002.  During that month, Defendant Rumsfeld personally approved the use of military dogs to induce fear and to exploit "individual phobias" during the interrogation of a specific detainee at Guantanamo.

52.     On December 2, 2002, Defendant Rumsfeld personally approved a list of illegal interrogation techniques (the "December Rumsfeld Techniques") for use on detainees at Guantanamo.

53.     The December Rumsfeld Techniques were contrary to settled law and military standards governing detention and interrogation as set forth in the Army Field Manual 34-52, which was in effect at all times relevant to this suit.  The December Rumsfeld Techniques included the following:  the use of "stress positions," 20-hour interrogations, the removal of clothing, playing upon a detainee's phobias to induce stress (such as through the use of dogs), deception to make the detainee believe the interrogator was from a country with a reputation for torture, the use of falsified documents and reports, isolation for up to 30 days, and sensory deprivation.

54.     Approximately one month before Defendant Rumsfeld approved the December Rumsfeld Techniques, senior U.S. military officers had expressed "serious reservations" about the legality of the same techniques when they were proposed by an intelligence task force at Guantanamo.

55.     Senior members of the U.S. military, including the General Counsel of the Department of the Navy, were critical of the legality of the December Rumsfeld Techniques ultimately approved by Defendant Rumsfeld.

56.     On January 15, 2003, Defendant Rumsfeld rescinded his blanket authorization for some of the techniques in the December Rumsfeld Techniques.  However, in an order to the commander of the U.S. Southern Command, Defendant Rumsfeld stated that he personally could authorize the continued use of the otherwise-rescinded techniques, and that he wanted to be involved in the formulation of a plan to use them.  His order provided:  "Should you determine that particular techniques in either of these categories are warranted in an individual case, you should forward that request to me.  Such a request should include a thorough

justification for the employment of those techniques and a detailed plan for the use of such techniques."

57.     Defendant Rumsfeld's Guantanamo interrogation policies, which deviated from existing laws on detainee treatment, along with his pressure on subordinates for more intelligence, were also applied in Afghanistan.  Upon information and belief, U.S. commanders in Afghanistan were instructed that "doctrinal approaches to 'EPW' or 'Detainee' operations" were not "tak[ing] full advantage of the various policies adopted by civilian leadership to deal with the unique nature of this unconventional operation."  An official military investigation later concluded that a number of the December Rumsfeld Techniques developed for use in Guantanamo had "migrat[ed]" to Afghanistan.

58.     On January 15, 2003, Defendant Rumsfeld directed the General Counsel of the Department of Defense to convene a "Working Group" on interrogation techniques for his personal review and consideration.  Defendant Rumsfeld had extensive personal involvement in the Working Group, and dictated the composition of its membership.

59.     The Working Group solicited and obtained information from U.S. military officers in Afghanistan concerning techniques being used by U.S. forces there.  By this time, interrogators in Afghanistan were using harsh interrogation techniques on detainees, including the use of stress positions, dogs to induce fear, and sleep and sensory deprivation.  These techniques violated U.S. and international law and were inconsistent with the governing Army Field Manual 34-52.  The Working Group did not express any objection to any of the techniques in use in Afghanistan.

60.     Reports of widespread and systemic detainee abuse in Afghanistan had already been raised by this time.  Among other things, two Afghan detainees had died while in

U.S. military custody at Bagram in December 2002. Defendant Rumsfeld knew and had reason to know that the deaths had been deemed homicides, and that other detainee abuses had been reported.

61. Upon information and belief, despite the evidence of detainee abuses in Afghanistan, neither Defendant Rumsfeld nor any of his subordinate officials at the Defense Department in the United States objected to any of the interrogation techniques in use in Afghanistan. Because of the lack of objection, the U.S. military commanders in Afghanistan considered the techniques to be "approved policy," and U.S. personnel continued to use those techniques despite their inconsistency with standing military doctrine and international and domestic law.

62. Defendant Rumsfeld's Working Group produced a series of draft reports, including proposed interrogation techniques. Upon information and belief, the Working Group was instructed to accept as binding and controlling authority the legal analysis set forth by the Office of the Legal Counsel ("OLC") of the Justice Department on all legal issues concerning techniques that would constitute torture or cruel inhuman or degrading treatment under U.S. and international law. The OLC analysis adopted a definition of torture contrary to U.S. and international law. Upon information and belief, the Working Group was prohibited from developing its own analysis regarding the legality of proposed interrogation techniques. Upon information and belief, the OLC analysis was set forth in memoranda dated August 1, 2002, and March 14, 2003. The Justice Department has since withdrawn the OLC memorandum of August 1, 2002, and issued a new analysis in December 2004, superseding the August 1, 2002, OLC memorandum in its entirety.

63.    Top-ranking military attorneys of the Judge Advocate General Offices of every branch of the U.S. Armed Forces objected to the OLC's legal analysis on the ground that it violated U.S. and international law; that the legal analysis was inconsistent with existing U.S. military training; that the erosion of existing standards would put U.S. soldiers at risk of abuse; that following the OLC analysis would expose U.S. officers and soldiers to criminal and civil liability; and that the interrogation methods suggested would be of "questionable practical value in obtaining reliable information."

64.    On April 4, 2003, the Working Group issued its final report to Defendant Rumsfeld.  The final report included interrogation techniques that had been submitted by commanders in Afghanistan.  The Working Group's April 4 Report recommended 35 interrogation techniques for use at Guantanamo.  On April 16, 2003, Defendant Rumsfeld personally approved the use of 24 of the techniques (the "April Rumsfeld Techniques").

65.    The April Rumsfeld Techniques authorized isolation, dietary manipulation, environmental manipulation, "sleep adjustment," and "false flag" (leading detainees to believe that the interrogator is from a foreign country and will engage in torture). None of these techniques were authorized by the governing Army Field Manual 34-52. Defendant Rumsfeld again provided that even harsher techniques could be used with his personal authorization.

66.    Terms like "environmental manipulation," "stress positions," "sleep adjustment," and other terms in the December Rumsfeld Techniques or in other interrogation policies were deployed knowingly as euphemisms for torture and cruel, inhuman and degrading treatment, including extended sleep deprivation.  Subordinates understood those authorizations to include practices such as keeping detainees in ice water near the point of death by hypothermia,

using strobe lights and music to disorient detainees, and using large dogs to terrify blindfolded detainees.

67.     After the beginning of the Iraq war, the unlawful interrogation techniques embodied in the December and April Rumsfeld Techniques spread to Iraq.  General Paul Kern of the U.S. Army, who undertook a military investigation into the Abu Ghraib prison scandal, stated that the proliferation of techniques in the various theaters of war "became confusing" and that Defendant Rumsfeld's interrogation techniques for Guantanamo were found on the computers of U.S. Army personnel at Abu Ghraib prison in Iraq.  Military intelligence soldiers stationed at Abu Ghraib prison were "looking at Guantanamo Bay and Afghanistan as a model" for interrogation techniques.

68.     Upon information and belief, Under Secretary of Defense Stephen Cambone supervised and implemented, and Defendant Rumsfeld approved, the activities of a clandestine program composed jointly of U.S. military and CIA personnel for operation in Iraq in or around the summer of 2003.  Upon information and belief, members of this program were authorized to use unlawful interrogation tactics, including physical abuse and sexual humiliation, against Iraqi detainees.

69.     In the summer of 2003, in anticipation of obtaining approval for harsher interrogation practices, a member of Defendant Sanchez's staff transmitted an email message asking military intelligence personnel in Iraq to provide a "wish list" of interrogation techniques they wished to use.  The email stated the "gloves are coming off," and "we want these individuals broken."  Defendant Sanchez knew and had reason to know of the email message and did not prevent its transmittal or countermand it after it was sent.

70.    U.S. military interrogators reasonably understood this email request as permission from command headquarters to use harsh interrogation methods, and engaged in unlawful mistreatment of detainees as a direct result of the email.  Upon information and belief, on the same day the email request was sent from Defendant Sanchez's staff, intelligence officials at one of the U.S. detention centers in Iraq responded with a list of interrogation techniques.  The list included open-hand strikes, closed-fist strikes, low-voltage electrocution, techniques intended to induce claustrophobia, and techniques intended to induce muscle fatigue.  Defendant Sanchez used this list, among other things, to develop interrogation policy in Iraq.

71.    In August and September 2003, Defendant Rumsfeld sent Major General Geoffrey Miller, the commander of the U.S. military joint task force at Guantanamo, to Iraq to deploy more aggressive interrogation methods on a widespread basis.  The purpose of sending Miller to Iraq was "to make certain that [the United States] had the proper conditions within [detention facilities in Iraq] in order for … information to be gathered."  Miller was sent by Defendant Rumsfeld and his Under Secretary to "gitmo-ize" detention facilities in Iraq by importing Guantanamo interrogation practices.

72.    Defendant Rumsfeld sent Major General Miller to Iraq despite Miller's record of authorizing abuse and tolerating torture of detainees at Guantanamo.  Before Miller's mission to Iraq, his subordinates at Guantanamo had engaged in unlawful interrogation practices so extreme that agents of the FBI who had witnessed the interrogations formally presented concerns and objections to Miller.

73.    Upon information and belief, Defendant Rumsfeld knew and intended that Miller would apply in Iraq the techniques that Defendant Rumsfeld had approved for use at Guantanamo as well as other abusive policies and practices.  Upon information and belief,

Defendant Rumsfeld also knew and had reason to know about the widespread detainee torture and other cruel, inhuman and degrading treatment of detainees at Guantanamo and in Afghanistan that had resulted from his policies and practices.

74.     As a result of the order by Defendant Rumsfeld, Major General Miller and his team caused illegal interrogation techniques from Guantanamo to be adopted as practices and policies for detainees in Iraq.  Miller's team consisted of 17 military personnel, all of whom had served at Guantanamo.  Miller and his team used the April Rumsfeld Techniques as a "baseline" for recommending new, harsher interrogation techniques for use at the U.S. detention facility at Abu Ghraib in Iraq.

75.     According to Defendant Pappas, detainee policies and procedures at Abu Ghraib were enacted as a specific result of Major General Miller's mission.  Major General Miller told Defendant Karpinski that detainees at Guantanamo were "treated like dogs," and that he recommended the same for detainees in Iraq.  Defendant Sanchez had given Major General Miller complete authority to take over any detention facility he wanted to implement his policies and practices.

76.     Based on Major General Miller's recommendation, Defendant Pappas instituted the use of dogs for the purpose of instilling fear in detainees to "set[ ] the atmosphere" for obtaining information from detainees.  Upon information and belief, Defendant Pappas told a sergeant at Abu Ghraib that the use of dogs to intimidate detainees was "good to go."  That sergeant and another soldier subsequently used military dogs to terrify and abuse detainees, including two juveniles.

77.     Defendant Karpinski carried out the plans of Defendant Sanchez and Major General Miller to "gitmo-ize" Abu Ghraib and abdicated her duty as a commander to prevent torture and other cruel, inhuman or degrading treatment.

78.     Defendants also engaged in a pattern, policy and practice of transferring Army personnel known to have engaged in torture and cruel, inhuman or degrading treatment from Afghanistan to Iraq, which led to further "migration" of illegal interrogation or detention techniques.  Defendants Rumsfeld and Sanchez knowingly permitted the transfer of Army units known to have engaged in the torture of detainees, from one theater of war to another, without preventing or punishing perpetrators of torture and without taking adequate and effective measures to prevent further abuses.

79.     For example, in early 2003, Captain Carolyn Wood and members of the 519th Military Intelligence Battalion under her command were transferred from Afghanistan to Iraq, and in July 2003, Captain Wood and her battalion were assigned to Abu Ghraib. Previously, while deployed in Afghanistan, members of the 519th Military Intelligence Battalion under Wood's command had been involved in the killing of two detainees.

80.     During 2003, Defendant Sanchez's staff approved techniques for use in Iraq that were being used at the time by U.S. military forces in Afghanistan.  Upon information and belief, the approved techniques included stress positions, sensory and sleep deprivation, and use of dogs.

81.     On September 14, 2003, Defendant Sanchez signed a memorandum authorizing the use of 29 interrogation techniques (the "September Sanchez Techniques"). Defendant Sanchez issued the September Sanchez Techniques a few days after Defendant Rumsfeld visited the U.S. detention facility at Abu Ghraib.

82.     At least 12 of the September Sanchez Techniques were unlawful and contrary to existing Army interrogation manuals and five went beyond even those authorized by Defendant Rumsfeld for use at Guantanamo.  The September Sanchez Techniques included the use of dogs to exploit "Arab fear of dogs," isolation, stress positions, sleep deprivation, and environmental manipulation.  Some techniques, including the use of dogs, stress positions, yelling, loud music, and light control required Defendant Sanchez's personal approval.

83.     The September Sanchez Techniques were based on sources that included the April Rumsfeld Techniques and techniques used in Afghanistan that had resulted in torture and abuse and "wish lists" of techniques proposed by U.S. intelligence officials in Iraq.

84.     The September Sanchez Techniques were implemented immediately even though the U.S. Central Command ("CENTCOM") had not approved them.  When CENTCOM military attorneys subsequently rejected many of the techniques, Defendant Sanchez modified his previous authorization of particular techniques but continued to authorize interrogators to "control" the lighting, heating, food, shelter, and clothing given to detainees.  He placed limited restrictions on the use of dogs but continued to permit the use of dogs in interrogations with prior authorization on a case-by-case basis.  Defendant Sanchez later denied approving techniques that he had authorized in his September memorandum.

