## UNITED STATES DISTRICT COURT
### DISTRICT OF COLUMBIA

*In re* Iraq and Afghanistan Detainees Litigation

| | | |
|---|---|---|
| Arkan Mohammed ALI, *et al.*, | ) | |
| | ) | |
| Plaintiffs. | ) | Civil Action No. 05-1377 (TFH) |
| v. | ) | |
| | ) | |
| Thomas PAPPAS, | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS

Defendant Colonel Thomas Pappas respectfully moves this Court, pursuant to Fed. R. Civ. P. 12(b)(1), (2), and (6), to dismiss this action on the grounds that the Court lacks jurisdiction over the subject matter of this action and personal jurisdiction over defendant Pappas, and that the Complaint fails to state a claim upon which relief can be granted. In support of this motion, the Court is respectfully referred to the memorandum of law and the Declaration of Colonel Thomas Pappas, filed herewith.

Respectfully submitted,

Mark E. Nagle, Bar #416364
Tracy Varghese, Bar #472805
Eileen Moorhead, Bar #461914
TROUTMAN SANDERS LLP
401 9th Street, N.W.
Washington, D.C. 20004
(202) 274-2972 (tel.)
(202) 654-5666 (fax)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

*In re* Iraq and Afghanistan Detainees
Litigation

Arkan Mohammed ALI, et al.,

               Plaintiffs,

     v.

Thomas PAPPAS,

            Defendant.

Civ. No. 05-1378 (TFH)

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

## Table of Contents

MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ..................................................1

ARGUMENT ................................................................................................................3

I.    The Fifth And Eighth Amendments Are Inapplicable To Aliens Detained Abroad And Held At Military Facilities In Iraq ...............................3

      A.    The Fifth And Eighth Amendments Are Inapplicable To Aliens Outside The Sovereign Territory Of The United States........................4

      B.    The Eighth Amendment's Prohibition on Cruel and Unusual Punishment Does Not Apply To Aliens Detained Abroad Who Have Not Been Convicted Of Offenses......................................................13

II.    Special Factors Counsel Hesitation In The Creation Of A *Bivens* Remedy....................................................................................................13

III.    Colonel Pappas Is Entitled To Qualified Immunity With Respect To Plaintiffs' First and Second Causes of Action Alleging Constitutional Violations ..............................................................................................22

IV.    The Amended Complaint Fails To Link Colonel Pappas To Many Of The Acts Or Omissions Giving Rise To Plaintiffs' Claims .............................32

V.    Plaintiffs' Third, Fourth, and Fifth Causes of Action Alleging Violations of the Law of Nations and the Geneva Conventions Must Be Dismissed ..............................................................................................34

VI.    The Geneva Convention Does Not Provide A Private Right Of Action..........38

VII.    This Court Lacks Personal Jurisdiction over Colonel Pappas ........................41

CONCLUSION ...........................................................................................................43

# TABLE OF AUTHORITIES

## FEDERAL CASES

Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003)................................................28

Alvarez-Machain v. United States, 331 F.3d 604 (9th Cir. 2003)................................36

Anderson v. Creighton, 483 U.S. 635 (1987) ....................................................23, 25, 29

Balzac v. Puerto Rico, 258 U.S. 298 (1922)..........................................................................5

Bancoult v. McNamara, 370 F. Supp. 2d 1 (D.D.C. 2004)................................34, 35, 36

Barham, 2006 U.S. App. LEXIS 807.....................................................................................25

Barham v. Ramsey, No. 04-5388, 04-5389, 2006 U.S. App. LEXIS 807 (D.C. Cir. Jan. 13,
    2006) ..............................................................................................................................24

Behrens v. Pelletier, 516 U.S. 299 (1996) ........................................................................24

Bell v. Hood, 327 U.S. 678 (1946) .......................................................................................9

Bell v. Wolfish, 441 U.S. 520 (1979) .................................................................................13

Bivens v. Six Unknown Named Agents of the Bureau of Narcotics & Dangerous Drugs,
    403 U.S. 388 (1971)............................................................................................... passim

Bridges v. Wixon, 326 U.S. 135 (1945) ...............................................................................7

Brosseau v. Haugen, 543 U.S. 194 (2004)....................................................................24, 25

Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985)....................................................42

Butera v. District of Columbia, 235 F.3d 637 (D.C. Cir. 2001) ...............................24, 26

Carlson v. Green, 446 U.S. 14 (1980)................................................................................14

Correctional Services Corp. v. Malesko, 534 U.S. 61 (2001) ...........................14, 15, 22

County of Sacramento v. Lewis, 523 U.S. 833 (1998)......................................................13

Crawford-El v. Britton, 523 U.S. 574 (1998) ...................................................................34

Davis v. Passman, 442 U.S. 228 (1979) .............................................................................14

District No. 1, Pacific Coast District v. Maritime Admin., 215 F.3d 37 (D.C. Cir. 2000)............16

Dorr v. United States, 195 U.S. 138 (1904).........................................................................4

Downes v. Bidwell, 182 U.S. 244 (1901) .............................................................................5

FDIC v. Meyer, 510 U.S. 471 (1994) .................................................................................16

Farmer v. Moritsugu, 163 F.3d 610 (D.C. Cir. 1998)...............................................23, 24

Gray v. Poole, 243 F.3d 572 (D.C. Cir. 2001).....................................................................24

In re Guantanamo Detainee Cases, 355 F. Supp. 2d 443 (D.D.C. 2005).............................. passim

Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005) *cert. granted*, 74 U.S.L.W. 3287 (U.S. Nov. 7, 2005) (No. 05-184) .............................................................................38, 39

Hamdi v. Rumsfeld, 124 S. Ct. 2633 (2004) ......................................................................15

Hanson v. Denkla, 357 U.S. 235 (1958)..............................................................................42

Harlow v. Fitzgerald, 457 U.S. 800 (1982)...................................................................23, 27

Hawaii v. Mankichi, 190 U.S. 197 (1903)...........................................................................4

Hunter v. Bryant, 502 U.S. 224 (1991)........................................................................24, 33

Imbler v. Pachtman, 424 U.S. 409 (1976) ...........................................................................24

Ingraham v. Wright, 430 U.S. 651 (1977) ..........................................................................13

International Shoe Co. v. State of Washington, 326 U.S. 310 (1945)..............................42

Jackson v. United States, 730 F.2d 808 (D.C. Cir. 1984).................................................38

Jifry v. Federal Aviation Admin., 370 F.3d 1174 (D.C. Cir. 2004)................................27

Johnson v. Eisentrager, 339 U.S. 763 (1950) ................................................................ passim

Khalid v. Bush, 355 F. Supp. 2d 311 (D.D.C. 2005) ...................................................... passim

Kwong Hai Chew v. Colding, 344 U.S. 590 (1953) ...........................................................7

Landgraf v. USI Film Products, 511 U.S. 244 (1994) ........................................................9

Linda Hamilton v. Atlas Turner, Inc., 197 F.3d 58 (2nd Cir. 1999)..............................41

Mitchell v. Forsyth, 472 U.S. 511 (1985) ..................................................................22, 23, 24, 34

In re Multi-district Private Civil Treble Damage Antitrust Litigation Involving Gypsum
    Wallboard, 302 F. Supp. 794 (J.P.M.L. 1969) ....................................................................41

Ocampo v. United States, 234 U.S. 91 (1914) ...........................................................................5

Plyler v. Doe, 457 U.S. 202 (1982) ............................................................................................7

Rasul, 2006 U.S. Dist. LEXIS 4275 ................................................................................ passim

Rasul v. Bush, 542 U.S. 466 (2004) ................................................................................ passim

Rasul v. Rumsfeld, No. 04-1864, 2006 U.S. Dist. LEXIS 4275 (D.D.C. Feb. 6, 2006) ....... passim

Reid v. Covert, 354 U.S. 1 (1957) ..........................................................................................6, 7

Robinson v. Overseas Military Sales Corp., 21 F.3d 502 (2d. Cir. 1994) ....................................41

Ross v. McIntyre, 140 U.S. 453 (1891) ......................................................................................4

Russian Volunteer Fleet v. United States, 282 U.S. 481 (1931) ....................................................7

Sanchez-Espinosa v. Reagan, 770 F.2d 202 (D.C. Cir. 1985) ......................................................17

Saucier v. Katz, 533 U.S. 194 (2001) ...................................................................24, 25, 26, 29

Schneider v. Kissinger, 310 F. Supp. 2d 251 (D.D.C. 2004) .........................................34, 36, 38

Schneider v. Kissinger, 412 F.3d 190 (D.C. Cir. 2005) .........................................................20, 34

Schweiker v. Chilicky, 487 U.S. 412 (1988) .......................................................14, 20, 21, 22

Siegert v. Gilley, 500 U.S. 226 (1991) ..................................................................2, 23, 24, 25

Sierra Club v. EPA, 322 F.3d 718 (D.C. Cir. 2003) ......................................................................9

In re Ski Train Fire in Kaprun, Austria, 257 F. Supp. 2d 717 (S.D. NY 2003) ............................41

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) ......................................................16, 35, 36, 38

Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988) .........................................................20, 21, 22

Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) ..............................................9

Tenet v. Doe, 125 S. Ct. 1230 (2005) ........................................................................9

United States v. Smith, 499 U.S. 160 (1991)..............................................34, 35, 37

United States v. Stanley, 483 U.S. 669 (1987) ........................................................14

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) ............................... passim

Vancouver Women's Health Collective Society v. A.H. Robins Co., 820 F.2d 1359 (4th
    Cir. 1987) ......................................................................................................28

Verdugo-Urquidez, 494 U.S. at 271 ................................................................ passim

Whitman v. American Trucking Association, 531 U.S. 457 (2001)............................9

Wilson v. Layne, 526 U.S. 603 (1999) ............................................................. passim

Wong Wing v. United States, 163 U.S. 228 (1896)....................................................7

World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980) ..........................42

Yick Wo v. Hopkins, 118 U.S. 356 (1886)................................................................7

Youngstown Sheet & Tube v. Sawyer, 343 U.S. 579 (1952) ....................................15

Zadvydas v. Davis, 533 U.S. 678 (2001)................................................................27

Zicherman v. Korean Air Lines Co., 516 U.S. 217 (1996)......................................37

Zweibon v. Mitchell, 720 F.2d 162 (D.C. Cir. 1983) ..............................................24

## DOCKETED CASES

Al Odah v. United States, No. 05-5064 (D.C. Cir. notice of appeal Mar. 7, 2005)................10, 31

Arar v. Ashcroft, No. CV-04-0249 (DGT) (VVP), 2006 U.S. Dist. LEXIS 5803 (E.D.N.Y.
    Feb. 16, 2006) ..............................................................................................19

United States v. Passaro, No. 04-cr-211 (E.D.N.C.).................................................4

# FEDERAL STATUTES, REGULATIONS AND
## LEGISLATIVE HISTORY

42 U.S.C. § 1983 ................................................................................................................ 24