85.     As a result of the proliferation of interrogation memoranda issued by Defendant Sanchez, military interrogators in Iraq became increasingly confused about the legal limits of their conduct toward detainees.  This confusion, created by Defendant Sanchez, caused the torture and cruel, inhuman or degrading treatment of detainees.

86.     Defendant Pappas authorized interrogation techniques while in command at the Abu Ghraib prison that included, upon information and belief, sleep deprivation, use of

dogs to intimidate detainees, shackling, and forced stripping of detainees. Defendant Pappas

placed no restrictions on how techniques such as "sleep management" were to be implemented.

Moreover, he knew and had reason to know that soldiers at Abu Ghraib were engaging in

abusive treatment of detainees. Under such circumstances, it was highly foreseeable to

Defendant Pappas that soldiers would implement "sleep management" measures through torture

and cruel, inhuman or degrading treatment, such as beatings, chilling with cold water, and

nudity.

### 2.     Defendants' Other Orders and Authorizations

87.     In addition to authorizing unlawful interrogation techniques and practices,

Defendants authorized nondoctrinal command structures, failed to provide adequate training and

created intense pressure for intelligence. Defendants engaged in these acts even though it was

highly foreseeable to them, in light of their knowledge of ongoing detainee abuse, that their acts

would cause the torture and other cruel, inhuman or degrading treatment of detainees, including

Plaintiffs.

88.     At the direction of the Department of Defense, Army Brigadier General

Charles H. Jacoby, Jr., conducted an investigation into all detention operations in Afghanistan.

Upon information and belief, his official report concluded that there was a lack of clear military

rules and training in U.S. detention facilities in Afghanistan.

89.     An official report by U.S. Army Major General George Fay found that,

among other factors, "inadequate interrogation doctrine and training," the "lack of clear lines of

responsibility between the MP and MI chains of command," the "lack of a clear interrogation

policy for the Iraq Campaign," and "intense pressure felt by the personnel on the ground to

produce actionable intelligence from detainees" resulted in the abuse of detainees in Iraq. The

Defendants individually and together are responsible for injuries caused by the nondoctrinal command structures, the lack of training and the pressure for intelligence.

90.    Among the nondoctrinal command structures Defendants instituted was ordering military intelligence and military police work together to "set the conditions for interrogations."

91.    Defendant Sanchez appointed Defendant Pappas of the 205th Military Intelligence Brigade as the base commander for Abu Ghraib prison, and made him responsible for the support of all military police assigned to the prison.  In November 2003, control of Abu Ghraib was transferred from military police to military intelligence command.  Defendant Karpinski acquiesced in the transfer that put military intelligence operatives in control of conditions at Abu Ghraib, despite her admission that she lacked the authority to do so.

92.    The use of military police soldiers for interrogation was improper and done for the purpose of inflicting abuse on detainees to make them compliant during interrogation.  Military intelligence officers told military police soldiers, who were untrained in detainee interrogation tactics, to "make sure" that a detainee "has a bad night," or "make sure he gets the treatment."

93.    Patterns, practices and policies of misusing military police to abuse prisoners were pervasive throughout Iraq.  A U.S. soldier stated:  "I've seen this behavior throughout the country of Iraq, and Military Police could be very useful.  They could roughen up the detainees.  If they didn't want their prisoner to sleep, then they wouldn't sleep.  If they didn't want them to eat, they wouldn't eat.  They would confuse their time schedule.  And this escalated all the way to nudity, to sexual innuendo, to make them fear that rape or other sexual acts could be performed on prisoners, to beatings, to dogs let loose in the room, and various other things."

94.     Defendant Pappas ordered military police soldiers under Defendant Karpinski's command at Abu Ghraib to alter detainees' diets, to play loud music to disturb detainees' sleep patterns, and to implement other techniques requested by military intelligence soldiers. Defendant Pappas encouraged soldiers under his command to "soften up" detainees for interrogation, which they understood to mean physical and mental abuse.  Upon information and belief, Defendant Pappas and/or officers directly under his command issued orders through written memoranda to the noncommissioned officer in charge of the Abu Ghraib hard site. These orders from military intelligence "took away from normal health and welfare for the inmates."

95.     From the outset of and throughout the military actions in Afghanistan and Iraq, Defendants also knowingly failed to provide for adequate training of U.S. military personnel charged with the detention and interrogation of detainees.  Defendants failed to ensure that military personnel knew that torture and abuse of detainees are prohibited under military law and policy.  Defendants knew and had reason to know that the lack of training created a permissive environment in which their subordinates believed that abuse of detainees would be tolerated or approved.  Defendants' failures constituted a willful tolerance of and deliberate indifference to conditions that they knew and had reason to know would lead to torture and other cruel, inhuman or degrading treatment.

96.     Upon information and belief, members of the 519th Military Intelligence Battalion arriving in Afghanistan in July 2002 failed to receive adequate training and guidance and interrogators at the Bagram detention facility were not prepared to run a military operation. Upon information and belief, the commander of the Military Intelligence Battalion at Bagram

sought "additional legal guidance" from superiors on permissible interrogation techniques and did not receive it.

97.     Defendant Karpinski failed to ensure that even her top-ranking subordinates, much less those soldiers with direct contact with detainees, were aware of basic laws governing detainee operations.  One company under Defendant Karpinski's command wrote its own standard operating procedures for detainee operations because of a complete lack of training and guidance, despite the commander's admission that the company was completely unqualified to do so.  According to Lieutenant Colonel Gary Maddocks, Executive Officer of the 800th Military Police Brigade during relevant time periods, the torture at Abu Ghraib likely would not have occurred if military leaders had placed proper emphasis on the Geneva Conventions.

98.     Defendant Pappas failed to ensure that even his top-ranking subordinates, much less those soldiers with direct contact with detainees, were aware of the basic laws governing detention and interrogation.  A senior military intelligence officer under the command of Defendant Pappas was confused about whether the Geneva Conventions applied to "security detainees" in Iraq who were not "enemy prisoners of war" and did not understand the basic provisions of binding laws on interrogation.

99.     Defendants also placed intense pressure on subordinates to produce intelligence through detainee interrogations.  An official government report has pointed to "intense pressure felt by the personnel on the ground to produce actionable intelligence from detainees" as a cause of the torture and other cruel, inhuman or degrading treatment.

100.     Upon information and belief, Defendant Rumsfeld pressured Defendant Sanchez and other subordinates to produce actionable intelligence from detainees at Abu Ghraib.

Defendant Pappas was subjected to "intense pressure" placed on him by superior officers, including Defendant Sanchez, "for intelligence from interrogations." Defendant Pappas in turn put great pressure on his subordinates for intelligence. This pressure for intelligence led to torture of detainees. For example, members of the 82nd Airborne Division in Iraq admitted that the unit's soldiers engaged in actions constituting torture and abuse of detainees because of the pressure for intelligence.

      C.      **<u>Defendants' Knowledge of Torture and Abuse of Detainees</u>**

      101.    Prior to, during, and after Plaintiffs' detention, Defendants knew and had reason to know that their subordinates in Iraq and Afghanistan were committing torture and cruel, inhuman and degrading treatment, in violation of U.S. and international law.

      102.    During relevant time periods, Defendants were informed of the widespread abuse of detainees through reports of the International Committee of the Red Cross and other nongovernmental organizations and through reports or complaints conveyed by U.S. government and military personnel. Many of these reports and complaints of abuse are documented in government records released pursuant to litigation under the Freedom of Information Act, and additional documents continue to be disclosed.

      103.    Despite knowing or having reason to know of the widespread torture and abuse of detainees, Defendants failed to take timely and effective measures to prohibit, prevent and punish such practices and to punish or discipline the perpetrators and responsible commanders, who were all under Defendants' actual or effective command. Defendants had an actual opportunity and a legal duty to prevent abuses by their subordinates before Plaintiffs were injured, yet failed to take the necessary and required action. As a direct and foreseeable result, Plaintiffs suffered torture and other cruel, inhuman or degrading treatment.

104.    The reported prosecutions of military personnel who committed torture and other abuses have focused on low-ranking perpetrators.  Defendants have failed to punish or to take timely and effective measures against commanders who had a legal obligation to prevent and to stop the abuse but failed to do so.  Furthermore, the actions against low-level perpetrators and any other subordinates were taken too late – months or years after Defendants knew and had reason to know of the abuse.  Because Defendants did not take timely and effective measures to punish or otherwise prevent violations by the perpetrators or other subordinates, U.S. military personnel continued to engage in widespread abuse, and numerous individuals, including Plaintiffs, were subjected to torture and other abuse.

## 1.    <u>Knowledge and Reason to Know</u>

105.    Among the reasons why Defendants knew or had reason to know of torture and cruel, inhuman or degrading treatment of detainees in U.S. military custody are the following:

106.    In December 2001, John Walker Lindh, a U.S. citizen arrested and detained by the U.S. military in Afghanistan, was photographed while stripped naked and bound to a stretcher.

107.    In or about early 2002, soon after the start of military actions in Afghanistan, Defendant Rumsfeld had actual notice of allegations of torture and other abuse of detainees arrested by U.S. forces in Afghanistan.

108.    On January 7, 2002, the non-governmental organization Amnesty International wrote a letter to Defendant Rumsfeld expressing concern about the treatment of detainees captured in Afghanistan.  The letter noted that "as well as hooding, the following methods of interrogation may not be used as they violate the prohibition of torture and ill-treatment:  restraining in very painful conditions; playing of loud music; prolonged sleep

deprivation; threats, including death threats; violent shaking; and using cold air to chill the detainee."

109.    On January 22, 2002, Amnesty International sent another letter to Defendant Rumsfeld, complaining about the treatment of detainees.

110.    On April 10, 2002, Amnesty International again sent a lengthy memorandum to Defendant Rumsfeld, among others, in order to bring attention to allegations of mistreatment of detainees in Afghanistan and at Guantanamo.  Defendant Rumsfeld was questioned about the April 10, 2002, Amnesty International memorandum during a news briefing on April 15, 2002.

111.    On information and belief, in late 2002, a high-ranking Defense Department official who reported directly to Defendant Rumsfeld received complaints from agents of the FBI about abusive interrogation tactics used against detainees at Guantanamo.  Upon information and belief, FBI agents witnessed military personnel at Guantanamo subjecting detainees to sexual humiliation, using dogs to intimidate detainees, and placing detainees in isolation to an abusive extent.  Upon information and belief, Defendant Rumsfeld was aware of these complaints.

112.    In August 2002, the Army Criminal Investigations Command found probable cause to charge a team of four U.S. military personnel with the murder of an Afghan detainee in U.S. custody and a conspiracy relating to the murder.  The Criminal Investigations Command also found probable cause to charge a fifth U.S. soldier with being an accessory after the fact, and found that the team's commander had instructed a soldier to destroy incriminating photographs of the victim's body.  Despite the Criminal Investigations Command's findings, the

Commander's Report recorded no court-martial proceedings in the case and no disciplinary action other than a single written reprimand of one soldier.

113.    Upon information and belief, prior to December 2002, the International Committee of the Red Cross specifically expressed concern to U.S. military commanders at the Bagram detention facility that U.S. military personnel were shackling detainees in fixed positions.

114.    On December 26, 2002, the *Washington Post* reported on regular, systemic abuses at the U.S. detention facility in Bagram, Afghanistan, including the use of "stress and duress" techniques that constitute torture and other cruel, inhuman or degrading treatment, and the use of U.S. military personnel to "soften up" detainees for interrogation. Discussing the interrogation of detainees at the U.S. military base by agents of the Central Intelligence Agency, the article quoted a U.S. government official as follows:  "[I]f you don't violate someone's human rights some of the time, you probably aren't doing your job."

115.    In December 2002, two Afghan detainees, Mullah Habibullah and Dilawar, were killed in U.S. custody at the Bagram detention facility while being interrogated by members of the 519th Military Intelligence Battalion.  Both men were chained to the ceiling by their wrists in isolation cells.  Upon information and belief, they were both severely beaten by U.S. military personnel.  Upon information and belief, the chaining of prisoners to the ceilings of isolation cells for long periods of time was a standard practice well known to U.S. military officers at Bagram in 2002.  Although U.S. military physicians concluded that the cause of the detainees' deaths was homicide, the commander of U.S. military forces in Afghanistan continued to insist publicly that the two detainees had died of natural causes.

116.    On December 26, 2002, the nongovernmental organization Human Rights Watch wrote to President Bush and transmitted a copy of the letter to Defendant Rumsfeld, asking that allegations of torture at the Bagram detention facility in Afghanistan be investigated immediately.

117.    On January 14, 2003, executive directors of various human rights organizations wrote to Deputy Secretary of Defense Paul Wolfowitz and asked that the United States promulgate clear guidelines to prevent torture.  Upon information and belief, Defendant Rumsfeld received notice of that letter.

118.    On February 5, 2003, Amnesty International met with William J. Haynes, the General Counsel of the Department of Defense, to discuss allegations of torture and ill-treatment of detainees in Guantanamo and Afghanistan.  Upon information and belief, the General Counsel of the Department of Defense reports directly to Defendant Rumsfeld.