28 C.F.R. § 15.4(a) ............................................................................................................ 34

28 U.S.C. § 1292(b) .................................................................................................... 10, 31

28 U.S.C. § 2241 ............................................................................................................. 8, 9

18 U.S.C. § 2340A(a) ......................................................................................................... 4

28 U.S.C. § 2675(a) .................................................................................................... 37, 38

28 U.S.C. § 2679(b)(1), (d)(1) ........................................................................... 34, 35, 36, 37

28 U.S.C. § 2680(k) .......................................................................................................... 38

115 Stat. 224 .............................................................................................................. 15, 16

151 Cong. Rec. S14261 ..................................................................................................... 21

151 Cong. Rec. S14262 ..................................................................................................... 21

151 Cong. Rec. S14269 (Dec. 21, 2005) ............................................................................ 21

Article 138 of the Uniform Code of Military Justice, 10 U.S.C. §938 ............................... 18

Auth. for Use of Military Force, Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002) ............... 12

National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat.
    3136, 3474-75 .............................................................................................................. 21

    119 Stat. at 3474-75 .................................................................................................... 21

Ronald Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No.
    108-375, 118 Stat. 1811, 2068-71 ................................................................................. 21

Supreme Law of the Land . . ." U.S. Const. art. VI, cl. 2 (emphasis added) .................... 37

U.S.-Cuba, Art. III, 48 Stat. 1683, T.S. No. 866 .................................................................. 8

Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub.
    L. No. 100-694, 102 Stat. 4563 .................................................................................... 34

United States Constitution, the Alien Tort Statute, 28 U.S.C. § 1350......................................1, 34

United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80 ...........................................................................................................................34

Conn. Gen. Stat. § 52-59b (2004) ..........................................................................................42

6 U.S.T. 3316 (U.S.T. 1949)..................................................................................................40

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

*In re* Iraq and Afghanistan Detainees
Litigation

Arkan Mohammed ALI, et al.,

          **Plaintiffs,**

    v.

Thomas PAPPAS,

          **Defendant.**

Civ. No. 05-1378 (TFH)

---

## <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

Plaintiffs, nine Iraqi and Afghan nationals with no personal or business ties to the United States, have brought four separate civil actions against the Secretary of Defense[1] and three senior United States Army officers for physical and psychological injuries allegedly sustained during their detention at various military facilities in Iraq and Afghanistan. They contend that the treatment to which they were allegedly subjected infringed their rights under various provisions of the United States Constitution, the Alien Tort Statute, 28 U.S.C. § 1350, and the law of nations. Plaintiffs seek compensatory and punitive damages from Secretary Rumsfeld and the Army officers, all in their individual capacities, as well as declaratory relief against Mr. Rumsfeld in his official capacity.

This memorandum is submitted in support of the motion to dismiss all claims against Colonel Thomas Pappas, a decorated Army officer who has served with distinction for more than

---

[1] Secretary Rumsfeld, alone among the defendants, is also sued in his official capacity. In addition, Secretary Rumsfeld is the only defendant sued by Plaintiffs Mehboob Ahmad, Said Nabi Siddiqui, Mohammed Karim Shirullah and Haji Abdul Rahman for physical and psychological injuries allegedly sustained during their detention in Afghanistan. Therefore, this motion does not respond to their allegations.

25 years. Colonel Pappas was the Commander of the 105th Military Intelligence Brigade at the time of the alleged events giving rise to plaintiffs' complaint, and continues to serve on active duty. Colonel Pappas seeks dismissal of this action on several grounds, as set forth below.

First, the plaintiffs and the events they allege as the basis for their claims bear no connection to the United States that would support the exercise of subject matter jurisdiction by this Court. Although, as the Supreme Court long ago established, the Constitution follows the flag to some degree, not every action of the United States government anywhere in the world— and certainly not those of United States military officers serving in an active conflict with a resolute foe on the latter's home territory—triggers a right to invoke the jurisdiction of U.S. courts to seek civil remedies. For these reasons and others, the Complaint fails to state an actionable violation of any constitutional right. Dismissal is therefore warranted without even reaching the additional bases upon which Colonel Pappas, as a military officer, would be entitled to protection from personal liability. *See Siegert v. Gilley*, 500 U.S. 226, 232-234 (1991) (in assessing viability of *Bivens* action court should first consider whether complaint even states actionable violation of the Constitution; if not, analysis is at an end and dismissal is warranted).

Second, even if subject matter jurisdiction were otherwise arguably available, no cause of action against military officers in their individual capacities has been recognized in anything remotely resembling the circumstances here presented, and none should be now. The Supreme Court has in recent years repeatedly declined to extend the *Bivens* doctrine, *Bivens v. Six Unknown Named Agents of the Bureau of Narcotics & Dangerous Drugs*, 403 U.S. 388 (1971), and no such extension should be entertained by this Court. That result is warranted, if indeed not mandated, not only by the general retrenchment of *Bivens* jurisprudence, but also by the deference traditionally extended to the military departments by the Article III courts in the realm

of national security and defense.  All of these considerations constitute "special factors counseling hesitation," *Bivens*, 403 U.S. at 396, in the creation of a damages remedy against Colonel Pappas.

Third, even if a cause of action against individual officers were available in the circumstances here presented, Colonel Pappas would be entitled to immunity from suit.  The applicability of the constitutional provisions relied on by plaintiffs to an active combat theater or any other setting remotely akin to the military facilities in Iraq are by no means clearly established, and the immunity doctrine therefore shields Colonel Pappas from liability and the attendant burdens of litigation.  Finally, Colonel Pappas has been certified by the Attorney General's designee to have acted within the scope of his employment at the time of the matters alleged in the Complaint, so no claims can be asserted against him under the Geneva Convention or the Law of Nations, claims which in any event are not actionable.  For all these reasons, Colonel Pappas respectfully submits that the case against him should be dismissed.

## ARGUMENT

### I.    The Fifth And Eighth Amendments Are Inapplicable To Aliens Detained Abroad And Held At Military Facilities In Iraq

The Supreme Court has stated that "it is not open to us . . . to endorse the view that every constitutional provision applies wherever the United States Government exercises its power." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268-69 (1990) (citation omitted).  The Court's observation carries particular force in the context of this case, in which five foreign nationals complain about treatment they claim to have received in their home country at the hands of U.S. military forces.  No other link to the United States, of a personal, business or other nature, is alleged.  Plaintiffs can proceed in this Court, therefore, only if the Constitution applies to the

3

conduct of which they complain in a manner that gives rise to a cause of action for money

damages. For all the reasons set out below, it does not.[2]

A.    **The Fifth And Eighth Amendments Are Inapplicable To Aliens Outside The Sovereign Territory Of The United States**

In the late nineteenth century, the Supreme Court held the view that "[t]he Constitution

can have no operation in another country." *Ross v. McIntyre*, 140 U.S. 453, 464 (1891).

> The guarantees [the Constitution] affords . . . apply only to citizens
> and others within the United States, or who are brought there for
> trial for alleged offenses committed elsewhere, and not to residents
> or temporary sojourners abroad.

*Id.* Not long thereafter, in the *Insular Cases,* the Supreme Court held that, even in places where

the United States exercises sovereign power, not every constitutional provision applies to

governmental activity. *Dorr v. United States*, 195 U.S. 138, 149 (1904) (Sixth Amendment jury

trial provision inapplicable in the Philippines); *Hawaii v. Mankichi*, 190 U.S. 197, 214-215

(1903) (grand jury and jury trial provisions inapplicable in Hawaii, then a territory); *Downes v.

Bidwell*, 182 U.S. 244, 287 (1901) (Revenue Clauses inapplicable in Puerto Rico). Subsequent

decisions reinforced this point. *E.g., Balzac v. Puerto Rico*, 258 U.S. 298, 311-313 (1922) (Sixth

---

[2] Colonel Pappas does not suggest that he is unhinged from abiding by the Constitution, nor does he suggest that U.S. officials lawfully may abuse detainees on foreign soil. Like all U.S. military personnel, he is subject to the Uniform Code of Military Justice. Moreover, the federal criminal code prohibits torture or conspiracy to torture any person, including persons in U.S. custody, whether detained within or without the United States. *See, e.g.,* 18 U.S.C. § 2340A(a), (c). Even before Congress recently established uniform standards for the treatment of detainees held abroad, the United States had convened more than ten Courts-Martials with respect to matters allegedly occurring at Abu Ghraib. The United States is also prosecuting civilian contractors for mistreating detainees in their custody. *See, e.g., United States v. Passaro*, No. 04-cr-211 (E.D.N.C.) (ongoing prosecution of contractor for abusing detainee in Kunar Province of Afghanistan). Colonel Pappas' point is that the Constitution does not apply to the body politic of Iraq, so that Iraqi nationals are not permitted to avail themselves of the Constitution based upon the fact that they came into contact with an American soldier.

Amendment right to jury trial inapplicable in Puerto Rico); *Ocampo v. United States*, 234 U.S.

91, 98 (1914) (Fifth Amendment grand jury provision inapplicable in Philippines).

A *fortiori*, then, the Constitution's application outside locations in which the U.S.

exercises sovereign power will be of even lesser force. In *Johnson v. Eisentrager*, 339 U.S. 763

(1950), the Supreme Court held that U.S. courts lacked jurisdiction to consider a habeas corpus

petition submitted on behalf of German nationals seized abroad following Germany's surrender

in World War II, who were tried by a military commission and imprisoned in a U.S.-controlled

facility in Germany. The Court found that neither the federal habeas statutes nor the Constitution

itself conferred such jurisdiction. *Id.* at 781, 784-785. It rejected the argument that the Fifth

Amendment conferred rights on aliens held outside the sovereign territory of the United States,

*id.*, a rejection the Court itself later termed "emphatic." *Verdugo-Urquidez*, 494 U.S. at 269.

The *Eisentrager* decision was based in no small measure on the fact that the petitioners

"at no relevant time were within any territory over which the United States is sovereign, and the

scenes of their offense, their capture, their trial and their punishment were all beyond the

territorial jurisdiction of any court of the United States." *Eisentrager,* 339 U.S. at 778. Thus, the

circumstances in which the "privilege of litigation" had previously been extended to aliens did

not obtain, for these petitioners had not come to receive the "implied protection" that derived

from being physically present in the United States. *Id.*

The Court identified six characteristics of the petitioners that doomed their claim of

access to United States Courts:

> To support that assumption [that the prisoners were entitled to file
> petitions] we must hold that a prisoner of our military authorities is
> constitutionally entitled to the writ, even though he (a) is an enemy
> alien, (b) has never been or resided in the United States; (c) was
> captured outside of our territory and there held in military custody
> as a prisoner of war; (d) was tried and convicted by a Military

> Commission sitting outside the United States; (e) for offenses
> against laws of war committed outside the United States; (f) and is
> at all times imprisoned outside the United States.