119.    In March 2003, prominent newspapers such as the *New York Times*, *Los Angeles Times*, *Wall Street Journal*, and *Atlanta Journal-Constitution* published articles on persistent reports of serious human rights violations at detention centers at Guantanamo and in Afghanistan, including deaths of detainees under suspicious circumstances in Afghanistan.

120.    On March 10, 2003, Amnesty International sent a letter to President Bush, with a copy to Defendant Rumsfeld, calling upon the U.S. government to investigate allegations of torture and other abuse at the Bagram detention facility.  The letter described specific cases of abuse.

121.    On April 30, 2003, Defendant Rumsfeld visited Basra, Baghdad, and Abu Ghraib in Iraq.  While in Iraq, Defendant Rumsfeld met with U.S. military officers and, upon information and belief, discussed the treatment of detainees in Iraq.

122.    On May 1, 2003 Defendant Rumsfeld visited Afghanistan and met with Lieutenant General McNeill, the commander of U.S. and coalition forces.  By that time, Lieutenant General McNeill was fully aware of the abuse of detainees at the Bagram detention facility, including abuse resulting in the murder of two Afghan detainees by U.S. forces.

123.    Starting in May 2003, the International Committee of the Red Cross began sending reports detailing abuses of detainees in U.S. custody in Iraq to the U.S. Central Command in Qatar.  The May 2003 report described 200 allegations of torture and other abuse of detainees by U.S. soldiers.  The medical delegate of the International Committee of the Red Cross observed marks on the detainees' bodies that corroborated the allegations of abuse.

124.    General John Abizaid, the commander of the U.S. Central Command, confirmed that his office received the report in May 2003.

125.    U.S. Secretary of State Colin Powell confirmed that Defendant Rumsfeld knew of the various reports by the International Committee of the Red Cross, stating that he and Defendant Rumsfeld kept President Bush regularly apprised of their contents throughout 2003.

126.    On May 15, 2003, Amnesty International publicized allegations of torture and other abuse of Iraqi detainees by U.S. and British forces, including beatings and electric shocks.

127.    On June 23, 2003, Amnesty International sent a letter to Defendant Rumsfeld expressing concern about the death of an Afghan detainee held in U.S. custody.

128.    In June 2003, Amnesty International wrote to Ambassador Paul Bremer, then the Administrator of the Coalition Provisional Authority governing Iraq, to express its concerns about the treatment of detainees in U.S. custody in Iraq.  Bremer met regularly with

Defendant Sanchez during that time period to discuss detainee issues, including issues relating to detention conditions.

129.    In early July 2003, the International Committee of the Red Cross sent U.S. military forces in Iraq a working paper detailing approximately 50 allegations of abuse and violence against detainees in Iraq.  Among the abuses detailed in the report are the following: striking detainees with rifle butts, taking aim at detainees with rifles, slaps, punches, prolonged exposure to the sun, isolation in dark cells, and threats of indefinite detention or detention of family members.

130.    On July 15, 2003, the late Sergio Vieira de Mello, then the U.N. High Commissioner for Human Rights, raised concerns regarding the treatment of detainees in U.S. custody with Ambassador Bremer.

131.    Upon information and belief, Ambassador Bremer met with Defendant Rumsfeld in August 2003 and repeatedly urged him to improve conditions in U.S.-controlled detention facilities in Iraq.

132.    Upon information and belief, during 2003, U.S. officials from the State Department and the Coalition Provisional Authority appealed to high-level U.S. military officials to stop detainee abuse.

133.    On July 23, 2003, Amnesty International released a second report criticizing the United States for mistreatment of detainees in Iraq.  Allegations included the use of electric shocks, sleep deprivation, and stress positions.  Major newspapers, including the *New York Times*, reported on Amnesty International's allegations.

134.    On September 5, 2003, Defendant Rumsfeld visited the 4th Infantry Division and 101st Airborne in Iraq and met with Defendant Sanchez in Baghdad. During this time, Defendant Sanchez was developing a harsher interrogation policy for Iraq.

135.    Defendant Rumsfeld personally visited Abu Ghraib prison on September 6, 2003, while Major General Miller was there to implement interrogation techniques and while abuses were taking place. Photographs depicting Defendant Rumsfeld at the prison and meeting with Defendant Karpinski were published in the *New York Times*. Official U.S. military investigations have found that during the time of Defendant Rumsfeld's visit, military intelligence personnel at Abu Ghraib were requesting and encouraging military police personnel to abuse detainees in violation of established policies and laws.

136.    Upon information and belief, when Major General Miller returned from Iraq in September 2003, he provided briefings and recommendations on intelligence activities in Iraq to senior advisers to Defendant Rumsfeld, including Deputy Secretary of Defense Paul Wolfowitz and the Under Secretary of Defense for Intelligence, Stephen A. Cambone.

137.    Shortly after the visits of Defendant Rumsfeld and General Miller to Abu Ghraib, the International Committee of the Red Cross visited Abu Ghraib in October and determined that detainees in U.S. custody were being subjected to "physical and psychological coercion" which was in some cases "tantamount to torture." The abuses witnessed by the International Committee of the Red Cross included: threats, sleep deprivation, tight handcuffs that caused lesions and wounds, and holding of detainees in total darkness in bare concrete cells, while completely naked. U.S. military personnel told representatives of the International Committee of the Red Cross that such treatment was "part of the process." During this visit, the International Committee of the Red Cross found that detainees at Abu Ghraib had physical signs

of injury and psychological symptoms such as suicidal tendencies, memory loss, and acute anxiety reactions.

138.    The International Committee of the Red Cross conveyed its concerns to U.S. military commanders in Iraq through reports and briefings in October and November 2003. Defendants Karpinski, Pappas and Sanchez were notified in writing and otherwise of the details of abuse by the Red Cross by November 2003.

139.    In response to the International Committee of the Red Cross's oral and written reports of torture and other unlawful abuses in October and November 2003, Defendant Pappas revoked the International Committee of the Red Cross's access to interrogation areas and denied the International Committee of the Red Cross's requests to interview specified detainees. Defendant Sanchez's staff approved those denials of access.  Despite these notices of their subordinates' unlawful conduct, Defendant Sanchez, Karpinski and Pappas did not do anything to stop the torture and other unlawful abuses.

140.    Defendant Karpinski responded to the International Committee of the Red Cross November 2003 report in a letter dated December 24, 2003.  According to an official investigative report by Major General George Fay, Defendant Karpinski's response "gloss[ed] over, close to the point of denying[,] the inhumane treatment, humiliation, and abuse identified by the [International Committee of the Red Cross]."

141.    A senior Defense Department official has stated that if military officers in Iraq had responded properly to the reports of the International Committee of the Red Cross, "some of the abuses might not have happened."  Each of the Defendants had a duty to respond properly but failed to do so.  Defendant Rumsfeld was aware of the contents of the reports of the International Committee of the Red Cross.

142.    On November 12, 2003, the Lawyers Committee for Human Rights (now known as Human Rights First) wrote to the commander of U.S. forces in Afghanistan and transmitted a copy to Defendant Rumsfeld, requesting information about the current status of military investigations into the deaths of three detainees who died in U.S. custody in Afghanistan.

143.    Upon information and belief, on November 14, 2003, Amnesty International wrote a letter to Defendant Rumsfeld concerning reports of abuse of Iraqi detainees by the U.S. military.

144.    Between December 2003 and March 2004, military reports were issued regarding detainee abuse in Iraq.  Some or all of these reports were transmitted to Defendant Sanchez and were forwarded by him to his superior officers.

145.    Upon information and belief, throughout the period of time prior to January 2004 and thereafter, Defendants Sanchez, Karpinski and Pappas were personally present at Abu Ghraib and witnessed abuse of detainees.  A military lawyer asserted that Defendant Sanchez was personally present at Abu Ghraib during interrogations and may have witnessed abuse.

146.    Upon information and belief, Defendant Pappas was frequently present at Abu Ghraib during relevant time periods, resided at the Abu Ghraib facility for some period of time, and was present in a cellblock at Abu Ghraib on the night a detainee was killed during interrogation.

147.    During that time, it was common knowledge among soldiers and officers that detainees were kept naked or in women's underwear.  Lieutenant Colonel Steve Jordan, who reported directly to Defendant Pappas, was aware of the nude detainees and told military police

soldiers that nudity and issuance of women's underwear to male detainees was an interrogation technique. During the same time period, there were persistent and widespread rumors among soldiers and officers at Abu Ghraib that detainees were being physically and mentally abused. Military intelligence soldiers under Defendant Pappas' command openly encouraged the humiliation of detainees.

148. The infamous photos of Abu Ghraib abuses were given to Army investigators on January 13, 2004, by a U.S. soldier.

149. In February 2004, the International Committee of the Red Cross issued another exhaustive report on torture and abuse at U.S. detention facilities in Iraq. Upon information and belief, Defendant Rumsfeld knew of this and prior reports of the International Committee of the Red Cross as they were issued.

150. General John Abizaid, commander of the U.S. Central Command encompassing Iraq and Afghanistan, admitted in testimony before the Senate Armed Services Committee on May 19, 2004, shortly after the Abu Ghraib pictures became public, that "we should have known. And we should have uncovered it and taken action before it [abuse of detainees] got to the point that it got to. I think there's no doubt about that."

151. According to an official military report by Army Lieutenant General Anthony Jones, the following "indications and warnings" informed Defendant Sanchez's command that detainees were being abused at Abu Ghraib and other detention facilities in Iraq: "the investigation of an incident at Camp Cropper, [International Committee of the Red Cross] reports on handling of detainees in subordinate units, [International Committee of the Red Cross] reports on Abu Ghraib detainee conditions and treatment, [Army Criminal Investigations Command] investigations and disciplinary actions being taken by commanders, the death of an

OGA [Other Governmental Agencies, commonly understood to mean Central Intelligence

Agency] detainee at Abu Ghraib, the lack of an adequate system for identification and

accountability of detainees, and division commanders' continual concerns that intelligence

information was not returning to the tactical level once detainees were evacuated to the central

holding facility."

152.    The report of an official investigation headed by former Secretary of

Defense James Schlesinger (the "Schlesinger Report") also states that Defendants Karpinski and

Pappas "knew, or should have known, abuses were taking place and taken measures to prevent

them."

153.    Upon information and belief, Defendant Rumsfeld has personal

knowledge of the content of additional documents and reports documenting abuse and torture of

detainees in Guantanamo, Afghanistan and Iraq.  Indeed, Defendant Rumsfeld admitted that

prior to the public scandal of torture at Abu Ghraib, he had heard of "other charges of abuse at

different locations around the world.  It happens from time to time."

### 2.    Failure to Prevent or Punish Abuse and Torture

154.    Although Defendants knew and had reason to know of widespread

detainee abuse, they failed to take adequate measures against subordinates to prevent and punish

torture and abuse of detainees.  To the contrary, Defendants expanded or maintained their

subordinates' authority to use harsh measures against detainees.  Defendants' actions and

derelictions caused torture and abuse to continue and caused the Plaintiffs' injuries.  Illustrative

examples of Defendants' failures include the following:

155.    Defendants failed to discipline Captain Carolyn Wood of the 519th

Military Intelligence Battalion in connection with the two murders committed in Afghanistan by

personnel under her command in December 2002.  Instead, within weeks of the killings, Wood

was awarded the first of two Bronze Star medals for "exceptionally meritorious service."  None

of Captain Wood's subordinates who were directly involved in the killings was charged until

August 2004, after the Abu Ghraib photos became public. As a consequence of the failure to

discipline or punish Captain Wood and other responsible officers, the same unlawful techniques

continued to be used in Afghanistan and then were implemented in Iraq.  A third Afghan

detainee was tortured to death in March 2003, several months after the first two died in U.S.

custody.  At least five detainees have been tortured to death in U.S. military custody in

Afghanistan since December 2002.  At least three detainees have been tortured to death in Iraq.

155.    In May 2003, soldiers commanded by Lieutenant Colonel Jerry

Phillabaum, an officer under the command of Defendant Sanchez, and later under the command

of Defendant Karpinski, tortured detainees in Iraq at the Camp Bucca facility.  When Defendant

Karpinski took command of the 800th Military Police Brigade, including Phillabaum, she knew

of the conduct of Phillabaum's soldiers.  The incident was notorious at Camp Bucca and even at

military deployment sites in the United States.  Nonetheless, neither Defendant Karpinski nor

Defendant Sanchez punished Phillabaum and low-ranking soldiers who committed the torture

and abuse were given at most "less-than-honorable discharge."  Defendant Karpinski placed

Lieutenant Colonel Phillabaum in command of the Abu Ghraib prison, where soldiers under his

command again tortured and otherwise abused detainees.  As Defendant Karpinski admitted, the

inconsequential sanctions for the Camp Bucca abuse "communicated to the soldiers, the worst

that's gonna happen is, you're gonna go home."

157.    By at least November 2003, Defendant Sanchez knew and had reason to

know that soldiers under the command of Defendant Karpinski and Lieutenant Colonel

Phillabaum again had tortured detainees, this time at Abu Ghraib.  The Taguba Report described

Lieutenant Colonel Phillabaum's battalion as "the most troubled battalion guarding, by far, the largest number of detainees in the 800th MP [military police] Brigade."  Defendants Sanchez and Karpinski took no action against Colonel Phillabaum until Defendant Sanchez suspended Phillabaum's command on January 17, 2004, fully eight months after the first reports of torture by Phillabaum's subordinates at Camp Bucca.