*Id.* at 777. Therefore, although an alien might enjoy some constitutional protections "as he

increases his identity with our society," the Fifth Amendment could not be deemed to have

extraterritorial application. *Id.* at 770.

> Such extraterritorial application of organic law would have been so
> significant an innovation in the practice of governments that, if
> intended or apprehended, it could scarcely have failed to excite
> contemporary comment. Not one word can be cited. No decision
> of this Court supports such a view. . . . None of the learned
> commentators on our Constitution has even hinted at it. The
> practice of every modern government is opposed to it.

*Id.* at 784-785 (citations omitted).

The Court has, in more recent years, continued to take a dim view of efforts to extend the

reach of the Constitution beyond the sovereign territory of the United States. Thus, in *Verdugo-*

*Urquidez, supra*, the Court declined to extend the Fourth Amendment to activity of U.S. law

enforcement agents operating in Mexico. 494 U.S. at 270. The Court thereby rejected an

expansive reading of its decision in *Reid v. Covert*, 354 U.S. 1 (1957), in which a plurality had

ruled that American citizens, wives of soldiers who were to be tried in military tribunals for

capital crimes, were entitled to Fifth and Sixth Amendment protections. Urged by Verdugo-

Urquidez to interpret *Reid* to mean that federal officials were subject to the Fourth Amendment

"wherever and against whomever they act," the Court responded that "*Reid* stands for no such

sweeping proposition: it decided that United States citizens stationed abroad could invoke the

protection of the Fifth and Sixth Amendments." *Verdugo-Urquidez,* 494 U.S. at 270. The

concurring opinions of Justices Harlan and Frankfurter in *Reid*, moreover, were based on "much

narrower grounds than the plurality and declined even to hold that United States citizens were

entitled to the full range of constitutional protections in all overseas criminal prosecutions." *Id.,*
*citing* 354 U.S. at 75.

The Court sounded another limiting theme in *Verdugo-Urquidez* that had been featured in
its earlier decisions. Presented with the argument that its prior decisions recognized
constitutional rights of aliens, 494 U.S. 271, the Court explained that those earlier rulings
"establish only that aliens receive constitutional protections when they have come within the
territory of the United States and developed substantial connections with this country." *Id.,*
*citing Plyler v. Doe,* 457 U.S. 202, 211-12 (1982); *Kwong Hai Chew v. Colding,* 344 U.S. 590
(1953); *Bridges v. Wixon,* 326 U.S. 135 (1945); *Russian Volunteer Fleet v. United States,* 282
U.S. 481 (1931); *Wong Wing v. United States,* 163 U.S. 228 (1896); *Yick Wo v. Hopkins,* 118
U.S. 356 (1886). Verdugo-Urquidez was "an alien who has had no previous significant
voluntary connection with the United States, so these cases avail him not." 494 U.S. at 236-237.
Thus, extension of constitutional mandates to places far removed from U.S. sovereign territory
would "plunge [the Executive and Legislative Branches] into a sea of uncertainty as to what
might be reasonable in the way of searches and seizures conducted abroad." *Id.*

Certain rights may extend to places over which the United States "exercises plenary and
exclusive jurisdiction, but not 'ultimate sovereignty.'" *Rasul v. Bush,* 542 U.S. 466, 475 (2004).
In ruling that Guantanamo Bay detainees may file petitions for writs of habeas corpus in U.S.
courts, the Supreme Court again reviewed the petitioners' claims in light of the six *Eisentrager*
factors. *Id.* at 475-476. The Court found that the Guantanamo petitioners differed from the
*Eisentrager* detainees in "important respects." *Id.* at 476. The *Eisentrager* factors, moreover,
were now read by the Court as "relevant only to the question of the prisoners' *constitutional*
entitlement to habeas corpus," whereas the 1950 ruling had "far less to say on the question of the

petitioners' *statutory* entitlement to habeas corpus." *Id.* (emphasis in original). Because

subsequent decisions had "overruled the statutory predicate to *Eisentrager's* holding,"that

decision did not preclude the exercise of jurisdiction under 28 U.S.C. § 2241." *Id.* at 479.

The *Rasul* court also placed heavy emphasis upon the dominion and control exercised by

the United States over the Guantanamo Bay Naval Base.

> By the express terms of its agreements with Cuba, the United
> States exercises 'complete jurisdiction and control' over the
> Guantanamo Bay Naval Base, and may continue to exercise such
> control permanently if it so chooses.

*Id.* at 480, *citing* Lease of Lands for Coaling and Naval Stations, Feb. 23, 1903, U.S.-Cuba, Art.

III, T.S. No. 418 and Treaty Defining Relations with Cuba, May 29, 1934, U.S.-Cuba, Art. III,

48 Stat. 1683, T.S. No. 866. The Government conceded that an American citizen held at the

base could submit a habeas petition, and since the statute drew "no distinction between

Americans and aliens held in federal custody, there is little reason to think that Congress

intended the geographical coverage of the statute to vary depending on the detainee's

citizenship." 542 U.S. at 481 *Rasul* thus resolved the jurisdictional question presented on purely

statutory grounds. It did not address, nor purport to resolve, any question regarding the

application of constitutional provisions beyond U.S. borders.

On remand, Judge Green of this Court nonetheless construed *Rasul*, "in conjunction with

other precedent" as establishing that aliens held at Guantanamo Bay have Fifth Amendment

rights. *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 464 (D.D.C. 2005), *appeal

docketed*, No. 05-5124 (D.C. Cir. Mar. 31, 2005) (Guantanamo Bay "must be considered the

equivalent of a U.S. territory in which fundamental constitutional rights apply," and that aliens

detained there have cognizable rights under the Fifth Amendment.) Judge Green placed

dispositive weight on a single, oblique footnote, which states: "Petitioners' allegations . . .

8

unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States.' 28 U.S.C. § 2241(c)(3)." *Rasul*, 542 U.S. at 484 n.15.[3] That footnote cannot fairly be read as an implicit repudiation of the substantive holdings in *Eisentrager*, *Verdugo-Uriquidez*, and their numerous predecessors and progeny.

In reaching her decision, Judge Green relied heavily on the Supreme Court's finding in *Rasul* that the circumstances of U.S. control over Guantanamo Bay, make the facility unique to the world and not "a typical overseas military base." *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d at 462. Judge Green did not hold that constitutional protections extend to aliens, such as plaintiffs here, detained abroad in places other than Guantanamo Bay. Moreover, Judge Green acknowledged the "continuing murkiness" surrounding the concept of extraterritorial application of the U.S. Constitution, *id.* at 458 n.27, and certified her decision for interlocutory

_____

[3] Such a reading would be inconsistent with the repeated assurances throughout *Rasul* that habeas jurisdiction was the "only" question raised in or resolved by the Court. Footnote 15 is appended to a paragraph focused entirely on the question of statutory jurisdiction under 28 U.S.C. § 2241, and to a sentence asserting what "[p]etitioners contend" for jurisdictional purposes. 524 U.S. at 483. Deeming these allegations sufficient for jurisdictional purposes, a reading of footnote 15 strongly suggested by context, establishes only that they are not "wholly insubstantial" or "frivolous" on the merits. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 88 (1998); *Bell v. Hood*, 327 U.S. 678, 682-683 (1946). On the other hand, to construe footnote 15 as implicitly overruling the substantive Fifth Amendment holding of *Eisentrager*, and thereby rejecting decades of settled law in a single ambiguous sentence, would be implausible in the extreme and would violate familiar interpretive principles: that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994); that the Supreme Court, like Congress ordinarily "does not * * * hide elephants in mouseholes," *Whitman v. American Trucking Ass'n*, 531 U.S. 457, 468 (2001); and, perhaps most fundamentally, that no "implicit" hint in footnote 15 could authorize the lower courts to disregard otherwise binding Supreme Court precedent. *See, e.g., Tenet v. Doe*, 125 S. Ct. 1230, 1235 (2005) (If a "precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Sierra Club v. EPA*, 322 F.3d 718, 725 (D.C. Cir. 2003) ("failure to [overrule] expressly is dispositive" – lower courts cannot consider whether one Supreme Court precedent "impliedly overrules" another).

appeal under 28 U.S.C. § 1292(b), *see* Civil Action No. 02-CV-0299 et al., Docket No. 162,

Certification Order and Stay (Feb. 3, 2005). The D.C. Circuit subsequently accepted that

certification. *See Al Odah v. United States*, No. 05-5064 (D.C. Cir. notice of appeal Mar. 7,

2005).

Judge Leon of this Court also addressed whether aliens detained at Guantanamo Bay are

afforded constitutional protection in *Khalid v. Bush,* 355 F. Supp. 2d 311 (D.D.C. 2005), and

concluded that "non-resident aliens captured and detained outside the United States have no

cognizable constitutional rights." *Id.* at 320. Judge Leon explained that:

> The petitioners in this case are neither United States citizens nor aliens located
> within sovereign United States territory. To the contrary, they are non-resident
> aliens, captured in foreign territory, and held at a naval base, which is located on
> land subject to the "ultimate sovereignty" of Cuba. [citation omitted] Due to their
> status as aliens outside sovereign United States territory with no connection to the
> United States, it was well established prior to *Rasul* that the petitioners possess no
> cognizable constitutional rights.
>
> *        *        *
>
> Nothing in *Rasul* alters [that prior analysis]. . . . The Supreme Court majority in
> *Rasul* expressly limited its inquiry to whether non-resident aliens detained at
> Guantanamo have a right to a judicial review of the legality of their detention
> under the habeas statute, . . . and, therefore, did not concern itself with whether
> the petitioners had any independent constitutional rights.

*Id.* at 321, 322. Exactly the same reasoning applies to plaintiffs' constitutional claims here.

From the decisions discussed above, certain essential factors can be discerned that control

the availability *vel non* of jurisdiction in this Court. The geographic area in which the claim

arises must be part of the sovereign territory of the United States or at least be subject to the

exclusive jurisdiction and control of the U.S. Additionally, the plaintiff must have some nexus,

some connection, to the United States. When these factors are applied to the Complaint filed by

the plaintiffs here, it becomes clear that the Court lacks subject matter jurisdiction.

Iraq, of course, is not part of the sovereign territory of the United States, and the U.S. does not and did not exercise exclusive jurisdiction and control over it during the time of plaintiffs' detention. The Coalition Provisional Authority ("CPA"), an international governing body, assumed civil government responsibilities over Iraq on April 21, 2003. *See* UN Security Council Resolution 1483 (2003). On July 13, 2003, the Iraqi Governing Council ("IGC") became the provisional government of Iraq. The IGC consisted of twenty-five Iraqi political, religious and tribal leaders. Although the IGC was subject to the authority of the CPA, it had powers distinct from those of the CPA. Furthermore, the CPA relied on the IGC to provide advice and leadership for Iraq until the Iraqi Interim government was selected. The IGC governed Iraq until the Iraqi Interim Government, headed by Prime Minister Iyad Allawi, was given control on June 28, 2004. *See* UN Security Council Resolution 1546 (2004). On January 30, 2005, Iraq held a national election in which a transitional government was chosen by the Iraqi people for the purpose of formulating a national constitution. *See* UN Security Council Resolution 1546 (2004). At no time during this period did the United States exercise sovereignty, nor even "exclusive jurisdiction and control" of the sort it possesses at Guantanamo Bay.