158.    Defendant Sanchez left Defendant Karpinski in command of all detainee operations in Iraq until the torture and other abuses at Abu Ghraib were publicly exposed in the media in May 2004.  Despite numerous Pentagon investigations that found Defendant Karpinski had command responsibility for the mistreatment of detainees in Iraq, the administrative sanctions she received were based on a charge of dereliction of duty and essentially cleared her of responsibility for the abuse at Abu Ghraib.

159.    Major General Miller, who implemented policies that exacerbated the torture and cruel, inhuman or degrading treatment of detainees in Iraq, was not corrected, reprimanded or punished by Defendants Rumsfeld or Sanchez.  To the contrary, Defendant Sanchez placed Major General Miller in charge of all detention operations in Iraq in March 2004, and Major General Miller assumed those duties in April 2004.

160.    Officers under the command of Defendants repeatedly disregarded detainee complaints against soldiers, including incidents with evidence corroborating the detainee.  In failing to take steps to deter future misconduct, Defendants created a permissive climate in which military personnel believed that abuse and torture were authorized or tolerated.

161.    Defendant Rumsfeld continues to fail in his duty to thoroughly, independently and adequately investigate the responsibility of high-level commanders and civilian officials for the torture and other cruel, inhuman or degrading treatment of detainees.

162.    Defendant Rumsfeld continues to neglect serious reports of detainee abuse.  When Captain Ian Fishback and two fellow members of the 82nd Airborne Division publicly disclosed in September 2005 that members of the unit had engaged in systemic abuse over long periods of time, Defendant Rumsfeld did not condemn such conduct or launch an investigation. To the contrary, he disparaged the allegations publicly.

163.    Official investigative reports by Army Generals Taguba, Jones and Fay concluded that Defendants Karpinski and Pappas, among others, were responsible for the abuses at Abu Ghraib through their failures of leadership.  However, Defendants Rumsfeld and Sanchez have failed to address these failures of leadership through actions against commanders who were responsible for torture and other cruel, inhuman or degrading treatment.

164.    Despite having notice of torture and other cruel, inhuman or degrading treatment at multiple detention facilities throughout Iraq, Defendant Sanchez ordered Generals Fay and Taguba to investigate torture only in relation to Abu Ghraib and only in relation to certain brigades and for certain time periods.  Defendant Sanchez thus intentionally and knowingly avoided a meaningful and thorough inquiry into the knowledge and conduct of higher-level officials, as well as an investigation into the widespread nature of torture in Iraq. Defendant Rumsfeld knew of and acquiesced in or approved of Defendant Sanchez's actions.

165.    Upon information and belief, none of the official investigations has been tasked with assessing the accountability of senior Department of Defense officials or military officers above the rank of Brigadier General for the policies, practices, actions, orders and omissions that led to the torture and other abuse of prisoners in Afghanistan, Iraq and Guantanamo.  This failure to investigate and prosecute continues despite the findings of the limited investigations that have been conducted, including: the Taguba Report's finding of

"systemic and illegal" abuse of detainees by U.S. military police at Abu Ghraib; the Fay Report's finding of systemic failures, abuses, and lack of command and control; and the Schlesinger Report's finding that prisoner abuse was widespread and that there was "institutional and personal responsibility at higher levels."

166. Defendant Rumsfeld and other high-ranking U.S. commanders under his command continue to fail to discipline or charge high level military and civilian leaders implicated by reports of the International Committee of the Red Cross and journalists and by investigations by the military itself. Instead, many of the officers and civilians implicated in the military investigations of abuse have been promoted or remain in their positions, including Under Secretary Cambone, Major General Miller, Captain Carolyn Wood, Lieutenant General Dan McNeill, and Major General Barbara Fast.

167. Defendant Sanchez has not been sanctioned in any way and was assigned to command the Army's V Corps in Europe. Defendant Karpinski was demoted to Colonel and received a light sanction for unrelated misconduct. Defendant Pappas received only a fine.

### D. Consequences of Defendants' Conduct

#### 1. Plaintiffs Injured in Afghanistan and Iraq By Defendants' Actions and Derelictions

168. Defendants' actions and derelictions of duty set forth above caused Plaintiffs and many other detainees to be tortured and subject to cruel, inhuman and degrading treatment and punishment while in U.S. military custody in Iraq and Afghanistan.

169. The Plaintiffs were and are non-combatant innocent civilians who pose no threat to the United States, were not engaged in hostilities against the United States, were not prosecuted for criminal violations and were released from custody by the U.S. military after being brutally abused and tortured.

170.    Each of the Plaintiffs suffered serious physical and psychological injury as a result of Defendant Rumsfeld's actions and omissions.  Each of the Iraqi Plaintiffs (Plaintiffs Arkan M. Ali, Sabar, Khalid, Ali H., and Ahmed) suffered serious physical and psychological injury as a result of all Defendants' actions and omissions.

171.    Absent judicial action, Plaintiffs have no meaningful avenue for obtaining adequate redress for their injuries, including a declaration of their rights against Defendants. Plaintiffs have no effective means to prevent the policy, pattern, or practice at issue in this suit except through an action against high-ranking civilian and military U.S. commanders and officials.

172.    Plaintiffs and each of them fear and are at risk of detention by the U.S. military and of continued injury and abuse in violation of law.

### a.    Mehboob Ahmad

173.    Plaintiff Mehboob Ahmad was detained by U.S. military forces from approximately June to November 2003.  Plaintiff Ahmad was detained in U.S. custody at various locations in Afghanistan, including the Gardez firebase and the Bagram detention facility.

174.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Ahmad while he was in U.S. military custody, care and control, Defendant Rumsfeld's subordinates subjected Plaintiff Ahmad to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

> a.    Subjecting Plaintiff Ahmad to abusive and painful positions for several hours at a time during nightly interrogations, in order to humiliate him and cause severe pain.  These abusive positions included: (1) hanging him upside-down from the ceiling with a chain; (2) hanging him by his arms with a chain; (3) forcing him to kneel on a wooden pole, cuffing his hands and forcing them to be raised to the ceiling with a chain, and repeatedly pulling him up by the chain and dropping him so that he landed hard on the ground, and repeatedly pushing and kicking him; (4) forcing him to lie on

the small of his back, lift his arms and legs off the ground, and hold water bottles in the air with his hands and feet; (5) forcing him, for extended periods, to squat with his back against a wall, arms outstretched, with heavy water bottles in each hand, causing extreme pain, and repeatedly forcing him back into this position when he collapsed in pain; (6) forcing him to sit for long periods, bent at the waist, with legs stretched apart and arms looped under and around his legs and wrists cuffed.  In all of these abusive positions, Plaintiff Ahmad's feet were tightly shackled in steel cuffs linked by a chain and his hands were tightly restrained in plastic flexicuffs, causing cuts to his ankles and wrists;

b.    Causing extreme pain and fear by hanging Plaintiff Ahmad upside-down from the ceiling with a chain for several hours while U.S. military personnel slapped and pushed him in order to cause his body to swing, and resulting in his loss of consciousness, then, after providing him with medical attention and reviving him, again hanging him upside-down from the ceiling with a chain for several more hours, again leading to loss of consciousness;

c.    Inflicting excruciating electrical shocks on Plaintiff Ahmad during interrogation, with a device consisting of rings on each of his fingers, connected by wires, causing Plaintiff Ahmad's body to thrash uncontrollably and resulting in loss of consciousness;

d.    Forcing Plaintiff Ahmad to sit on his legs in a crouched position and flashing bright lights into his face, causing him to become disoriented and lose consciousness;

e.    Causing humiliation and pain during interrogation by removing Plaintiff Ahmad's clothing, while keeping him blindfolded, and (1) running a shoelace-like object over his body while telling him that it was a snake that would bite him, and (2) causing him to stand with his arms and legs forcibly stretched apart, and pushing his head sideways against a wall for over an hour while shouting questions at him;

f.    Sexually assaulting, taunting and humiliating Plaintiff Ahmad by forcing him to strip and stay naked for lengthy periods of time; stripping and anally probing him; and having interrogators direct insults at his mother, wife, and sister and imply that the soldiers would rape his wife;

g.    Threatening Plaintiff Ahmad with transport to Guantanamo, and showing him photographs of people sleeping in cages, purporting that the photographs were taken at Guantanamo;

h.      Intimidating and threatening Plaintiff Ahmad, and causing him
         pain and fear by repeatedly setting a snarling and barking dog at
         him while he was hooded and hanging by his arms, and allowing
         the dog to grab and pull at his arms and legs;

i.      Causing pain and fear by forcing Plaintiff Ahmad to drink 12 half-
         liter bottles of water in five minutes;

j.      Subjecting Plaintiff Ahmad to extreme sensory deprivation for the
         purpose of degrading and dehumanizing him by forcing him to
         wear black, opaque goggles almost continuously for the entire first
         month of his detention and for a period of several days' duration
         thereafter, and by applying sound-blocking earphones;

k.      Detaining Plaintiff Ahmad outdoors for weeks with no protection
         from the elements; and

l.      Forbidding Plaintiff Ahmad to speak with other detainees for the
         entire time he was detained, approximately five months, for the
         purpose of dehumanizing and degrading him.

175.    As a result of torture and other cruel, inhuman or degrading treatment
while in U.S. custody, Plaintiff Ahmad suffered severe physical and psychological injuries.  He
continues to suffer the lasting effects of those injuries.  Among other things, he suffers from leg
pain and he sometimes cannot move his limbs when he awakes from sleep.  He lacks mental
concentration, which was not the case prior to his detention.

176.    On information and belief, U.S. troops targeted Plaintiff Ahmad for arrest
and detention based on the false statements of local individuals who worked closely with U.S.
forces and harbored personal and/or political animosity toward Plaintiff Ahmad.  On information
and belief, some or all of these individuals continue to work closely with U.S. forces, continue to
harbor animosity toward Plaintiff Ahmad, and may again make false reports that would result in
Plaintiff Ahmad's arrest and detention by U.S. forces.

b.    **Said Nabi Siddiqi**

177.    Plaintiff Said Nabi Siddiqi was detained by U.S. military forces in Afghanistan from approximately July to August 2003.  Plaintiff Siddiqi was detained at various locations in Afghanistan, including the Gardez firebase, the Kandahar airfield, and the Bagram detention facility.

178.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Siddiqi while he was in U.S. military custody, care and control, Defendant Rumsfeld's subordinates subjected Plaintiff Siddiqi to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.    Subjecting Plaintiff Siddiqi to painful and abusive positions for long periods during interrogations, including forcing him to hold a 15-pound piece of wood in his cuffed hands, forcing him to maintain a pushup position while dousing him with water, beating him if he did not maintain the positions, beating, kicking, grabbing, pushing and poking him during interrogations, flashing bright lights into his eyes and yelling directly into his ears at top volume;

b.    Sexually humiliating and assaulting Plaintiff Siddiqi by stripping him naked, photographing him naked, probing his anus, and during interrogations, by stripping him naked, by making animal sounds and demanding to know which animals he had sex with and by repeatedly telling him that his wife was a slut and his daughter was a street beggar;

c.    Causing extreme thirst by denying Plaintiff Siddiqi water for a prolonged period of time;

d.    Throwing stones and other objects at Plaintiff Siddiqi and other detainees while they used an open bucket toilet, and forcing Plaintiff Siddiqi and others to expose themselves publicly with knowledge that this would cause extreme humiliation and degradation by Afghan cultural norms;

e.    Subjecting Plaintiff Siddiqi to sleep deprivation for lengthy periods by throwing stones at him and other detainees at night in order to keep them from sleeping and by awakening them during the night, forcing them to roll around, dousing them with water and verbally

abusing them, all for the purpose of dehumanizing and disorienting them;

f.    Interrogating Plaintiff Siddiqi every night for approximately two weeks, keeping him handcuffed and blindfolded for that entire period of time;

g.    Detaining Plaintiff Siddiqi for weeks in an outdoor area with no protection from the elements and extreme weather, for the purpose of dehumanizing him;

h.    Acting with deliberate indifference to Plaintiff Siddiqi's medical needs and health, confiscating his asthma inhaler, and detaining him in a room flooded with water.

179.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Siddiqi suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. Among other things, he has had depression, thoughts of suicide and nightmares, is quick to anger, suffers from anxiety, has pain in his right knee and lower back, and has suffered from memory loss. His asthma worsened as a result of the mistreatment he suffered while in detention, and has continued to be more severe since his release.

180.    On information and belief, U.S. troops targeted Plaintiff Siddiqi for arrest and detention based on the false statements of local individuals who worked closely with U.S. forces and harbored personal and/or political animosity toward Plaintiff Siddiqi. On information and belief, some or all of these individuals continue to work closely with U.S. forces, continue to harbor animosity toward Plaintiff Siddiqi, and may again make false reports that would result in Plaintiff Siddiqi's arrest and detention by U.S. forces.

### c.    **Mohammed Karim Shirullah**

181.    Plaintiff Mohammed Karim Shirullah was incarcerated by U.S. military forces in Afghanistan from approximately December 2003 to June 2004. Plaintiff Shirullah was

detained at various locations in Afghanistan, including the Gardez firebase and the Bagram

detention facility.