No case supports the exercise of jurisdiction in such circumstances. Iraq plainly lacks the status enjoyed by Puerto Rico or the Philippines at the time of the cases discussed above. It has no commonwealth, territorial or other affiliation with the United States. In all respects relevant for purposes of this motion to dismiss, Iraq stands on a footing *vis-à-vis* the United States more comparable to that of Germany at the time of the *Eisentrager* decision. *See* 339 U.S. at 778 (petitioners "at no time were within any territory over which the United States is sovereign, and

11

the scenes of their offense, their capture, their trial and their punishment were all beyond the territorial jurisdiction of the United States").

The Complaint is also devoid of any assertion linking plaintiffs to the United States. They allege no personal, business, social or other connection to this country. *See* Am. Complaint at ¶ ¶ 17-21, 189, 194, 199, 204, and 208. Like the plaintiff in *Verdugo-Urquidez*, they lack any "substantial connection" to this country. 494 U.S. at 269-71. They have undertaken none of the obligations of citizenship or even those that devolve upon resident aliens. Indeed, plaintiffs here do not identify a single occasion on which they have set foot in the United States, nor do they indicate having any relatives, business interests or other connection to this country.

Plaintiffs are foreign nationals of a country that was at war with the United States at the time of their detention. In fact the United States still remains deeply engaged in military actions in Iraq, actions that were specifically authorized by Congress. *See* Auth. for Use of Military Force, Pub. L. No. 107-243, 116 Stat. 1498 (Oct. 16, 2002). The plaintiffs were captured and detained by U.S. military forces in Iraq. *See* Am. Complaint at ¶ 16. Their detention was a direct consequence of the military action that was occurring simultaneously. Plaintiffs are situated similarly to the foreign nationals that the Supreme Court in *Eisentager* held could not avail themselves of the protections contained in the Constitution. As the court noted in *Eisentrager*, there are significant, potential adverse implications for the conduct of foreign and defense policies if the courts were to allow detainees held during active hostilities to have access to United States courts. *See Eisentrager*, 339 U.S. at 779 ("It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.") As such, there is no basis upon

12

which this Court can, or should, exercise jurisdiction over their claims.

    **B.**    **The Eighth Amendment's Prohibition on Cruel and Unusual Punishment Does Not Apply To Aliens Detained Abroad Who Have Not Been Convicted Of Offenses**

    Plaintiffs' claims that their Eighth Amendment rights were violated in the course of their confinement at various military facilities in Iraq must be dismissed for an additional reason. It is well settled that the Eighth Amendment only protects convicted prisoners from cruel or unusual punishment for their crimes. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (Eighth Amendment "protects individuals convicted of crimes from punishment that is cruel and unusual," but does not serve as source of substantive rights for pre-trial detainees); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998); *Ingraham v. Wright*, 430 U.S. 651, 672 n.40 (1977). Since the plaintiffs' were detainees at military detention facilities outside of the United States, and not convicted prisoners serving a sentence, they cannot assert an Eighth Amendment claim.

**II.**    **Special Factors Counsel Hesitation In The Creation Of A *Bivens* Remedy**

    This case presents a compelling array of "special factors counseling hesitation" in the creation of a *Bivens* remedy. 403 U.S. at 396. In *Bivens* itself, the Supreme Court used this phrase to underscore the importance of proceeding with care in the establishment of judicially-created remedies "in the absence of affirmative action by Congress." *Id.* Indeed, in the 34 years since *Bivens* was decided, the Court has extended its application only twice: to Congressional employees alleging denial of their Fifth Amendment equal protection rights, *Davis v. Passman*, 442 U.S. 228 (1979), and to prisoners claming violation of the Eighth Amendment's proscription against cruel and unusual punishments, *Carlson v. Green,* 446 U.S. 14 (1980).

All other claims have been cast aside; for the past twenty-five years, the Supreme Court has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68 (2001). Thus, in *Malesko*, the Court declined to recognize a *Bivens* remedy against a private company that operated community-based facilities under contract with the Federal Bureau of Prisons. In so ruling, the court relied upon a series of prior decisions that time and again had declined to extend the *Bivens* doctrine beyond its original bounds. *Id.* at 68-69, *citing Bush v. Lucas*, 462 U.S. 367 (1981) (no damages remedy against federal employee for alleged First Amendment violation); *Chappell v. Wallace, supra,* 462 U.S. at 304 (no damages action by enlisted military personnel against superiors); *United States v. Stanley*, 483 U.S. 669, 681 (1987) (same result even when some defendants are civilian personnel and not plaintiff's superior officers in military unit); *Schweiker v. Chilicky*, 487 U.S. 412, 421 (1988) (no claim against Social Security personnel alleged to have violated plaintiff's due process rights in handling of application for Social Security benefits).

With notable relevance for the present case, the Court in *Malesko* described its ruling in *Chilicky* as "reject[ing] the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court." 534 U.S. at 69. Therefore, "[i]t did not matter, for example, that '[t]he creation of a *Bivens* remedy would obviously offer the prospect of relief for injuries that must now go unredressed." *Malesko*, 534 U.S. at 69, *quoting Chilicky*, 487 U.S. at 425. What mattered in the Court's view was that, "[s]o long as the plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclosed judicial imposition of a new substantive liability." 534 U.S. at 69 (citation omitted).

Those separation of powers concerns apply with special force in the context of the Nation's military affairs and foreign policy. The Supreme Court has long recognized the

14

importance of "broad powers in military commanders engaged in day-to-day fighting in a theater of war." *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 635-37 n.2 (1952) (Jackson, J., concurring). *See also Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2647 (2004) ("Our Constitution recognizes that core strategic matters of war-making belong in the hands of those who are best positioned and most politically accountable for making them"); *Khalid*, 355 F. Supp. 2d at 329 ("The Court's role in reviewing the military's decision to capture and detain a non-resident alien is, and must be, highly circumscribed"), *appeal docketed*, No. 05-5063 (D.C. Cir. March 4, 2005). When the Executive acts pursuant to explicit Congressional authorization, the deference owed by the courts is all the greater. *Youngstown*, 343 U.S. at 635-37 (Jackson, J., concurring). *See* 115 Stat. 224 (Authorization For Use Of United States Armed Forces).

Recognizing a money damages action against military officers for decisions taken in performing their missions would have potentially devastating impact on the effectiveness of military and defense functions of the Executive. The Supreme Court foresaw in *Eisentrager* the potential for distracting officers from the situation on the battlefield to the situation in the courtroom:

> The writ, since it is held to be a matter of right, would be equally available to enemies during active hostilities as in the present twilight between war and peace. Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. *It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.*

*Id.* at 779 (emphasis added). Even more pernicious would be the long-term corrosive effect upon the willingness of commanders to take bold, aggressive action in pursuing military objectives.

15

A *Bivens* remedy is, after all, directed at, and specifically designed for, altering the behavior of individual persons, not institutions. That was one reason why the Supreme Court declined to recognize a *Bivens* cause of action against a federal agency in *FDIC v. Meyer,* 510 U.S. 471, 484-86 (1994) ("If we were to imply a damages action directly against federal agencies . . . there would be no reason for aggrieved parties to bring damages actions against individual officers. [T]he deterrent effects of the *Bivens* remedy would be lost"). The interference with the operation of our Armed Forces that *Bivens* actions of the sort alleged by plaintiffs here would engender is utterly at odds with the respective roles of the political branches and the Judiciary in defense and foreign affairs. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 733 n.21 (2004) (acknowledging "strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Dist. No. 1, Pacific Coast Dist. v. Maritime Admin.,* 215 F.3d 37, 42 (D.C. Cir. 2000) (Executive's "judgments on questions of foreign policy and national interest" were "not subjects fit for judicial involvement").

Separation of powers concerns relating to national defense and military affairs functions also played a prominent role in *Verdugo-Urquidez,* for the Court of Appeals ruling there under review would have applied not only to law enforcement but to other government activity abroad that could result in searches and seizures. Noting that the Nation "frequently employs Armed Forces outside this country—over 200 times in our history—for the protection of American citizens or national security," 494 U.S. at 273, the Supreme Court was concerned, with remarkable prescience for the current action, that

> Application of the Fourth Amendment to those circumstances
> could significantly disrupt the ability of the political branches to
> respond to foreign situations involving our national interest. Were
> respondent to prevail, aliens with no attachment to this country
> might well bring actions for damages to remedy claimed violations

16

of the Fourth Amendment in foreign countries or in international
waters.

*Id.* at 273-74, *citing Bivens,* 403 U.S. 388 (1971) (other citations omitted).  Even if a *Bivens*

action were deemed unavailable in some situations owing to "special factors counseling

hesitation," 403 U.S. at 396, "the Government would still be faced with case-by-case

adjudications concerning the availability of such an action."  494 U.S. at 274.

The Court of Appeals for this Circuit applied these principles to reject a purported *Bivens*

claim in *Sanchez-Espinosa v. Reagan,* 770 F.2d 202 (D.C. Cir. 1985), a civil action arising from

an alleged plan by President Reagan and the National Security Council to overthrow the

government of Nicaragua.  Perceiving with clarity the disruptive potential of money damages

claims of this nature, the Court stated:

> [T]he special needs of foreign affairs must stay our hand in the
> creation of damage remedies against military and foreign policy
> officials . . . . The foreign affairs implications of suits such as this
> cannot be ignored—[especially] their ability to produce what the
> Supreme Court has called in another context 'embarrassment of our
> government abroad' through multifarious pronouncements by
> various departments on one question.  Whether or not the present
> litigation is motivated by considerations of geopolitics rather than
> personal harm, we think that as a general matter the danger of
> foreign citizens using the courts in situations such as this to
> obstruct the foreign policy of our government is sufficiently acute
> that we must leave to Congress the judgment of whether a damage
> remedy should exist.

*Id.* at 209.

The Supreme Court's decision in *Chappell v. Wallace, supra*, offers additional insights

on the disruptive potential that money damages actions pose for the military.  There, five enlisted

personnel brought an action against superior officers for alleged racial discrimination in

assignments, performance evaluations and other aspects of their military service.  Assessing the

impact such a lawsuit could have on the efficacy of the military structure, the court emphasized

17

the unique demands of military service and the need for "strict discipline and regulation that

would be unacceptable in a civilian setting." 462 U.S. at 300.  Consequently, [c]ivilian courts

must, at the very least, hesitate long before entertaining a suit which asks the court to tamper

with the established relationship between enlisted personnel and their superior officers . . . ." *Id.*

> [Judges] are not given the task of running the Army.  The
> responsibility for setting up channels through which . . .
> grievances can be considered and fairly settled rests upon the
> Congress and upon the President of the United States and his
> subordinates.  The military constitutes a specialized community
> governed by a separate discipline from that of the civilian.  Orderly
> government requires that the judiciary be as scrupulous not to
> interfere with legitimate Army matters as the Army must be
> scrupulous not to intervene in judicial matters.