182.    For the purpose of causing pain and injuring, interrogating, intimidating,

degrading and abusing Plaintiff Shirullah while he was in U.S. military custody, care and control,

Defendant Rumsfeld's subordinates subjected Plaintiff Shirullah to the following forms of

torture and other cruel, inhuman or degrading treatment, among others:

a.    Punching, slapping, and kicking Plaintiff Shirullah in the head during interrogation so fiercely and repeatedly that he fell to the ground repeatedly and that the blows ruptured his right eardrum;

b.    Subjecting Plaintiff Shirullah to painful and abusive positions for long periods of time during interrogations, including making him stand on his toes and beating him if he failed to maintain the position;

c.    Stripping Plaintiff Shirullah naked and throwing water on him during interrogation;

d.    Depriving Plaintiff Shirullah of sleep for long periods by repeatedly kicking the walls of his cell throughout the night to keep him awake;

e.    Intentionally dehumanizing Plaintiff Shirullah by subjecting him to sensory deprivation by forcing him to wear black, opaque goggles and wrist restraints for a period of more than two weeks, and by subjecting him to solitary confinement in a room for over one month;

f.    Humiliating Plaintiff Shirullah and causing pain by forcing him to maintain painful and contorted positions, including forcing him to maintain his arms in a "T" position for one hour, and forcing him to sit in a very small space with no back support for six hours with his wrists and legs tied and his eyes and ears covered;

g.    Sexually humiliating Plaintiff Shirullah by stripping him naked, probing his anus and photographing him while he was naked, and forcing him to use an open toilet, with knowledge that such treatment would cause extreme psychological suffering by Afghan cultural norms;

h.    Failing to treat the injury that U.S. personnel caused to Plaintiff Shirullah's ear while beating him; and

i.    Dehumanizing Plaintiff Shirullah by forbidding him to speak with other detainees for the entire time that he was detained, approximately six months.

183.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Shirullah suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. Among other things, he is deaf in his right ear and experiences pain in that ear, and his legs swell painfully. He cannot sleep through the night without medication.

184.    On information and belief, U.S. troops targeted Plaintiff Shirullah for arrest and detention based on the false statements of local individuals who worked closely with U.S. forces and harbored personal and/or political animosity toward Plaintiff Shirullah. On information and belief, some or all of these individuals continue to work closely with U.S. forces, continue to harbor animosity toward Plaintiff Shirullah, and may again make false reports that would result in Plaintiff Shirullah's arrest and detention by U.S. forces.

### d.    Haji Abdul Rahman

185.    Plaintiff Haji Abdul Rahman was incarcerated by U.S. military forces in Afghanistan from approximately December 2003 to May 2004. Plaintiff Abdul Rahman was detained in various locations in Afghanistan, including the Gardez firebase and the Bagram detention facility.

186.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Abdul Rahman while he was in U.S. military custody, care and control, Defendant Rumsfeld's subordinates subjected Plaintiff Abdul Rahman to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.    Subjecting Plaintiff Abdul Rahman to interrogation while forcing him to kneel, naked and with his hands cuffed behind his back and with blackout goggles on, placing a chain or other object through the handcuffs and repeatedly jerking on it to pull his arms and wrench his shoulders and wrists to cause extreme fear, intimidation and pain;

b.    Sexually assaulting and humiliating Plaintiff Abdul Rahman by forcing him to strip naked in front of other people and anally probing him on multiple occasions, by placing blackout goggles over his eyes, and by photographing him while he was naked;

c.    Subjecting Plaintiff Abdul Rahman to extreme restraints, blackout goggles and handcuffs for virtually the entire first month of his detention; subsequently placing him in blackout goggles and sound-deadening headphones and subjecting him to solitary confinement for 15 days for no reason other than to intimidate, humiliate, degrade and abuse him;

d.    Subjecting Plaintiff Abdul Rahman to sleep deprivation by detaining him in brightly-lit areas for approximately three months and by making loud noises to keep him and other detainees awake and to dehumanize them and to disorient them as to the passage of time; and

e.    Threatening to transport him to Guantanamo, so that he feared he would never return home.

187.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Abdul Rahman suffered severe physical and psychological injuries.  He continues to suffer the lasting effects of those injuries.  Among other things, he suffers great pain and sometimes loss of sensation and near-paralysis in his right leg and back.  Since his release, Plaintiff Abdul Rahman also has suffered from increasing shoulder pain resulting from the physical injuries inflicted by U.S. forces.  The pain is so severe that he requires frequent injections to manage it.  Even light physical activity makes the pain worse.  He also suffers vision problems and memory lapses.  He has emotional problems and is quick to anger, which has caused difficulties with his family and work.

188.    On information and belief, U.S. troops targeted Plaintiff Abdul Rahman for arrest and detention based on the false statements of local individuals who worked closely with U.S. forces and harbored personal and/or political animosity toward Plaintiff Abdul Rahman.  On information and belief, some or all of these individuals continue to work closely with U.S. forces, continue to harbor animosity toward Plaintiff Abdul Rahman, and may again make false reports that would result in Plaintiff Abdul Rahman's arrest and detention by U.S. forces.

### e.    Arkan M. Ali

189.    Plaintiff Arkan M. Ali was detained by U.S. military forces in Iraq for about 11 months, from approximately July 2003 to June 2004.  Plaintiff Arkan M. Ali was detained at various locations in Iraq, including a civil defense station in Baghdad, a military prison at the Baghdad international airport, Camp Bucca, and the Abu Ghraib prison.

190.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Arkan M. Ali while he was in U.S. military custody, care and control, Defendants' subordinates subjected Plaintiff Arkan M. Ali to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.    Subjecting Plaintiff Arkan M. Ali to severe beatings by groups of military personnel throughout his eleven months in U.S. custody, including twice beating him to unconsciousness during interrogation, using hands, feet, chains and weapons;

b.    Forcibly restraining Plaintiff Arkan M. Ali and using a large knife to repeatedly stab and slice his forearm causing extreme pain, bleeding and scarring;

c.    Burning or shocking Plaintiff Arkan M. Ali's forearm with a small metal device;

d.    Subjecting Plaintiff Arkan M. Ali to prolonged sensory and sleep deprivation;

e.  Repeatedly locking Plaintiff Arkan M. Ali for several days in a wooden phone booth-sized box, sometimes after stripping him naked and tying a hood over his head;

f.  Shackling Plaintiff Arkan M. Ali with his hands behind his head, placing him on the ground in a prone position, then stepping on his head and pulling up on the shackles, causing extreme pain;

g.  Urinating on Plaintiff Arkan M. Ali intentionally to humiliate and degrade him;

h.  Detaining Plaintiff Arkan M. Ali in a "silent tent" for days at a time, during which he was denied sleep and dragged face-down along the ground and severely beaten by soldiers whenever it appeared he might be falling asleep;

i.  Chaining Plaintiff Arkan M. Ali to a metal shipping container, then repeatedly kicking him, spitting on him, choking him, and bringing a leashed guard dog very close to his face while he cringed away in fear;

j.  Subjecting Plaintiff Arkan M. Ali to multiple death threats, including but not limited to the following: on more than one occasion, holding a gun to his head and chambering a round; threats to transfer him to Guantanamo where he was told soldiers could kill detainees with impunity; mock executions by threatening to run Plaintiff Arkan M. Ali and other detainees down with a large military vehicle; brandishing guns and threatening to shoot Plaintiff Arkan M. Ali and other detainees; approaching Plaintiff Arkan M. Ali with a sword and threatening to slaughter him;

k.  Falsely telling Plaintiff Arkan M. Ali and other detainees during transport between prisons that they were being taken to another country, in order to terrorize and disorient them and to lead them to believe that they would never see their families again;

l.  Denying Plaintiff Arkan M. Ali food and water for long periods, intentionally causing extreme hunger and thirst; and

m.  Repeatedly desecrating the Quran in the presence of Plaintiff Arkan M. Ali and other detainees to demean and degrade them, including having a military dog pick up the Quran in its mouth.

191.  As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Arkan M. Ali suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. Among other things, he suffers from

migraine headaches and continues to suffer from pain in the kidneys, colon and urinary tract, which were affected by serious infections at the time of his release from detention.  He also bears severe scars on his arm from the stabbing and burning he suffered, and reduced strength in that arm.  He has severe depression, frequent severe nightmares, decreased sexual function, memory problems, insomnia, anxiety attacks, and episodes of shortness of breath and an involuntary gulping reflex, which he never experienced prior to his detention.  He becomes fearful and anxious to a debilitating extent whenever he leaves his home.  As a result of his continuing injuries, Plaintiff Arkan M. Ali has been unable to maintain employment and his personal relationships with his family and others have deteriorated.

192.    Upon Plaintiff Arkan M. Ali's release from U.S. custody, a U.S. official threatened him by specifically telling him that that if he ever reported or discussed the abuse he and others suffered in detention, the U.S. government would find him and he would never see his family again.  Plaintiff Arkan M. Ali understood the official to mean that such future detention would be retaliatory and would include further torture and other cruel, inhuman or degrading treatment or even death.

193.    Plaintiff Arkan M. Ali continues to fear abuse and redetention based in part on the threat of redetention at the time of his release and on the continuing and frequent round-ups and sweeps in Baghdad by U.S. forces and Iraqi forces acting at their direction.

**f.    Thahe M. Sabar**

194.    Plaintiff Thahe M. Sabar was detained by U.S. military forces in Iraq from approximately July 2003 to January 2004.  Plaintiff Sabar was detained at various locations in Iraq, including locations in Baghdad known as al-Qasr al-Jumhouri or al-Qasr al-Sujood, the prison at the Baghdad international airport, Camp Bucca, and Abu Ghraib.

195.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Sabar while he was in U.S. military custody, care and control, Defendants' subordinates subjected Plaintiff Sabar to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.     Frequent severe beatings, including beating Plaintiff Sabar with their fists and guns while he was handcuffed and helpless, hitting him in the genitals, and forcing him and other detainees to run through a gauntlet of 10 to 20 uniformed soldiers who were screaming at them and beating them with wooden batons;

b.     Twice using a gun-shaped device to inflict excruciating electrical shocks on Plaintiff Sabar;

c.     Sexually assaulting Plaintiff Sabar:  One or more soldiers in the presence of male and female soldiers inserted their fingers into Plaintiff Sabar's anus and grabbed and fondled his buttocks and penis while making moaning sounds and jeering at him in a sexually degrading and intimidating manner;

d.     Staging extraordinary mock executions of Plaintiff Sabar and other detainees to terrorize, humiliate and degrade them and to extract false confessions, including: forcing Plaintiff Sabar and other detainees to stand against a wall and staging a mock firing squad with simulated gunfire, laughing as detainees lost control of their bladders in their terror; thrusting Plaintiff Sabar and other detainees briefly into a cage of live lions that had been owned by Uday Hussein; and threatening to send Plaintiff Sabar to Guantanamo and informing him that he would be killed there;

e.     Using extreme restraints, hooding him and applying handcuffs so tightly that Plaintiff Sabar suffered extreme pain and experienced numbness in his hands and wrists;

f.     Shackling Plaintiff Sabar's hands to a fence behind his back, subjecting him to that position for several hours at temperatures exceeding 120 degrees Fahrenheit (50 degrees Celsius) while denying him any water or food, and other prolonged periods of exposure to extremely hot conditions, for the purpose of causing pain, extreme thirst, and humiliation;

g.     Shackling Plaintiff Sabar's hands and feet so tightly that they bled and became numb, hooding him so that it was difficult to breathe and he lost consciousness, and placing him in solitary confinement

under those conditions for four days in a small concrete room in temperatures exceeding 120 degrees Fahrenheit, while depriving him of adequate food and water.

h.      Intentionally causing humiliation and extreme hunger by depriving Plaintiff Sabar of food and water for extended periods of time, or by providing him with food containing pork or foul-smelling and spoiled food which caused detainees to vomit when they tried to eat it;

i.      Intentionally humiliating Plaintiff Sabar by denying him the use of toilet facilities for extended periods while he was shackled thereby causing him to soil his pants; and

j.      Desecrating the Quran in the presence of Plaintiff Sabar and other detainees to demean and degrade then, including throwing the book to the floor and stepping on it.

196.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Sabar suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. Among other things, Plaintiff Sabar continues to suffer from pain from a dislocated shoulder and in his legs, and persistent headaches. He lost two teeth as a result of beatings. Plaintiff Sabar also suffers from debilitating depression, anxiety, and irritability. He suffers from decreased sexual function and decreased sex drive. In addition, Plaintiff Sabar sometimes experiences vivid flashbacks to the mock executions and other torture and cruel treatment he suffered during detention. He is chronically lethargic and suffers from severe, chronic insomnia. When he is able to sleep, he experiences nightmares that leave him shaking and crying, as a direct result of the torture and other mistreatment he experienced in custody.

197.    After his release from U.S. custody, Plaintiff Sabar and Plaintiff Khalid returned to Abu Ghraib to seek return of property confiscated from them by U.S. forces and to inquire about a mutual business partner who remained in custody. Plaintiffs Sabar and Khalid

were detained in a locked room by military personnel and then released without receiving any response to their inquiries.