*Id.* at 301.  Not without significance to the Court's holding was the fact that Article 138 of the

Uniform Code of Military Justice, 10 U.S.C. §938, afforded every member of the Armed Forces

who "believes himself wronged by his commanding officer" the right to complain to any

superior commissioned officer, who is obliged to refer the complaint to the officer who has

general court-marital jurisdiction over the officer against whom the complaint is made.  462 U.S.

at 303-03.  Other existing procedures, such as the boards for correction of military records,

further reinforced the Supreme Court's view that a damages remedy could wreak havoc on

military efficacy.  *Id.*

  Recognition of a *Bivens* cause of action would be incompatible with the constitutional

roles assigned to the Executive, Congress and the Judiciary.  It would create exactly the

problems anticipated by the Supreme Court more than 50 years ago in *Eisentrager, supra.*  It is

not at all difficult to envision the multitude of problems that would arise from permitting those

foreign nationals detained during combat operations to sue their captors.  Without question,

allowing such claims would cause any rational military officer to "divert his efforts and attention

from the military offensive abroad to the legal defensive at home."  339 U.S. at 779.  The

potential for disruption of military operations, and hence the implementation of national defense and foreign policy as devised and implemented by the President and his senior advisers, is readily apparent.

Plaintiffs themselves contend that their alleged mistreatment was a result of military "orders" given by superior military and civilian officials, including the Secretary of Defense. Am. Complaint at ¶¶ 40-44. Litigation of this claim could not help but entail extensive intrusion into internal military and Department of Defense communications and decision-making processes. No case supports such an intrusion into the Executive's conduct of national defense, and permitting it would run directly counter to the Supreme Court' teaching in *Eisentrager* that "[e]xecutive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout history, essential to war-time security." 339 U.S. at 774.

This important principle was the underpinning for the recent decision in *Arar v. Ashcroft,* No. CV-04-0249 (DGT) (VVP), 2006 U.S. Dist. LEXIS 5803 (E.D.N.Y. Feb. 16, 2006). Plaintiff Arar asserted *Bivens* claims against the Attorney General and others for allegedly ordering his removal to Syria for the "purpose of detention and interrogation under torture by Syrian officials." *Id.* at *3. Acknowledging the "crucial national-security and foreign policy considerations" implicated by the plaintiff's allegations, the court concluded that "extending a *Bivens* remedy 'could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest." *Id.* at 92, quoting *Verdugo-Urquidez,* 494 U.S. at 273-74.

Similarly, in *Schneider v. Kissinger,* 412 F.3d 190 (D.C. Cir. 2005), *petition for cert. filed,* 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743), the Court of Appeals for this Circuit refused to allow tort claims to proceed against the former Secretary of State that were brought by

plaintiffs claiming violations of international law in connection with a coup d' etat allegedly engineered by U.S. government officials. Finding all claims barred by the political question doctrine, the court found its role constrained by the Constitution's allocation of responsibility for defense and foreign affairs. *Id.* at 195 (Article III "provides no authority for policymaking in the realm of foreign relations or provision of national security").

The special factors analysis mandated by *Bivens* itself also requires consideration of "affirmative action by Congress." 403 U.S. at 396. Thus, in *Chilicky,* a money damages remedy was unavailable to Social Security benefit recipients who alleged that their benefits had been illegally terminated. 487 U.S. at 443-444. Congress had enacted "comprehensive and elaborate review and benefit-restoration procedures" that prompted the Court to conclude, "Congress is in a better position to decide whether or not the public interest would be served by creating [a damages remedy]." *Id.* at 441.

*Chilicky* was the foundation for this Circuit's subsequent decision in *Spagnola v. Mathis,* 859 F.2d 223 (D.C. Cir. 1988) (*en banc*), which applied the special factors analysis to reject *Bivens* claims asserted in the federal employment context. Plaintiffs asserted constitutional torts against federal managers responsible for their non-selection and non-promotion. The Circuit found the Civil Service Reform Act, a statute that embodied a comprehensive system of rights and remedies for federal employees and applicants, a bar to their action for damages.

> [C]ourts must withhold their power to fashion damages remedies when Congress has put in place a comprehensive system to administer public rights, has "not inadvertently" omitted damages remedies for certain claimants, and has not plainly expressed an intention that the courts preserve *Bivens* remedies.

*Id.* at 228. Tellingly, "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial abstention." *Id.* at 227, *citing Chilicky*, 487 U.S. at 426-427 (other citation omitted).

Two recent legislative enactments, the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (to be codified at 10 U.S.C. § 801 note and 42 U.S.C. § 2000dd) and the Ronald Reagan National Defense Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (codified at 10 U.S.C. § 801 stat. note § 1092), constitute the same sort of Congressional action that precluded damages actions in *Chilicky* and *Spagnola.* The Reagan Act directs the Department of Defense to implement a system for preventing unlawful treatment of military detainees abroad, the specific details of which are set forth in the statute itself. Punishment of those accused of unlawful treatment is specifically reserved to the military justice system. *See Reagan Act, supra,* at § 1091(a)(4)-(5).

Section 1403 of the 2006 Act mandates that all persons under control of the U.S. government, regardless of location, may not be subjected to cruel, inhuman or degrading treatment. 119 Stat. at 3474-75. No cause of action was created to enforce this section, however, and its principal sponsor, Senator John McCain, specifically recognized that the legislation does not create a private right of action. *See* 151 Cong. Rec. S14269 (Dec. 21, 2005) (Statement of Sen. McCain) ("This bill [does] not create a private right of action"). Enforcement is to be effected through the military justice system. 151 Cong. Rec. S14261 (statement of Sen. Kyl) ("[statute] directly regulates military officers and is enforced through the usual mechanisms of military discipline"); 151 cong. Rec. S14262 (statement of Sen. Graham) ("These standards of treatment are important, but they need to be enforced through the military's internal systems of accountability and Congressional oversight, not through lawsuits and adversarial proceedings brought by detainees").

As did *Chilicky* and *Spagnola,* this case presents damages claims the recognition of which would upset the statutory structures crafted by Congress. The plain language and

21

legislative history of the 2005 and 2006 Defense Authorization Acts are quite clear that no private right of action is to be recognized. Its omission is thus in no way "inadvertent." This Court therefore should defer to this Congressional judgment and dismiss plaintiffs' claims. *See Malesko*, 534 U.S. at 67 & n.3 (Supreme Court has "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one"). This Court has, in fact, already cited the Reagan Act in declining to review Executive Branch decisions regarding detention of aliens abroad. *Khalid,* 355 F. Supp. 2d at 329. The Court refused to issue a writ of habeas corpus to persons held at Guantanamo Bay, Cuba in part because of the "[c]onspicuous . . . absence in the Reagan Act of any reference by Congress to federal court review where United States personnel engage[] in impermissible treatment of a detainee." *Id.* That result is no less warranted in the present case.

## III.    Colonel Pappas Is Entitled To Qualified Immunity With Respect To Plaintiffs' First and Second Causes of Action Alleging Constitutional Violations

Plaintiffs' first and second causes of action alleging violations of the Fifth and Eighth Amendments of the Constitution should be dismissed because Colonel Pappas is entitled to qualified immunity. Qualified immunity was established by the Supreme Court to protect public officials from the burdens of discovery and trial, as well as from liability, in connection with the performance of their official duties. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (stating that qualified immunity protects public officials against the burdens of litigation, as well as liability); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) ("[B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery."); *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998). The "essence" of qualified immunity is "its possessor's entitlement not to have to ... stand trial or face the other burdens of litigation," *Mitchell*, 472 U.S. at 526, including the "broad-ranging discovery" that

22

can be "peculiarly disruptive of effective government. *Harlow*, 457 U.S. at 817; *Anderson v. Creighton*, 483 U.S. 635, 646, n.6 (1987). Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526; *Siegert*, 500 U.S. at 232.

Qualified immunity is rooted in the strong public policy of minimizing the "expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office," thus allowing public officials to defeat insubstantial claims on motions to dismiss. *Harlow*, 457 U.S. at 814-18; *see also Mitchell*, 472 U.S. at 526 (qualified immunity must be resolved in the earliest possible stage in the litigation). The Supreme Court has recognized that *Bivens* suits "frequently run against the innocent," and impose a heavy cost "not only to the defendant officials, but to society as a whole," including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow*, 457 U.S. at 814. Qualified immunity was specifically designed to ensure "the vigorous and fearless performance" of law enforcement duties "essential to the proper functioning of the criminal justice system." *Imbler v. Pachtman*, 424 U.S. 409, 427-28 (1976).[4] Thus, it is vital to protect officials from such claims with a vigorous application of qualified immunity "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The Supreme Court has sought to achieve the aims of qualified immunity by recognizing that it protects officials from suit unless their actions violated "clearly established law of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996); *see also*

---

[4] Although *Imbler* is a case involving 42 U.S.C. § 1983 and not *Bivens*, "the qualified immunity analysis is identical under either cause of action." *Wilson v. Layne*, 526 U.S. 603, 609 (1999); *see also Gray v. Poole*, 243 F.3d 572, 577 n.4 (D.C. Cir. 2001).

*Barham v. Ramsey*, No. 04-5388, 04-5389, 2006 U.S. App. LEXIS 807, at *14 (D.C. Cir. Jan.

13, 2006); *Butera v. District of Columbia*, 235 F.3d 637, 645-646 (D.C. Cir. 2001); *Farmer*, 163

F.3d at 613. Dismissal is *required* unless the non-conclusory fact allegations demonstrate a

constitutional violation by the defendant official, and that the particular right in question was

clearly established at the time defendant acted. *Saucier v. Katz*, 533 U.S. 194, 201 (2001)

(emphasis added); *Siegert*, 500 U.S. at 232. Where there is a "legitimate question" as to the

standards governing conduct in particular circumstances, "it cannot be said" that "clearly

established" rights were violated. *Mitchell*, 472 U.S. at 535, n.12; *see also Brosseau v. Haugen*,

543 U.S. 194, 198 (2004) (per curiam) ("Qualified immunity shields an officer from suit when

she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law

governing the circumstances she confronted."); *Zweibon v. Mitchell*, 720 F.2d 162, 172-73 (D.C.

Cir. 1983) (defining a clearly established right as an "indisputable" or "unquestioned" right).