198.    Plaintiff Sabar continues to fear redetention and abuse by U.S. forces.  His fear is based in part on his previous redetention upon seeking return of property, on the continuing and frequent sweeps in Baghdad neighborhoods by the U.S. military and Iraqi forces acting at their direction, on the continuing high rates of detention of Iraqis by the U.S. military and by Iraqi forces acting at the direction of the U.S. military, and on the security situation in Baghdad.  As a result of his fear, in the past year, plaintiff Sabar has changed his personal residence four times, and his place of business once.  Plaintiff Sabar has also sent his children to live in another country because he fears that they may be harmed, especially if he is redetained.

### g.    Sherzad K. Khalid

199.    Plaintiff Sherzad K. Khalid was detained by U.S. military forces in Iraq from approximately July to September 2003.  Plaintiff Khalid was detained at various locations in Iraq, including locations in Baghdad known as al-Qasr al-Jumhouri or al-Qasr al-Sujood, a prison at the Baghdad international airport, and Camp Bucca.

200.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Khalid while he was in U.S. military custody, care and control, defendants' subordinates subjected Plaintiff Khalid to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

      a.    Kicking and punching Plaintiff Khalid over a period of hours while he was shackled and hooded and seated on the ground, terrorizing and injuring him with random and unanticipated blows;

      b.    Forcing Plaintiff Khalid and other detainees to run a gauntlet of approximately 10 to 20 uniformed U.S. soldiers who beat them with batons; grabbing Plaintiff Khalid by the head, shoving him to the ground, and stepping on his head; interrogating Plaintiff Khalid on numerous occasions and beating him severely before each

interrogation; and routinely beating Plaintiff Khalid throughout his period of detention, such that his body was covered with deep bruises at the time of his release;

c.    Sexually assaulting and humiliating Plaintiff Khalid by grabbing his buttocks and simulating anal rape by pressing a water bottle against the seat of his pants; putting a hand inside Plaintiff Khalid's pants and grabbing his buttocks during a severe beating, punching him in the mouth breaking one of his teeth when he protested, and then brandishing a long wooden pole and threatening to sodomize him on the spot and every night of his detention;

d.    Using extreme restraints, applying tight hoods that restricted Plaintiff Khalid's breathing and vision, and handcuffing him so tightly that he suffered severe and long-lasting pain, in order to cause pain and fear;

e.    Shackling Plaintiff Khalid's hands to a fence behind his back, subjecting him to that painful position for several hours at temperatures exceeding 120 degrees Fahrenheit (50 degrees Celsius) while denying him any water or food, in order to cause extreme thirst, pain, and humiliation, and other prolonged periods of exposure to extremely hot conditions;

f.    Subjecting Plaintiff Khalid to prolonged sleep deprivation in a so-called "silent tent" for several days and severely beating him whenever he started to fall asleep;

g.    Subjecting Plaintiff Khalid to extraordinary mock executions and death threats to coerce false confessions, including placing a gun to Plaintiff Khalid's head and demanding a confession; briefly thrusting him and other detainees into a cage of live lions several times; and placing him in a mock firing squad with simulated gunfire;

h.    Intentionally causing Plaintiff Khalid severe hunger and humiliation by denying him food and water for extended periods, or providing him with food containing pork or foul-smelling, spoiled food that caused detainees to vomit when they tried to eat it;

i.    Intentionally humiliating Plaintiff Khalid by denying him the use of toilet facilities for extended periods while he was shackled, thereby causing him to soil his pants;

j.    Deliberately depriving Plaintiff Khalid of adequate medical attention and acting with deliberate indifference to his medical

needs, including refusing to provide adequate treatment for severe abdominal pains, which were diagnosed after his release as caused by a serious stomach infection.

201.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Khalid suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. As a result of the untreated stomach infection he suffered in detention, he developed ulcers of the stomach and is required to take medication. Since his detention, he has continued to suffer from migraine headaches and back pain. He has lost his appetite. In addition, he suffers from severe and chronic insomnia, high levels of anxiety, irritability, reduced sex drive, severe depression and nightmares that have caused serious difficulty in his work and family relationships. He often experiences episodes when his mind goes blank, and does not become conscious of his surroundings until someone nearby attempts to rouse his attention. As a result of these psychological injuries, Plaintiff Khalid is now unable to drive a car, pursue new business opportunities, or pursue other ordinary activities.

202.    After his release from U.S. custody, Plaintiff Khalid accompanied Plaintiff Sabar to Abu Ghraib to seek return of property confiscated by U.S. forces and to inquire about a mutual business partner who remained in custody. Both Plaintiff Sabar and Plaintiff Khalid were detained in a locked room by military personnel and were then released without receiving any response to their inquiries.

203.    Plaintiff Khalid continues to fear redetention and abuse. His fear is based in part on his previous redetention upon seeking return of property and on the continuing sweeps and detentions throughout Iraq by U.S. forces and Iraqi forces acting at their direction. Because of his fear, Plaintiff Khalid has stopped traveling to Baghdad, which he would ordinarily do in

the course of his business, because of his concern that he may be targeted there by U.S. forces and Iraqi forces acting at their control.

### h.     Ali H.

204.    Plaintiff Ali H. was detained by U.S. military forces in Iraq from approximately August to September 2003, when he was 17 years old.  Plaintiff Ali H. was detained at various locations in Iraq, including a former Baghdad police station, a facility in or near the city of Al-Tasferat, the Baghdad airport prison, Abu Ghraib, and facilities near the cities of Yusufiya and Mosul and in the Jurf Al-Sakher desert.

205.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Ali H. while he was in U.S. military custody, care and control, Defendants' subordinates subjected Plaintiff Ali H. to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.     At the time of arrest, shooting Plaintiff Ali H., hitting him with a gun, throwing him to the ground, and stepping on his head even though he was innocent of any wrongdoing, bleeding profusely from two gunshot wounds, and posed no threat to the arresting soldiers;

b.     Refusing to provide medical care for gunshot wounds inflicted by U.S. forces for several hours and then removing bullets from Plaintiff Ali H.'s neck and back without anesthetic, intentionally causing excruciating pain;

c.     Refusing to provide Plaintiff Ali H. with food, water, and pain medication for one-and-a-half days, despite his gunshot wounds and forcing him to remain shackled for hours with his hands behind his back and his feet spread, in order to cause pain, hunger, thirst, and humiliation;

d.     Refusing to provide Plaintiff Ali H. with adequate medical treatment and pain medication for approximately 16 days after transport to the Baghdad airport prison despite examination of his gunshot wounds by U.S. military personnel during prison intake processing, when he was close to physical collapse, causing excruciating pain and injury;

e.    Refusing to provide Plaintiff Ali H. with adequate medical care and pain medication after he received a life-threatening shrapnel wound during a mortar attack while he was housed in an outdoor tent at Abu Ghraib. U.S. military personnel intentionally inflicted pain and torture on Plaintiff Ali H. while he was recovering from abdominal surgery after his transfer from Abu Ghraib to facilities at Yusufiya, Mosul, and in the Jurf al-Sakher desert by: roughly dragging him from one location to another after surgery, in a way calculated to cause severe pain; keeping him shackled hand and foot to a bed with a blanket placed over his face; transferring him to the Mosul prison where he was forced to sleep on the ground outdoors in extremely hot weather without any shelter, despite being in excruciating pain and having an intravenous tube in his arm; pulling roughly and forcefully on a catheter inserted in his bladder, causing excruciating pain; and refusing to change the bandages on his surgical wounds and humiliating him when he requested medical assistance, thereby causing his surgical wound to become infected and leak pus, and inflicting further extreme pain and humiliation by roughly ripping away the bandage and then intentionally leaving the wound half-exposed in order to humiliate and injure him; and

f.    Intentionally releasing Plaintiff Ali H. in a manner intended to terrorize and degrade him by first informing him that he would be released, then telling him he would be sent to another prison, and then cutting off his identification bracelet, confiscating his release papers and physically throwing him from a bus to the ground outside while he still had an intravenous tube in his arm, in a manner calculated to prevent him from seeking relief for the injuries he suffered while in custody.

206.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Ali H. suffered severe physical and psychological injuries. He continues to suffer the lasting effects of those injuries. Among other things, he suffers frequent, severe, and disabling pain in his abdomen and back, particularly in cold weather. His physician has advised him not to run or to lift objects weighing more than a few pounds and has further advised that his condition may worsen over time. As a direct result of the injuries he suffered and the deliberate indifference to his medical condition on the part of U.S. military personnel, Plaintiff Ali H. has disfiguring scars on his abdomen, back, and neck. Plaintiff Ali H. also

suffers from frequent nausea and vomiting. He tires very easily and requires frequent rest. He suffers from loss of normal sex drive. He also has severe depression and anxiety, a persistent lack of energy, and insomnia. When he is able to sleep, Plaintiff Ali H. has frequent nightmares relating to the abuse he suffered and witnessed in detention, and awakens his parents during the night when he screams and cries in his sleep. In addition, he is often forced to leave school because of debilitating fatigue, severe depression and abdominal pains.

207.    Plaintiff Ali H. continues to fear redetention and abuse by U.S. forces, based in part on the continuing and frequent sweeps in Baghdad neighborhoods by the U.S. military and Iraqi forces acting at their direction and on the continuing high rates of detention of Iraqis by the U.S. military and by Iraqi forces acting at the direction of the U.S. military. As a result of his fear, in the past year, plaintiff Ali H. has temporarily had to flee his home for another part of the country.

### i.    Najeeb Abbas Ahmed

208.    Plaintiff Najeeb Abbas Ahmed was detained twice by U.S. military forces in Iraq. He was first detained from approximately May 2003 to July 2003. He was detained a second time from approximately July 2003 through December 2003. Plaintiff Ahmed was detained at various locations in Iraq, including U.S. facilities in Ibrahimiya, Karbala University, Nasiriya, Camp Bucca prison, Diwaniya, Tasferat, Camp Cropper prison at the Baghdad airport, and Abu Ghraib prison.

209.    For the purpose of causing pain and injuring, interrogating, intimidating, degrading and abusing Plaintiff Ahmed while he was in U.S. military custody, care and control, Defendants' subordinates subjected Plaintiff Ahmed during the two periods of his detention to the following forms of torture and other cruel, inhuman or degrading treatment, among others:

a.    Devising a scheme to humiliate, sexually assault, and physically injure Plaintiff Ahmed, by throwing him to the ground, stepping on his neck and legs, sitting on his back and feet, tying him with extremely tight restraints on his wrists, then calling a group of 10 to 12 U.S. soldiers to come into the room. The soldiers taped toy animals to Plaintiff Ahmed's head and shoulder and chanted racial epithets at him. A soldier kicked the soles of Plaintiff Ahmed's feet. A soldier put a gun to his head. Another approached him in a menacing way and then spat in his face. A soldier stepped on his head. When Plaintiff Ahmed begged for water because he was sweating and suffering from chest pains, a soldier approached him, exposed his penis, told Plaintiff Ahmed to drink, and then unzipped Plaintiff Ahmed's pants. Soldiers shone a bright beam of light in Plaintiff Ahmed's face. During all these proceedings, soldiers videotaped and photographed Plaintiff Ahmed;

b.    Physically torturing Plaintiff Ahmed by grabbing him, slamming his head into a wall, and then forcing him to kneel with his head against the wall, even though that position caused excruciating pain due to a back injury;

c.    Threatening to send Plaintiff Ahmed to Guantanamo and telling him that he would be imprisoned there for life;

d.    Imprisoning Plaintiff Ahmed in a place known as the "silent tent," where detainees were awakened during the night by soldiers kicking them and forcing them to march to the latrines in the cold. On many other occasions, soldiers used other schemes to keep Plaintiff Ahmed awake at night, such as screaming and playing loud music at night, and shining bright lights on him;

e.    Confiscating Plaintiff Ahmed's medications for high blood pressure and heart disease and his eyeglasses, while deliberately refusing to provide medical care to Plaintiff Ahmed when he suffered chest pains, heart attacks, and a possible stroke while in custody. On one occasion, after Plaintiff Ahmed suffered a heart attack, U.S. military personnel transferred him to a local hospital, but physically took him from the hospital against his treating physician's advice that release might cause his death. On another occasion, soldiers confiscated his medication again, shoved him, screamed at him, and told him to shut up when he attempted to explain that he needed the medication for a serious heart condition. During detention, he suffered an apparent stroke and was hospitalized. While he was incapacitated in the hospital, soldiers refused to untie his hands, so that he was required to eat his meals by putting his mouth to his tray;

- 67 -

f.    Exposing Plaintiff Ahmed to extremely hot temperatures, exceeding 120 degrees Fahrenheit, in small, enclosed and crowded spaces, so that he had difficulty breathing.  On one occasion, Plaintiff Ahmed was deliberately housed for two days in a small, roofless, outdoor cage in the hot desert sun at temperatures exceeding 120 degrees, for the purpose of degrading and injuring him.  Soldiers blasted loud music toward the cage at night to keep Plaintiff Ahmed awake.  During the day, Plaintiff Ahmed crouched on all fours along the perimeter of the cage to try to shelter in any small bit of shade.  During this two-day period, Plaintiff Ahmed suffered from severe diarrhea but had no access to a lavatory or even any means of privacy.