      In examining whether an official is entitled to qualified immunity, a court must first

consider the threshold question of whether "[t]aken in the light most favorable to the party

asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

right?" *Saucier*, 533 U.S. at 201; *Siegert*, 500 U.S. at 232; *Barham*, 2006 U.S. App. LEXIS 807,

at *15. If there is no violation of a constitutional right, "there is no necessity for further inquiries

concerning qualified immunity." *Saucier*, 533 U.S. at 201. If, however, a constitutional

violation can be demonstrated, "the next sequential step is to ask whether the right was clearly

established" at the time of the violation. *Id.; Barham*, 2006 U.S. App. LEXIS 807, at *15. This

inquiry must be made within "the *specific context of the case*, not as a broad general

proposition," and the relevant test of "whether a right is clearly established is whether it would

be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Saucier*, 533 U.S. at 201-02 (emphasis added); *Wilson*, 526 U.S. at 615; *Anderson*, 483 U.S. at 640; *Barham*, 2006 U.S. App. LEXIS 807, at *16. In other words, as discussed in greater detail below, it is insufficient to allege broadly, as plaintiffs do, that their Fifth and Eighth Amendment rights were violated. Rather, the Court must examine the factual context in which the alleged violations occurred to determine the reasonableness of the official's actions.

Application of the qualified immunity doctrine to the specific context of this case compels the conclusion that plaintiffs' Fifth and Eighth Amendment claims must be dismissed. As outlined above in greater detail, plaintiffs have failed to allege facts demonstrating that Colonel Pappas' conduct violated their constitutional rights, which is the threshold inquiry in the qualified immunity analysis. However, even assuming, *arguendo*, that plaintiffs adequately alleged a violation of their constitutional rights, they have failed to allege the violation of a constitutional right that was clearly established in the specific context of this case.

As the Supreme Court has explained, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Wilson*, 526 U.S. at 615; *accord Brosseau*, 543 U.S. at 199; *see also Anderson*, 483 U.S. at 640 (stating that the law is "clearly established" for immunity purposes only if, in the particular factual context presented, the "contours of the right" are "sufficiently clear" that the government official would know that he acted in violation of it); *Butera*, 235 F.3d at 646 ("courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning... the constitutional right must be identified 'at the appropriate level of specificity' for a court to determine . . . whether the right was 'clearly established.'"). Additionally, as noted, the relevant test of "whether a right is clearly established is whether it

25

would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In this case, for the purpose of determining whether the law was clearly established, the appropriate focus is an objective inquiry of whether a reasonable military official could have believed that his or her alleged decisions, taken in the heat of battle, regarding the detention of non-resident aliens in foreign countries that, at the relevant time, were war zones in which military operations were ongoing, would not violate the Fifth and Eight Amendments of the Constitution, in light of the information the military official possessed and the circumstances he or she and the U.S. military faced at the time.

Under the qualified immunity doctrine, a court generally looks to the case law of the Supreme Court and the relevant circuit to determine whether a government official was on notice at the time that his or her actions were unlawful in light of the situation he or she confronted. *See Wilson*, 526 U.S. at 617 (immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts unlawful); *see also Rasul v. Rumsfeld*, No. 04-1864, 2006 U.S. Dist. LEXIS 4275, at *47-48 (D.D.C. Feb. 6, 2006) ("Accordingly, the court will look to case law that was available to the defendants at the time of the plaintiffs' detention. Only with this foundation can the court determine whether a reasonable person would, at the time of the alleged torture, be aware that the plaintiffs were entitled to the Fifth Amendment rights they claim"). When this inquiry is undertaken, it is clear that a reasonable military official could have believed that his or her alleged actions in this context did not violate the Constitution, in light of the situation he or she confronted because, at the time the events in this case took place, the Constitution had not been held to apply to non-resident aliens abroad.

As noted above, qualified immunity shields government officials from liability as long as

their conduct does not violate clearly established rights which a reasonable official *would have known at the time of the conduct*. *Harlow*, 457 U.S. at 818-19 (emphasis added).  In their Complaint, plaintiffs all acknowledge that they were released from detention by June 2004. Therefore, judicial opinions issued subsequent to, or at the same time as, their release, such as *Rasul v. Bush*, which was issued on June 28, 2004, are inapposite to the qualified immunity analysis in this case.  542 U.S. at 466.  For qualified immunity purposes, the only relevant case law is that which was in existence at the time the events in this case took place and that which was clearly established.

At the time the events in this case took place, constitutional protections had not been extended to non-resident aliens abroad.  *See, e.g., Verdugo-Urquidez*, 494 U.S. at 271 ("establishing only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country"); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."); *Eisentrager*, 339 U.S. at 784-90; *Jifry v. Fed. Aviation Admin.*, 370 F.3d 1174, 1182-83 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1299 (2005) ("The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."); *Vancouver Women's Health Collective Soc'y v. A.H. Robins Co.*, 820 F.2d 1359, 1363 (4th Cir. 1987) ("The Constitution does not extend its guarantees to nonresident aliens living outside the United States.").

In fact, this Court has specifically recognized that, at the time of plaintiffs' alleged detainment in this case, *Eisentrager* and *Verdugo-Urquidez* "indicate[d] that the Constitution applies only once aliens were within the territory of the United States and developed substantial

contacts in this country." *Rasul*, 2006 U.S. Dist. LEXIS 4275, at *55. Since the alien detainees

in this case were in Iraq, which is indisputably not "within the territory of the United States," the

Constitution does not confer any rights upon them. *Id.* Therefore, in light of this settled law, a

reasonable military official could have believed his alleged actions were lawful in the situation

he or she confronted at the time the events in this case took place. *See Wilson*, 526 U.S. at 617

(immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts

unlawful).

Additionally, judicial decisions regarding the legal rights of Guantanamo Bay detainees,

regardless of when they were issued, are not relevant to the qualified immunity analysis in this

case; however, to the extent the Court finds otherwise, it should be noted that, in March 2003,

prior to the plaintiffs' alleged detention, the D.C. Circuit held that Guantanamo detainees were

not entitled to protection under the Constitution. *See Al Odah v. United States*, 321 F.3d 1134,

1141 (D.C. Cir. 2003), *rev'd sub nom. Rasul*, 542 U.S. 466 (2004). Therefore, if the Court

deems such case law relevant, based on *Al Odah*, at the time the events in this case took place, a

reasonable military official could have believed that his alleged actions were lawful in the

situation he confronted. Therefore, Colonel Pappas is entitled to qualified immunity.

While recent cases in the Supreme Court and the courts of the D.C. Circuit have

examined the question of what legal rights are conferred upon detainees at Guantanamo Bay

Naval Base, none of those cases addressed "the *specific context of the case*," *Saucier*, 533 U.S. at

201 (emphasis added), before this court: whether the United States Constitution confers rights on

non-resident alien detainees in the war zone of Iraq where military operations were ongoing at

the time. *See, e.g., Rasul*, 542 U.S. at 481 (federal courts have jurisdiction to hear Guantanamo

detainees' habeas petitions); *Rasul*, 2006 U.S. Dist. LEXIS 4275, at *43-44, 46. Indeed, those

decisions can be distinguished from the case before this court because Guantanamo Bay is not "a typical overseas military base," but one that is unique to the world. *In re Guantanamo Detainee Cases*, 355 F.Supp. 2d at 462. As the Supreme Court recognized, "the United States exercises 'complete jurisdiction and control' over the Guantanmo Bay Naval Base." *Rasul*, 542 U.S. at 480. Therefore, in *Rasul v. Bush*, the statutory right allegedly violated, "defined at the appropriate level of specificity," *Wilson*, 526 U.S. at 615, was the "narrow" question "whether the habeas statute confers a right to judicial review of the legality of Executive detention of aliens *in a territory over which the United States exercises plenary and exclusive jurisdiction, but not 'ultimate sovereignty.'*" 542 U.S. at 470, 475 (emphasis added). Similarly, in *Rasul v. Rumsfeld*, this Court noted that "[f]or this case, the appropriate level of specificity requires inquiry into whether the Constitution affords Fifth Amendment due process protection to aliens captured abroad and *brought within the exclusive jurisdiction and control of the United States at Guantanmo*." 2006 U.S. Dist. LEXIS 4275, at *43-44 (emphasis added).

By contrast, in this case, the United States indisputably does not, and did not, exercise "'complete jurisdiction and control'" over Iraq. *Rasul*, 542 U.S. at 480. This distinction is crucial because the "contours of the right[s]," *Anderson*, 483 U.S. at 640, of non-resident alien detainees in the war zone of Iraq necessarily differ from those detained in Guantanamo Bay, where the United States does have "'complete jurisdiction and control.'" *Rasul*, 542 U.S. at 480; *see also Rasul*, 2006 U.S. Dist. LEXIS 4275, at *52 n.18 ("As discussed in *Rasul v. Bush*, the nature of Guantanamo remaining under 'the ultimate sovereignty of the Republic of Cuba' yet at the same time under the 'complete jurisdiction and control' of the United States is problematic in determining the level of rights to afford detainees.") (citation omitted). Indeed, the Supreme Court recognized that very fact, stating that "[w]hatever traction the presumption against

extraterritoriality might have in other contexts, it certainly has no application to the operation of the habeas statute with respect to persons detained within 'the territorial jurisdiction' of the United States," such as Guantanamo Bay. *Rasul*, 542 U.S. at 480 (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). By contrast, in the context of this case, "the presumption against extraterritoriality," *id.*, takes on significant traction because, at the time the events in this case took place, the U.S. Constitution had not been applied extraterritorially to non-resident aliens in Iraq, which are indisputably *not* within the territorial jurisdiction of the United States. *See Wilson*, 526 U.S. at 617 (immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts unlawful).

Moreover, even assuming, *arguendo*, that this Court could look to the decisions regarding Guantanamo Bay detainees to inform its qualified immunity analysis in this case, the Court must reach the same conclusion, that Colonel Pappas is protected by qualified immunity, because the extent to which even Guantanamo detainees may avail themselves of constitutional protections is unclear as of the date of this brief, let alone at the time the events in this case occurred. For instance, as recently as February of 2006, this Court noted that "the extent to which Guantanamo detainees may avail themselves of constitutional protections is currently before the D.C. Circuit." *Rasul*, 2006 U.S. Dist. LEXIS 4275, at *44 (citing *Khalid*, 355 F. Supp. 2d 311, *appeal docketed*, No. 05-5063 (D.C. Cir. March 4, 2005)). The Court further noted the inherent difficulty in resolving the legal issue and the uncertainty facing the courts, asserting as follows:

> This determination requires the court to balance the interests of the detainees' constitutional rights, the executive branch's authority to classify individuals as enemy combatants and detain those individuals according to the government's discretion without undue court interference, and the scope of the judiciary's role in this case. Unsure of the way in which the D.C. Circuit will strike such a balance, or at least inform the contours of this trichotomy, a judicial determination by this court regarding the first prong under *Bivens* is imprudent.

30

*Id.* at *46. Noting that "a resolution on this matter is forthcoming," the court specifically reserved "judgment on whether the Guantanamo detainees enjoy Fifth and Eight Amendments protections." *Id.* The Court ultimately held that at the time of the detainees' detention, from February 2002 to March 2004, it was not clearly established that constitutional protections applied to Guantanmo detainees. *Id.* at *5, 7, 55-56.