210.    As a result of torture and other cruel, inhuman or degrading treatment while in U.S. custody, Plaintiff Ahmed suffered severe physical and psychological injuries.  He continues to suffer the lasting effects of those injuries.  Among other things, he has suffered severe deterioration of his heart condition, and his cardiologist has advised him that his condition has worsened as a result of the ill-treatment he suffered in detention to the extent that surgery is required.  Plaintiff Ahmed also suffers from debilitating depression, irritability, and negative thoughts.  He has become extremely emotional and cries easily.  Because he was detained twice, and subjected to torture and cruel, inhuman or degrading treatment during both periods of detention, Plaintiff Ahmed is terrified of being redetained in the future.  Because of these medical and psychological injuries, Plaintiff Ahmed has been unable to work.

**2.    Defendants' Policies, Patterns or Practices Caused Widespread Torture and Abuse of Detainees in Afghanistan and Iraq**

211.    Plaintiffs' injuries are part of a widespread pattern of torture and abuse of detainees in U.S. military custody in Iraq and Afghanistan.  Numerous reports of nongovernmental and U.S. government entities have described this pattern, as Defendants knew and should have known.

a.    **Afghanistan**

212.    The abuse in Afghanistan began soon after the commencement of military actions and has lasted well beyond the declared end of major combat operations.

213.    In December 2001, John Walker Lindh, a U.S. citizen, was arrested and detained by the U.S. military in Afghanistan.  Photographs taken during his detention in Afghanistan show him stripped naked and bound to a stretcher.

214.    Press reports and internal government documents document that U.S. military personnel have subjected detainees in U.S. custody in Afghanistan to torture and other cruel, inhuman or degrading treatment, including:

a.    Extreme physical abuse:  Soldiers severely beat detainees, forced them into painful and contorted positions for hours or days on end, chained prisoners to the ceiling of isolation cells for long periods of time, and dumped cold water over detainees in the middle of the winter.  Beatings were for the specific purpose of making detainees more susceptible to interrogation.

b.    Sexual abuse and humiliation:  Detainees were kept naked for prolonged periods in the presence of male and female soldiers and in front of other detainees.  A female interrogator kicked a detainee in the genitals.  Soldiers subjected detainees to sexual taunts, with knowledge that such treatment would be particularly offensive and humiliating by Afghan cultural norms.

c.    Use of dogs to frighten and intimidate detainees.

d.    Sensory deprivation:  Detainees were kept hooded or goggled, held in dark cells, and kept in isolation for prolonged periods.

e.    Sleep deprivation:  Detainees were forced to stay awake for prolonged periods by methods such as shining bright lights on them, blaring loud music, shouting at them or beating them if they fell asleep.  The Army Criminal Investigation Command found that sleep deprivation by military intelligence was a direct contributing factor leading to the death of a detainee at the Bagram detention facility.

   f. Solitary confinement:  detainees were hooded, shackled and were forced into isolation cells for at least the first 24 hours of captivity as a matter of policy, and in many cases longer.

215. Detainees have been killed by torture and other cruel, inhuman or degrading treatment while in U.S. custody in Afghanistan.  For example:

   a. The Army Criminal Investigation Command concluded in September 2002 that a U.S. Army captain and three noncommissioned officers murdered a civilian in their custody in Afghanistan.

   b. Two other Afghan detainees, Mullah Habibullah and Dilawar, died in December 2002 at the Bagram detention facility in Afghanistan while in the custody of the U.S. military.  The detainees were shackled to the ceiling with their hands suspended over their shoulders for prolonged periods, suffered blunt force trauma to their legs, and were beaten by multiple soldiers.  For months after military pathologists determined that the cause was homicide, the military falsely asserted that the men had died of natural causes.

   c. Another detainee, Jamal Naseer, an 18-year-old soldier, died at a U.S. firebase in Gardez after being tortured and abused while in U.S. custody.  Naseer and seven other members of the Afghan Army were detained by U.S. forces and interrogated at Gardez for 17 days, where they were regularly beaten by U.S. interrogators with fists and cables, some while shackled or while suspended upside down, and some subjected to electric shocks and immersion in cold water and exposed to cold weather, including snow, after which the detainees were denied medical treatment for their injuries.

216. Upon information and belief, multiple other detainees have died while in U.S. military custody in Afghanistan under circumstances suggesting the cause of death was homicide.

217. The U.S. Army Criminal Investigations Command determined that members of the 377th Military Police Battalion and a unit that appears to be the 519th Military Intelligence Battalion committed abuses against detainees in Afghanistan, including the following:  slamming detainees into walls, twisting handcuffs to cause pain, kneeing detainees,

forcing a detainee to maintain painful, contorted positions, shackling a detainee's arms to the ceiling, and forcing water into the mouth of a detainee until he could not breathe.

### b.    <u>Iraq</u>

218.    The U.S. government, the International Committee of the Red Cross, and non-governmental human rights organizations have also documented widespread and systemic abuse committed at U.S. detention facilities in Iraq.

219.    Reports confirm abuses at the detention facility known as "Camp Cropper" at the Baghdad international airport; a facility near the city of Umm Qasr known as Camp Bucca; facilities in or near the cities of Tikrit and Mosul; and numerous locations in or near the city of Baghdad.  A U.S. military intelligence soldier reported that U.S. Army units tortured Iraqi civilians in their homes after conducting raids.  Methods included burning the victims, smashing their feet with the back of an axe-head, and breaking their bones.

220.    According to reports by the U.S. military, the International Committee of the Red Cross, and other non-governmental human rights organizations, and as revealed in internal government documents, U.S. personnel inflicted the following types of torture and other cruel, inhuman or degrading treatment, among others, on detainees at numerous U.S. facilities in Iraq:

a.    Extreme physical abuse: Soldiers tore out a detainee's toenails, administered electric shocks, beat detainees with hard objects (including pistols and rifles), slapped and punched detainees, kicked them with knees or feet on various parts of the body (legs, sides, lower back, groin), forcefully pressed detainees' faces into the ground by stepping on their heads, purposely exposed detainees to severe heat and sun for prolonged periods, and forced detainees to stay in "stress" positions (kneeling, squatting, standing with arms raised over their heads) for hours at a time, chained detainees to the ceilings naked, and in some instances threw icy water on them.

b.    Various forms of sexual abuse and humiliation:  Detainees were stripped naked and forced to stand for prolonged periods in public view, with arms raised or with women's underwear over their heads, while male and female guards observed and laughed; detainees were photographed in these positions; paraded naked in front of other detainees; and kept naked in solitary confinement for periods of several days.

c.    Threats of death, abuse, reprisals against family members, imminent execution or transfer to the military detention facility at Guantanamo; mock or threatened executions, including aiming rifles at detainees, sometimes putting firearms directly against detainees' heads or torsos.

d.    Sensory deprivation:  Hooding detainees to prevent them from seeing, to disorient them, and to prevent them from breathing freely; employing hooding in conjunction with beatings to increase fear, to dehumanize detainees, and to allow interrogators to remain anonymous and thus to act with impunity; holding detainees in total darkness for prolonged periods.

e.    Medical deprivation:  Soldiers withheld critical medication for a potentially fatal disease from a detainee.

f.    Food and water deprivation:  Soldiers withheld food and water from detainees

g.    Painful and humiliating restraints:  Soldiers applied flexi-cuffs to detainees' wrists so tightly and for such extended periods that they caused skin lesions and long-term nerve damage; and restrained detainees repeatedly over periods of several days, for several hours each time, with handcuffs attached to the bars of their cell doors in humiliating (i.e. naked or in underwear) and/or painful positions.

221.    Official U.S. military reports have documented the notorious abuses at Abu Ghraib prison, among other detention facilities.  These reports determined that soldiers inflicted the following torture and other cruel, inhuman or degrading treatment on detainees at Abu Ghraib:

a.    Homicide:  A Navy SEAL beat a detainee to death in the head with a rifle butt.  The detainee later died in the shower room while his hands were cuffed behind his back and he was suspended by his wrists in a position known as "Palestinian hanging."

b.    Extreme physical abuse:  Soldiers punched, kicked and slapped detainees; knocking at least one detainee unconscious; beating detainees with a broom handle and a chair; breaking chemical lights and pouring the contents on detainees; slamming detainees against a wall with such force as to require stitches.

c.    Sexual abuse and humiliation:  Soldiers threatened to rape detainees; an interpreter allegedly raped a juvenile male detainee while a female U.S. soldier watched and took pictures; soldiers forced a naked detainee to stand on a box with a sandbag on his head, attaching wires to his fingers, toes and penis to simulate electric torture; stripping detainees naked for prolonged periods; photographing and videotaping naked detainees, sometimes in forced sexual positions; forcibly dressing detainees in women's underwear; forcing detainees to masturbate; arranging naked detainees in a pile and jumping on them; placing a dog leash around a naked male detainee's neck and photographing him; forcing a detainee to "bark like a dog" while military police personnel spit and urinated on him and beat him until he lost consciousness.

d.    Abusive use of military dogs:  Repeated instances of using military dogs to intimidate, frighten and threaten adult and juvenile detainees; using dogs to cause detainees to lose control of their bladders or bowels out of fear; and allowing a dog to bite and severely injure at least one detainee.

e.    Sensory deprivation:  Keeping detainees in solitary confinement, including in empty cells in total darkness.

222.    In reports presented to U.S. government officials and military commanders, the International Committee of the Red Cross documented hundreds of additional individual allegations of abuse committed at U.S. military detention facilities throughout Iraq. Fifty incidents of torture and other abuse were reported as occurring at the Camp Cropper detention facility alone.  Among the "illustrative" cases of torture reported by the International Committee of the Red Cross are the following:

a.    Forcing detainees to sit or lie down on blistering surfaces, causing severe burns that resulted in large crusted lesions and, in one case, three months' hospitalization, the amputation of a finger and large skin grafts.

      b.      Hooding and restraining a detainee with flexi-cuffs; threatening him with torture and death; urinating on him; severely beating him; depriving him of sleep for several days; and administering additional beatings when he said he would report the abuse to the International Committee of the Red Cross.

223.     A number of detainees have died in U.S. custody in Iraq under circumstances suggesting criminal homicide.  For example:

      a.      In November 2003, Abed Hamed Mowhoush, a general in the Iraqi Army, died at a U.S. detention facility in western Iraq.  During interrogation, U.S. troops had stuffed him into a sleeping bag and wrapped him in an electrical cord.  He also had been severely beaten by closed fists, a club and a rubber hose until he was nearly senseless.

      b.      As noted above, another detainee died during interrogation, shackled in a "Palestinian hanging" position in the shower room at Abu Ghraib, and with his ribs broken.

224.     At least 28 individuals have died by confirmed or suspected acts of homicide at the hands of U.S. military personnel in U.S. custody in Iraq and Afghanistan since 2002.  Only one of those homicides took place at Abu Ghraib.

225.     In Iraq, detainee abuse was so commonplace that a vocabulary developed to describe it.  One sergeant in the 82nd Airborne Division described how ubiquitous abuses were:  "To 'smoke' someone is to put them in stress positions until they get muscle fatigue and pass out.  That happened every day."  "To 'F**k a PUC' means to beat him up.  We would give them blows to the head, chest, legs, and stomach, pull them down, kick dirt on them.  This happened every day."  A second sergeant corroborated the statements of the first.  He witnessed or participated in: putting detainees in stress positions; "hard hitting" of detainees; "smoking" detainees and sleep and food deprivation.

226.     Reports of continuing physical abuse of detainees after the revelations of Abu Ghraib include reports of detainees who have been punched or slapped; detainees who have

been placed in wooden boxes with their hands cuffed and eyes blocked by darkened goggles, without food or water for long periods of time; sexual abuse, humiliation, and threats of rape; threats of death, abuse, reprisals against family members during interrogations; and threats of transfer and staged mock transfers to Guantanamo.

### 3.     Defendants' Policies, Patterns and Practices Continue

227.     Defendants' policies, practices and procedures at issue in this case remain in effect.  Upon information and belief, Defendant Rumsfeld has not renounced or formally revoked or rescinded policies, orders and authorizations that caused Plaintiffs to be tortured and abused.  Nor has Defendant Rumsfeld prohibited the use of all interrogation techniques contrary to U.S. and international law.  Defendant Rumsfeld has not fulfilled his obligations to hold subordinates accountable for their derelictions and unlawful conduct.

228.     The number of detainees in Iraq in U.S. military custody has risen unabated since the fall of 2004, and increased sharply since January 2005.  As of the end of November 2005, the U.S. military is detaining in excess of 14,000 detainees in Iraq at Camp Bucca, Abu Ghraib, Camp Cropper and elsewhere.  The U.S. military continues to engage in sweeps and to arrest and detain large numbers of civilians innocent of any wrongdoing on a regular basis in Afghanistan and Iraq.  As of March 2005, detainees in Iraq are reported to remain detained an average of three to four months before their cases are reviewed.  Although the U.S. military is reportedly releasing detainees after lengthy detentions and has released approximately 2,800 "security detainees" since the end of August 2005, the overall number of detainees continued to increase due to mass arrests and detention operations.  The U.S. military is embarking on plans for expanded, state-of-the-art U.S. military detention facilities in Iraq estimated to cost $50 million.

229.    In Afghanistan, upon information and belief, the United States continues to detain more than 500 individuals. The number of detainees held by the United States has steadily risen since the summer of 2004. In the past 18 months, the number of detainees held by the United States has increased by more than 40%.