Indeed, other decisions issued by this Court also reveal that the law with respect to Guantanamo detainees' constitutional rights in American courts is not clearly established today. For instance, in *In re Guantanamo Detainee Cases*, this Court stated that: "Guantanamo Bay must be considered the equivalent of a U.S. territory in which fundamental constitutional rights apply." 355 F.Supp. 2d at 464.[5]  By contrast, in *Khalid v. Bush*, this Court stated:

> The petitioners in this case are neither United States citizens nor aliens located within sovereign United States territory.  To the contrary, they are non-resident aliens, captured in foreign territory, and held at a naval base, which is located on land subject to the "ultimate sovereignty" of Cuba.  Due to their status as aliens outside sovereign United States territory with no connection to the United States, it was well established prior to *Rasul* that the petitioners possess no cognizable constitutional rights.

355 F. Supp. 2d at 321 (citations omitted).  These decisions demonstrate that even today, the law is not clearly established as to whether the U.S. Constitution confers any rights upon non-resident alien detainees at Guantanamo Bay.  Therefore, even if these cases were to be employed to inform the qualified immunity analysis in this case, they compel the conclusion that the law

---

[5] Further evidence that the law with respect to this issue is not clearly established is evident from the fact that Judge Green, who presided over *In re Guantanamo Detainee Cases,* certified her decision for interlocutory appeal under 28 U.S.C. § 1292(b), *see* Civil Action No. 02-CV-0299 et al., Docket No. 162, Certification Order and Stay (Feb. 3, 2005).  The D.C. Circuit subsequently accepted that certification. *See Al Odah v. United States*, No. 05-5064 (D.C. Cir. notice of appeal Mar. 7, 2005).  These facts demonstrate that both Judge Green and the D.C. Circuit recognize that there is "substantial ground for difference of opinion" on a "controlling question of law." 28 U.S.C. § 1292(b).

with respect to whether the Constitution confers rights upon non-resident alien detainees in Iraq was not clearly established at the time the events in this case took place.

In sum, at the time the events in this case took place, the law was clear that the Constitution does not apply to non-resident aliens abroad. *See Wilson*, 526 U.S. at 617 (immunity applied where no "controlling authority" in the jurisdiction indicating challenged acts unlawful). Accordingly, a reasonable military official could have believed that his or her alleged actions were lawful in the specific context of this case. *See Hunter*, 502 U.S. at 229 (stating that "the qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'") (internal quotations omitted). Additionally, Colonel Pappas contends that the decisions issued with respect to the Guantanamo Bay detainees, the majority of which were issued after the events in this case took place, are not relevant to the qualified immunity analysis in this case. However, in the event the Court finds otherwise, Colonel Pappas maintains that even today, the law is not clearly established as to whether the U.S. Constitution confers any rights upon non-resident alien detainees at Guantanamo Bay. Since there is a "legitimate question" as to the standards governing conduct in this particular context, "it cannot be said" that a "clearly established" right was violated. *Mitchell*, 472 U.S. at 535 n.12. For all the above reasons, Colonel Pappas should be accorded qualified immunity.

## IV.   The Amended Complaint Fails To Link Colonel Pappas To Many Of The Acts Or Omissions Giving Rise To Plaintiffs' Claims

The specificity with which a *Bivens* complaint must be pled in order to survive a motion to dismiss on qualified immunity grounds is governed by the Supreme Court's immunity jurisprudence, which requires pleading facts beyond the bare requirements of the Federal Rules of Civil Procedure Rule 8(a). *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (plaintiff

must "put forward specific, non-conclusory factual allegations").

Plaintiffs' allegations on their face limit Colonel Pappas' alleged responsibility to Iraq. *See* Am. Complaint at ¶ 30. Nothing ties him to Afghanistan. *Id.* Even within Iraq, the specific allegations against Pappas are limited to the Abu Ghraib prison. Other Iraq locations are identified in the Complaint, but Colonel Pappas is not alleged to have taken any specific actions with respect to those locations. *See* Am. Complaint at ¶ 189, 194, 199, 204 & 208. Moreover, plaintiffs Sherzad Kamal Khalid ("Khalid") and Ali H. failed to identify Colonel Pappas as someone that had "control and authority" over them. *See* Am. Complaint at ¶¶ 19-20. Khalid and Ali H.'s omission of Colonel Pappas as someone with "control and authority" over them is significantly underscored by the fact that the remaining three plaintiffs filing suit against him do make that assertion. *See* Am. Complaint at ¶¶ 17-18, & 21. Plaintiffs' failure to allege any connection to Colonel Pappas to these alleged violations of their constitutional rights warrants dismissal of these claims.

V.    **Plaintiffs' Third, Fourth, and Fifth Causes of Action Alleging Violations of the Law of Nations and the Geneva Conventions Must Be Dismissed**

Plaintiffs' third and fourth causes of action are claims for damages under the Alien Tort Statute. 28 U.S.C. § 1350. The Alien Tort Statute provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* In their fifth cause of action, plaintiffs seek damages for alleged violations of the Geneva Conventions. Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (codified in part at 28 U.S.C. §§ 2671, 2674, 2679)(hereinafter "*Westfall* Act"), however, the exclusive remedy for these claims is a suit against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80. *See* 28 U.S.C. § 2679(b)(1), (d)(1).

Under section 2679(b)(1), a plaintiff's sole remedy for a claim for damages arising from any "negligent or wrongful act or omission" of a federal employee acting within the scope of his or her employment is a suit against the United States under the FTCA. 28 U.S.C. § 2679(b)(1); *see also United States v. Smith*, 499 U.S. 160, 163 (1991); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 264 (D.D.C. 2004), *aff'd on other grounds*, 412 F.3d. 190 (D.C. Cir. 2005), *petition for cert. filed*, 74 U.S.L.W. 3363 (Dec. 8, 2005) (No. 05-743).[6] Upon certification by a designee of the Attorney General that the individual employee acted within the scope of his employment, the United States is substituted in place of the individual defendant. 28 U.S.C. § 2679(d)(1). *See also Bancoult v. McNamara*, 370 F. Supp. 2d 1, 6 (D.D.C. 2004), *appeal docketed*, No. 05-5049 (D.C. Cir. Feb. 22, 2005). The Attorney General has delegated his authority to certify scope of

---

[6] The D.C. Circuit did not address the *Westfall* Act immunity issues ruled on by the district court in *Schneider*, on the grounds that its resolution of all claims under the political question doctrine was "jurisdictional [and therefore] determinative." *Schneider*, 412 F.3d at 193.

employment to any Director of the Torts Branch, Civil Division. *See* 28 C.F.R. § 15.4(a).

Timothy P. Garren, a Torts Branch Director, has certified that plaintiffs' claims are based upon actions taken by Colonel Pappas in the scope of his federal employment. *See* attached Certification of Scope of Employment, filed March 1, 2006. Consistent with this certification and the arguments set forth herein and by the government, the United States should be substituted in place of Colonel Pappas with respect to plaintiffs' third, fourth, and fifth causes of action. As a result of this substitution, the alleged international law violations pled in counts three, four, and five should be dismissed as to Colonel Pappas. *See* 28 U.S.C. § 2679(b)(1) ("civil action[s] or proceeding[s] . . . against the employee or the employee's estate [are] precluded").

The *Westfall* Act provides only two exceptions to the rule that the FTCA is the exclusive remedy and the federal employee is immune from suit. That rule does not apply to: (1) claims brought "for a violation of the Constitution of the United States" – that is, *Bivens* claims like those pled by plaintiffs in counts one and two; or (2) claims brought "for a violation of a statute of the United States . . . ." 28 U.S.C. § 2679(b)(2). All other claims against federal employees based upon conduct undertaken within the scope of federal employment are barred by the Act. *See, e.g., Smith*, 499 U.S. at 166-67 (refusing to infer another exception beyond the two expressly stated in the *Westfall* Act).

Plaintiffs' claims under the Alien Tort Statute and Geneva Conventions do not fall within either exception to the *Westfall* Act. As the Supreme Court made clear in *Sosa v. Alvarez-Machain*, "the ATS [Alien Tort Statute] is a jurisdictional statute creating no new causes of action." 542 U.S. at 724. Indeed, this court has specifically held that the Alien Tort Statute "does not confer rights nor does it impose obligations or duties" that can be "violated" for purposes of

the *Westfall* Act. *See Rasul v. Rumsfeld*, 2006 U.S. Dist. LEXIS 4275, at *35; *accord Bancoult*, 370 F. Supp. 2d at 9. The Alien Tort Statute merely affords the jurisdictional basis for the assertion of rights conferred elsewhere, namely by the law of nations or a U.S. treaty. *See Sosa*, 542 U.S. at 724; *Rasul v. Rumsfeld*, 2006 U.S. Dist. LEXIS 4275, at *34; *Bancoult*, 370 F. Supp. 2d at 9-10. A claim brought under the Alien Tort Statute is not a claim brought "for a violation of" that statute, 28 U.S.C. § 2679(b)(2), and thus is "not exempt from the exclusive remedy provision of the [*Westfall*] Act." *Alvarez-Machain v. United States*, 331 F.3d 604, 631 (9th Cir. 2003), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004). *Accord Rasul v. Rumsfeld*, 2006 U.S. Dist. LEXIS 4275, at *14-38 (substituting the United States in place of individual defendants on ATS claims); *Bancoult*, 370 F. Supp. 2d at 9-10 (same); *Schneider*, 310 F. Supp. 2d at 266-67 (same).[7]

Substitution also is required on plaintiffs' fifth cause of action because plaintiffs' claim for alleged violation of the Geneva Conventions likewise is not a claim "for a violation of the

---

[7] The scope of employment certification upheld by the court in *Rasul v. Rumsfeld* is nearly identical to the certification made here. In *Rasul v. Rumsfeld*, Judge Urbina upheld certifications for Secretary Rumsfeld and several military officers regarding their involvement in the alleged development and implementation of harsh interrogation techniques at Guantanamo Bay. In reaching its holding, the court noted that "the defendants' [alleged] actions are inextricably intertwined with their respective roles in the military," and that nothing in the complaint indicated "the defendants had any motive divorced from the policy of the United States to quash terrorism around the world." 2006 U.S. Dist. LEXIS 4275, at *27-28. Likewise, in *Bancoult*, the court upheld certifications for several current and former officials in the Departments of Defense and State concerning their involvement in the forced removal of a native population from an island in the Indian Ocean because the challenged activities "were undertaken by each of the individual defendants to further the U.S. government's national security interests, not their personal interests." 370 F. Supp. 2d at 8. And in *Schneider*, the district court upheld a certification that former National Security Advisor Henry Kissinger was acting within the scope of his employment when he allegedly committed human rights violations in support of a coup d'etat in Chile because his conduct affected the establishment of a socialist government in Chile which "would have had a substantive impact on U.S. foreign policy and would naturally implicate national security concerns for which Dr. Kissinger had some responsibility." 310 F. Supp. 2d at 265-66.