230.    Absent a revocation and prohibition of Defendants' policies, practices and patterns as well as affirmative policies, practices and procedures ensuring compliance with the requirements of law, Plaintiffs and many others remain at risk of abuse and torture.

231.    Upon information and belief, detainees in U.S. military custody in Iraq and Afghanistan continue to suffer and to be at risk of abuse and torture in Iraq and Afghanistan as evidenced by the following examples:

a.    In September 2005, five soldiers with the 75th Ranger Regiment in Iraq allegedly abused three detainees awaiting transfer to a detention facility in September 2005, by punching, kicking and hitting with an object that was described as a broomstick.

b.    Twelve soldiers with a California Army National Guard infantry battalion are alleged to have abused detainees in June 2005 by, among other things, using an electric stun gun on handcuffed and blindfolded detainees.

c.    The death of a 20-year old detainee in detention at Abu Ghraib on August 15, 2005 is being investigated by the U.S. Army as a possible homicide.

d.    In July 2005, two soldiers with an Alabama Army Reserve unit allegedly assaulted two Afghan detainees, striking them in the chest, shoulders and stomach.

e.    Former Afghan detainees who were released some time after the fall of 2004 reported food and sleep deprivation, beatings, and being forced into stress positions.

f.    Upon information and belief, on September 25, 2004, an Afghan detainee, Sher Mohammed Khan, died in U.S. custody in Afghanistan. When his family retrieved the body, it was badly bruised.

g.    Former members of the Army's 82nd Airborne Division reported routine torture and abuse of detainees by members of their battalion at a U.S. base in Iraq in late 2003 through April 2004. The unit continued the torture and other cruel, inhuman or degrading treatment of detainees even after the public scandal surrounding torture at Abu Ghraib prison. After that publicity, one sergeant said, "things toned down. We still did it but we were careful."

232.    The continuation of abusive treatment demonstrates that Defendants' measures have been inadequate to prevent abuse and torture of detainees and that the policies, practices and procedures of Defendants continue to cause torture and abuse of detainees.

233.    Detainees remain fearful that they will be re-arrested and again tortured and abused if they speak out regarding their treatment. Upon information and belief, a former detainee in Iraq was forced by U.S. soldiers to sign a statement that he had not been abused even though he had been beaten on his legs with a bat, had his arms dislocated and nose crushed, and was subjected to an unloaded gun being placed in his mouth and the trigger pulled.

234.    Upon information and belief, three released Iraqi detainees were told by American soldiers not to speak to the media regarding their treatment or they would be arrested again. Upon information and belief, another detainee asked for his name to be withheld from a press report for fear of retaliation by American soldiers.

## VI.   CLAIMS

### First Cause of Action
### Violation of Fifth Amendment Due Process Clause

235.    The previous paragraphs are incorporated as if set forth fully herein.

236.    Defendants' actions described herein violate the Due Process Clause of the Fifth Amendment to the Constitution, which prohibits any person acting under color of U.S. law from engaging in or allowing torture, abuse or other treatment that that "shocks the conscience," of any person in U.S. custody or control.

237.    In their conduct set forth in this Complaint, each of the Defendants acted under color of federal law.

238.    Defendants' actions, orders, authorizations, approvals and omissions caused the torture and abuse of Plaintiffs in violation of the Fifth Amendment and give rise to a cause of action for damages directly under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

239.    Defendants had actual and constructive knowledge that their subordinates were violating the constitutional rights of Plaintiffs, and had actual and constructive knowledge that it was highly likely that these constitutional violations would occur as a result of their actions, orders, policies, practices and omissions.  Despite this knowledge, Defendants acted with reckless and deliberate indifference to their subordinates' unconstitutional actions.  Through their actions and failures to act, Defendants expressly and tacitly authorized their subordinates' unlawful conduct.

240.    Defendants had power to formulate policies relating to the treatment and interrogation of detainees, and exercised that power to generate illegal practices, namely, the torture and other cruel, inhuman or degrading treatment of detainees in Iraq and Afghanistan.

241.    Defendants Rumsfeld, Sanchez and Pappas directly and knowingly authorized subordinates to engage in conduct that shocks the conscience — namely, the torture and other cruel, inhuman or degrading treatment of detainees.

### Second Cause of Action
### Violation of the Fifth and Eighth Amendment
### Prohibition on Cruel and Unusual Punishment

242.    The previous paragraphs are incorporated as if set forth fully herein.

243.    Defendants' actions described herein violate the prohibition on cruel and unusual punishment in the Due Process Clause of the Fifth Amendment and the Cruel and

Unusual Punishment Clause of the Eighth Amendment to the Constitution. Those amendments prohibit any person under color of U.S. law from engaging in or allowing torture, or other cruel, inhuman or degrading treatment or punishment or other treatment that constitutes deprivation of basic human needs such as food and reasonable safety, and the unnecessary and wanton infliction of pain on any person in U.S. custody or control. The Cruel and Unusual Punishment Clause of the Eighth Amendment and the Due Process Clause of the Fifth Amendment give rise to a cause of action for damages directly under the Constitution pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

244.    Defendants and their subordinates authorized, ratified, and failed to stop and prevent the torture and other cruel, inhuman or degrading treatment of Plaintiffs and other detainees in U.S. custody, which occurred as a form of summary punishment for perceived or alleged wrongdoing and constituted imposition of sentence on Plaintiffs without an adjudication of guilt.

245.    Defendants had power to formulate policies relating to the treatment and interrogation of detainees, and exercised that power to generate illegal practices, namely, the torture and other cruel, inhuman or degrading treatment of detainees in Iraq and Afghanistan.

246.    Defendants were responsible for the command and supervision of individuals who subjected Plaintiffs and other detainees to torture and other cruel, inhuman or degrading treatment. Defendants knew that their subordinates had engaged in such unlawful activity, including actions undertaken maliciously and sadistically for the very purpose of causing unnecessary pain and harm to further unlawfully the interrogation, punishment, intimidation or coercion of Plaintiffs and other detainees. Defendants also knew that it was highly likely that their subordinates would continue to engage in such unlawful torture and other

cruel, inhuman or degrading treatment or punishment.  Yet Defendants acted with deliberate indifference and conscious disregard of the high likelihood of injury, and failed to take steps to prevent subordinates from engaging in such conduct.

**Third Cause of Action**
**Torture in Violation of the Law of Nations**

247.     The previous paragraphs are incorporated as if set forth fully herein.

248.     Defendants' actions described herein violate the law of nations which prohibits engaging in or permitting torture.  The prohibition against torture is a "specific, universal, and obligatory" norm, from which no derogation is allowed.  *See Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2763, 2766 (2004); U.N. Convention Against Torture or Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85.

249.     Defendants' actions and omissions are the direct and proximate cause of Plaintiffs' injuries and give rise to a cause of action for a tort in violation of the law of nations.

250.     Defendants had effective command and control of individuals who intentionally and knowingly subjected Plaintiffs to torture, which is prohibited by the law of nations.

251.     Defendants had actual and constructive knowledge of their subordinates' torture of detainees in U.S. custody and each Defendant violated his or her duty as a commander to punish the perpetrators or otherwise to prevent further acts of torture.

**Fourth Cause of Action**
**Cruel, Inhuman or Degrading Treatment in Violation of the Law of Nations**

252.     The previous paragraphs are incorporated as if set forth fully herein.

253.     Defendants' actions described herein violate the law of nations which prohibits engaging in or permitting cruel, inhuman or degrading treatment or punishment.  The

prohibition against cruel, inhuman or degrading treatment is a "specific, universal, and obligatory" norm, from which no derogation is allowed.  *See* U.N. Convention Against Torture or Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 23 I.L.M. 1027, 1465 U.N.T.S. 85.  Defendants' actions and omissions are the direct and proximate cause of Plaintiffs' injuries and give rise to a cause of action for a tort in violation of the law of nations.

254.    Defendants had effective command and control of individuals who intentionally and knowingly subjected Plaintiffs to cruel, inhuman or degrading treatment, which is prohibited by the law of nations.

255.    Each of the Defendants had actual and constructive knowledge of his or her subordinates' torture of detainees in U.S. custody, but did not fulfill his or her duty as a commander to punish the perpetrators or otherwise to prevent further acts of cruel, inhuman or degrading treatment or punishment.

### Fifth Cause of Action
### Violation of the Geneva Conventions

256.    The previous paragraphs are incorporated as if set forth fully herein.

257.    Plaintiffs were tortured and subjected to other cruel, inhuman or degrading treatment during their detentions in U.S. custody in violation of specific provisions of the Third and Fourth Geneva Conventions, including but not limited to Article 3 Common to all Four Conventions.

258.    Violations of these provisions of the Geneva Conventions are direct and enforceable treaty violations as well as violations of the law of nations.

259.    Defendants are liable for violations of Plaintiffs' rights under the Geneva Conventions because Defendants formulated, authorized, approved, directed or ratified the torture and other cruel, inhuman or degrading treatment of Plaintiffs as part of a policy, pattern

or practice.  In addition, each Defendant is liable because his or her subordinates deliberately and intentionally engaged in the torture and other cruel, inhuman or degrading treatment of Plaintiffs while acting under the Defendant's effective command and control, and the Defendants knew and had reason to know of their subordinates' actions but failed to prevent or punish them.

### Sixth Cause of Action
### Declaratory Relief for Violation of the Law of
### Nations, of the Geneva Conventions and of the Constitution

260.    The previous paragraphs are incorporated as if fully set forth herein.

261.    There is a real and actual controversy between Plaintiffs and Defendant Rumsfeld as to whether he has violated the Plaintiffs' legal rights under the law of nations, binding treaties and the U.S. Constitution as a result of torture and other cruel, inhuman or degrading treatment or punishment of Plaintiffs while in U.S. custody.

262.    Plaintiffs reasonably fear that they are at risk of and will again be subjected to Defendant Rumsfeld's unlawful and unconstitutional actions, and seek a judicial declaration that Defendant Rumsfeld's conduct deprived them of their rights under the law of nations, provisions of the Geneva Conventions, and the Fifth and Eighth Amendments to the U.S. Constitution.

263.    The Court therefore should grant declaratory relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201, 2202.

## VII.    PRAYER FOR RELIEF

Plaintiffs therefore respectfully request that the Court enter a judgment including but not limited to:

> a.    A declaration that the acts alleged herein are unlawful and violate the U.S. Constitution, treaty provisions including provisions of the Geneva Conventions, military rules and guidelines, and the law of nations;

b.      A declaration that the policy, pattern, or practice of Defendant Rumsfeld alleged herein is unlawful and violates the U.S. Constitution, treaty provisions including provisions of the Geneva Conventions, military rules and guidelines, and the law of nations;

c.      A declaration that assigns responsibility for Plaintiffs' injuries to Defendants for their failure to take necessary and adequate measures to prevent persons under their effective command from engaging in the torture and other cruel, inhuman or degrading treatment or punishment of Plaintiffs and their failure to punish persons under their effective command for engaging in such conduct;

d.      Compensatory damages for violation of the law of nations and the U.S. Constitution in an amount that is fair, just and reasonable;

e.      Attorneys' fees and costs; and

f.      All other appropriate relief as may be just and proper.

## VIII.  <u>JURY DEMAND</u>

Plaintiffs request a trial by jury in this action on each and every count alleged herein.

Respectfully submitted,

_____

LUCAS GUTTENTAG
CECILLIA D. WANG
American Civil Liberties Union
    Foundation
Immigrants' Rights Project
405 14th Street, Suite 300
Oakland, CA 94612
(510) 625-2010

STEVEN R. SHAPIRO
OMAR C. JADWAT
AMRIT SINGH
STEVEN WATT
American Civil Liberties Union
    Foundation
125 Broad Street
New York, NY 10004
(212) 549-2500

_____

ARTHUR B. SPITZER
D.C. Bar No. 235960
American Civil Liberties Union
    of the National Capital Area
1400 20th Street, N.W., Suite 119
Washington, D.C. 20036
(202) 457-0800

_____

MICHAEL POSNER*
DEBORAH PEARLSTEIN*
HINA SHAMSI*
PRITI PATEL*
Human Rights First
333 Seventh Avenue, 13th Floor
New York, NY 10001-5004
(212) 845 5200

_____

BILL LANN LEE
CHIMÈNE I. KEITNER
NIREJ S. SEKHON
Lieff Cabraser Heimann & Bernstein LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, CA 94111-3339
(415) 956-1000

JOHN D. HUTSON*
RADM, JAGC, USN (ret.)
Of Counsel, Human Rights First
Human Rights First
2 White Street
Concord, NH 03301
(603) 228-1074

JAMES P. CULLEN*
BG, JAGC, USA (ret.)
Of Counsel, Human Rights First
1251 Avenue of the Americas
New York, NY 10020
(212) 278-1565

PAUL HOFFMAN
Schonbrun DeSimone Seplow Harris &
     Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

DAVID RUDOVSKY
Kairys, Rudovsky, Epstein & Messing LLP
924 Cherry St., Suite 500
Philadelphia PA 19107
(215) 925-4400

ERWIN CHEMERINSKY
Duke University School of Law
Science Drive & Towerview Rd.
Durham, NC  27707
(919) 613-7173

\* Representing Plaintiffs against Defendant Rumsfeld only

508326.1