Constitution . . . or . . . for a violation of a statute of the United States." *See* 28 U.S.C. §

2679(b)(2)(B). Treaties adopted by the United States may be part of the "law of the land,"

*see Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996), but a tort claim based directly

upon a treaty does not constitute a claim for the violation of the Constitution or a federal statute

as required by the *Westfall* Act.[8] This is especially clear given the Supreme Court's

interpretation of the exceptions to the *Westfall* Act. *See Smith*, 499 U.S. at 173-74. In *Smith*, the

Court held that "Congress' express creation of these two exceptions [for claims for violations of

the Constitution and federal statutes] convinces us that the Ninth Circuit erred in inferring a third

exception" to the *Westfall* Act. *Smith*, 499 U.S. at 167. Indeed, this Court held that a claim

alleging violations of the Geneva Conventions was not within either *Westfall* Act exception and

substituted the United States in place of the individual defendants. *See Rasul v. Rumsfeld*, 2006

U.S. Dist. LEXIS 4275, at *13-38. This Court should likewise reject plaintiffs' attempt to create

a third exception for claims for violations of treaties.

   Upon the substitution of the United States on plaintiffs' third, fourth, and fifth causes of

action in accordance with the *Westfall* Act, dismissal of the resulting FTCA claims is required.

The *Westfall* Act provides that when the United States is substituted for an individual defendant,

the resulting claim is "subject to the limitations and exceptions applicable to" FTCA claims. 28

U.S.C. § 2679(d)(4). In this case, plaintiffs have not satisfied the jurisdictional requirements for

proceeding on an FTCA claim. An essential prerequisite to the pursuit of an FTCA claim is the

exhaustion of all administrative remedies. *See* 28 U.S.C. § 2675(a) ("An action shall not be

---

[8] The distinction between federal constitutional, statutory, and treaty provisions is expressly
recognized in the Constitution. The Supremacy Clause states: "This Constitution, and the Laws
of the United States which shall be made in pursuance thereof; *and all Treaties* made, or shall be
made, under the Authority of the United States, shall be the Supreme Law of the Land . . ." U.S.
Const. art. VI, cl. 2 (emphasis added).

instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claims all have been finally denied by the agency in writing"). This requirement is jurisdictional. *See* 28 U.S.C. § 2675(a); *Jackson v. United States*, 730 F.2d 808, 809 (D.C. Cir. 1984); *Schneider*, 310 F. Supp. 2d at 269. Since plaintiffs have not exhausted their administrative remedies, this Court lacks subject matter jurisdiction over their FTCA claims.

Moreover, even if plaintiffs were to satisfy the administrative claim requirement, counts three, four, and five would be barred by, *inter alia*, 28 U.S.C. § 2680(k), which precludes "[a]ny claim arising in a foreign country." Plaintiffs' alleged injuries occurred in Iraq, and the Supreme Court in *Sosa* expressly held that Section 2680(k) bars a claim where the plaintiff's injury occurs in a foreign country. 542 U.S. at 712.

In sum, pursuant to the *Westfall* Act and the March 1, 2006 Certification of Scope of Employment, plaintiffs' third, fourth, and fifth causes of action alleging violations of the law of nations and the Geneva Conventions must be dismissed as to Colonel Pappas and the United States should be substituted in his place. Additionally, upon the substitution of the United States, dismissal of the resulting FTCA claims is required because plaintiffs have failed to exhaust the requisite administrative remedies and because their alleged injuries occurred in a foreign country.

## VI.    The Geneva Convention Does Not Provide A Private Right Of Action

Plaintiffs' fifth cause of action states that the defendants' alleged violations of the Geneva Convention are "direct and enforceable treaty violations." As the D.C. Circuit ruled in July 2005, the Geneva Convention does not provide a private right of action. *Hamdan v. Rumsfeld*, 415 F.3d 33, 40 (D.C. Cir. 2005) ("Thus, the Geneva Conventions do not give the

plaintiffs an independent vehicle for their lawsuit.") *cert. granted*, 74 U.S.L.W. 3287 (U.S. Nov. 7, 2005) (No. 05-184).

The Court's conclusion is buttressed by a long-standing principle that treaties generally do not create judicially enforceable rights. "[T]his country has traditionally negotiated treaties with the understanding that they do not create judicially enforceable individual rights." *Id.* at 38. "International agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts..." Restatement (Third) of the Foreign Relations Law of the United States, § 907 cmt. a, at 395 (1987).

In *Hamdan* the plaintiff, an Afghan national, was captured in Afghanistan and transported by U.S. troops to Guantanamo Bay Naval Base. By Executive Order, Hamdan was designated for trial before a military commission. He filed a petition for habeas corpus, which was granted by the district court. Hamdan argued successfully before the District Court that his trial by a military commission violated the 1949 Geneva Convention. In reversing, the Circuit noted that "[i]f a treaty is violated, this 'becomes the subject of international negotiations and reclamation' not the subject of a lawsuit." *Id.* at 38-39 (internal citations omitted).

In *Hamdan*, the Circuit relied on the Supreme Court's decision in *Eisentrager*, 339 U.S. 763, that while the Geneva Convention "specifies rights of prisoners of war...'responsibility for observance and enforcement of these rights is upon political and military authorities.'" 415 F.3d at 39. The Supreme Court was concerned with the prospect of exposing military officers, otherwise occupied by the exigencies of an active military theater, to lawsuits back home in the United States. *See Eisentrager*, 339 U.S. at 779.

The Supreme Court's concerns are even more compelling in this case than in *Hamdan*. While Guantanamo Bay was a U.S. Naval Base, far from the war in Iraq, and subject to a lease

conferring specific authority upon the United States, the various military facilities cited by plaintiff's were in an active military zones in another sovereign nation. To require military officers engaged in an active war zone to stop, consult with attorneys, respond to complaints, engage in discovery, and compile lists of witnesses is exactly what the *Eisentrager* Court was trying to avoid. *See* 339 U.S. at 779 ("It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home").

Plaintiffs are attempting here to create a new remedy that was neither contemplated nor sanctioned by the parties to the Convention. The Geneva Convention already provides a mechanism for enforcement.[9] If the mechanism is not satisfactory, or no longer relevant to present-day circumstances, the solution is certainly not a judicial re-write of an important international treaty. The only solution is through diplomatic avenues.

Accordingly, plaintiffs' cause of action alleging violations of the Geneva Convention should be dismissed for failure to state a claim for which relief can be granted.

---

[9] Articles 132 of the Geneva Convention provides:

> At the request of a Party to the conflict, an enquiry shall be instituted, in a manner to be decided between the interested Parties, concerning any alleged violation of the Convention. If agreement has not been reached concerning the procedure for the enquiry, the Parties should agree on the choice of an umpire who will decide upon the procedure to be followed. Once the violation has been established, the Parties to the conflict shall put an end to it and shall repress it with the least possible delay.

6 U.S.T. 3316 (U.S.T. 1949).

**VII.**    **This Court Lacks Personal Jurisdiction over Colonel Pappas**

Plaintiffs filed their suit against Colonel Pappas in the District of Connecticut and attempted to effect service on Colonel Pappas by serving the Complaint on Colonel Pappas' parents, who live in the State of Connecticut. Plaintiffs allege, incorrectly, that Colonel Pappas is a resident of Connecticut. Am. Complaint at ¶ 30. Colonel Pappas is in fact a resident of New Jersey. *See* Declaration of Thomas Pappas, dated March 3, 2006, at 1.

When the Judicial Panel on Multi-District Litigation transfers a case from the court in which it was filed, the transferee court may hear challenges to the transferor court's jurisdiction. *In re Multi-district Private Civil Treble Damage Antitrust Litigation Involving Gypsum Wallboard*, 302 F. Supp. 794, 794 (J.P.M.L. 1969) ("Motions to ...dismiss for lack of jurisdiction are being routinely considered by courts to which multi-district litigation has previously been transferred..."); *Linda Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58 (2nd Cir. 1999). In deciding the question of personal jurisdiction, this Court must apply the law of Connecticut, the District in which this action was initially filed. *In re Ski Train Fire in Kaprun, Austria*, 257 F. Supp. 2d 717, 723 (S.D. NY 2003) ("In a multi-district litigation, the transferee court must apply the law of the transferor forum in determining issues of personal jurisdiction.") Plaintiffs have the burden to plead facts establishing that this Court has personal jurisdiction over a non-resident defendant such as Colonel Pappas. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507, 510-11 (2d. Cir. 1994). Plaintiffs have wholly failed to plead such facts.

In order to establish personal jurisdiction over Colonel Pappas, plaintiffs must first allege facts to show that his actions come within the Connecticut Long-Arm Statute, which authorizes a court to exercise personal jurisdiction over an nonresident individual who:

> in person, or through an agent: (1) Transacts any business within the state; (2) commits a tortious act within the state, except as to a cause of action for

41

defamation of character arising from the act; (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; (4) owns, uses or possesses any real property situated within the state; or (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state.

Conn. Gen. Stat. § 52-59b (2004). Colonel Pappas is a resident of New Jersey. Plaintiffs do not claim that Colonel Pappas regularly transacted business in Connecticut, or engaged in a tortious act within the state or outside of the state causing injury to a resident of Connecticut, that he owns real property in the state, or uses a computer located within Connecticut. Accordingly, the District Court in Connecticut would not have personal jurisdiction over Colonel Pappas.

Plaintiffs must also allege sufficient facts for the court to determine that it would be consistent with constitutional due process guarantees to exercise jurisdiction over Colonel Pappas. The test is whether the defendant has sufficient "minimum contacts" with the forum such that exerting jurisdiction would not "offend traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945). The contacts must be such that it may be fairly said that he purposely availed himself of the privilege of conducting activities within Connecticut. *See Hanson v. Denkla*, 357 U.S. 235, 253 (1958). The suit must also have arisen directly from the defendant's purposeful contacts in the forum. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). Finally, the defendant's contacts with the forum must be such that the defendant should have reasonably anticipated being "haled into court" there. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Plaintiffs have wholly failed to allege *any* minimum contacts between Colonel Pappas and Connecticut. There is nothing in the complaint that tends to show that Colonel Pappas

42

"purposely availed" himself of activities in Connecticut such that he would have had any basis to anticipate being haled into court here. Because the exercise of jurisdiction over him thus offends "traditional notions of fair play and substantial justice," personal jurisdiction is lacking.

## CONCLUSION

For the foregoing reasons, defendant Pappas respectfully submits that his motion to dismiss should be granted.

Dated: March 6, 2006

Respectfully submitted,

Mark E. Nagle, Bar #416364
Tracy Varghese, Bar #472805
Eileen Moorhead, Bar #461914
TROUTMAN SANDERS LLP
401 9th Street, N.W.
Washington, D.C. 20004
(202) 274-2972 (tel.)
(202) 654-5666 (fax)