**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE:<br><br>**IRAQ AND AFGHANISTAN**<br>**DETAINEES LITIGATION** | Misc. No.  06-0145 (TFH) |
| This document relates to:<br><br>**ALI v. PAPPAS**<br>**ALI v. RUMSFELD**<br>**ALI v. KARPINSKI**<br>**ALI v. SANCHEZ** | Civ. No.  05-1377 (TFH)<br>Civ. No.  05-1378 (TFH)<br>Civ. No.  05-1379 (TFH)<br>Civ. No.  05-1380 (TFH) |

**<u>MEMORANDUM OPINION</u>**

This is a lamentable case in which the Court has been called upon to determine whether

the plaintiffs may pursue monetary damages and declaratory relief against the former Secretary of

Defense and other high-ranking military officers who the plaintiffs allege are liable for torture

and abuse inflicted on them while detained by the United States military during ongoing

hostilities in Iraq and Afghanistan.  Pending before the Court are the defendants' motions to

dismiss the plaintiffs' Consolidated Amended Complaint for Declaratory Relief and Damages

(the "Amended Complaint").  Despite the horrifying torture allegations, after a searching and

careful review of the relevant case law, and thorough consideration of the parties' legal briefs and

the arguments presented during the hearing held on December 8, 2006, the Court has determined

that the motions to dismiss filed by the defendants, Colonel Janis Karpinski, Lieutenant General

Ricardo Sanchez, and Colonel Thomas Pappas shall be granted in part and denied in part as

moot, and the motion to dismiss filed by former Secretary of Defense Donald Rumsfeld and the United States shall be granted in its entirety, thereby resolving all claims pending before the Court.

## BACKGROUND

Nine plaintiffs filed these lawsuits claiming they are innocent civilians[1] who were tortured and abused while detained by the United States military at various locations in Iraq and Afghanistan. Am. Compl. ¶¶ 16-25; Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss 4 ("Pls.'s Opp'n Br. ___"). Plaintiffs Arkan Mohammed Ali, Thahe Mohammed Sabar, Sherzad Kamal Khalid, Ali H., and Najeeb Abbas Ahmed are Iraqi citizens (collectively referred to as the "Iraqi plaintiffs") who were detained at Abu Ghraib prison or other military facilities in Iraq. Am. Compl. ¶¶ 16-25. Plaintiffs Mehboob Ahmad, Said Nabi Siddiqi, Mohammed Karim Shirullah, and Haji Abdul Rahman are Afghani citizens (collectively referred to as the "Afghani plaintiffs") who were detained at military facilities in Afghanistan. Am. Compl. ¶¶ 16-25; Pls.' Opp'n Br. 4. The plaintiffs were detained for varying durations ranging from one month to one year, and several plaintiffs were detained on multiple occasions. Am. Compl. ¶¶ 16-25. Each plaintiff ultimately was released from custody without ever being charged with a crime. Am. Compl. ¶ 1.

---

[1] The plaintiffs state that they "were not engaged in any hostilities against the United States and pose no threat." Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss 4. The Afghani plaintiffs maintain that they were "targeted . . . for arrest and detention based on the false statements of local individuals who worked closely with U.S. forces and harbored personal and/or political animosity toward" them. Am. Compl. ¶¶ 176, 180, 184, 188. The Iraqi plaintiffs offered no theory about the reasons for their detentions by the military. During oral arguments before this Court on December 8, 2006, the defendants implied that the plaintiffs' characterization of themselves as innocent civilians might be subject to dispute. Nevertheless, as explained in Part II, *infra*, for the purpose of resolving the pending motions to dismiss, the Court will assume the truth of all facts alleged in the plaintiffs' Amended Complaint.

The plaintiffs assert that they were tortured and otherwise subjected to cruel, inhuman and degrading acts during their detentions. Pls.' Opp'n Br. 4. To be more explicit, Mehboob Ahmad alleges that a chain was used to hang him upside-down from the ceiling, in which position he remained for several hours while "military personnel slapped and pushed him in order to cause his body to swing . . . resulting in his loss of consciousness, then, after providing him with medical attention and reviving him, again hanging him upside-down from the ceiling with a chain for several more hours, again leading to loss of consciousness." Am. Compl. ¶ 174. Mr. Ahmad also was manacled to a chain used to pull him upward and drop him to the ground, repeatedly pushed and kicked, subjected to electrical shocks until he lost consciousness, stripped and anally probed, and forced to hang by his arms while hooded and an aggressive dog "grab[bed] and pull[ed] at his arms and legs." Am. Compl. ¶ 174. Said Siddiqi was forced to remain in a push-up position while doused with water and then beaten if he failed to sustain the position, stripped naked and photographed, anally probed, deprived of water for prolonged periods, and detained in a room flooded with water. Am. Compl. ¶ 178. Mohammad Shirullah was assaulted in the head "so fiercely and repeatedly" that he ruptured an eardrum, and was forced to remain in painful physical positions for prolonged periods, such as sitting in a space with no back support while his wrists and legs were tied and his eyes and ears were covered. Am. Compl. ¶ 182. Haji Rahman alleges that interrogators used a chain to force his arms upward while they were handcuffed behind his back and he was in a kneeling position with blackout goggles on, loud noises and bright lights were used to deprive him of sleep, he was anally probed multiple times, stripped naked in front of other people and photographed, and forced to wear

3

blackout goggles and sound-deadening headphones for prolonged periods to induce sensory deprivation. Am. Compl. ¶ 186. Arkan Ali was beaten to unconsciousness, forcibly restrained and stabbed with a knife in his forearm, burned or shocked, locked for days in a phone-booth-sized wood box while stripped naked and hooded, urinated on, shackled with his hands behind his head while his head was stepped on and the shackles pulled, denied sleep and then dragged face down and beaten for falling asleep, chained to a metal container while kicked, spit on, choked, and threatened with a guard dog, threatened with death by having a gun placed to his head and a round chambered, mock executed by threat of being run down by a military vehicle, threatened with slaughter by sword, and denied food and water. Am. Compl. ¶ 190. Thahe Sabar was severely beaten while handcuffed, hit in the genitals, forced to "run through a gauntlet of 10 to 20 uniformed soldiers who were screaming at [him] and beating [him] with wooden batons," electrically shocked, sexually assaulted by soldiers who inserted their fingers in his anus and fondled his buttocks and penis, placed before a mock firing squad with simulated gunfire, placed in a cage of live lions, hooded and shackled in such a way as to cause breathing difficulties, bleeding and loss of consciousness, deprived of food or fed spoiled food that caused vomiting, denied access to toilets while shackled so he soiled his pants, and subjected to the desecration of the Quran. Am. Compl. ¶ 195. Sherzad Khalid was randomly kicked and punched while shackled and hooded, subjected to simulated anal rape by having a water bottle pressed against the seat of his pants, threatened with sodomy by use of a wooden pole, restrained and hooded in such as way as to impair his breathing and vision, shackled to a fence with his hands behind him in extreme temperatures without food or water, put in a cage of live lions, and

4

placed before a mock firing squad. Am. Compl. ¶ 200. Ali H. was shot when arrested and had

the bullets removed without anesthesia, shackled for prolonged periods with his hands behind his

back and feet spread, denied medical treatment after sustaining a life-threatening shrapnel wound

during a mortar attack while detained, dragged to and from locations after abdominal surgery,

refused bandage changes thereby leading to infection, and forced to sleep unsheltered outdoors in

extreme temperatures while injured. Am. Compl. ¶ 205. Najeeb Ahmed was subjected to:

> [A] scheme to humiliate, sexually assault, and physically injure Plaintiff Ahmed, by
> throwing him to the ground, stepping on his neck and legs, sitting on his back and
> feet, tying him with extremely tight restraints on his wrists, then calling a group of
> 10 to 12 U.S. soldiers to come into the room. The soldiers taped toy animals to
> Plaintiff Ahmed's head and shoulder and chanted racial epithets at him. A soldier
> kicked the soles of [his] feet. A soldier put a gun to his head. Another approached
> him in a menacing way and then spat in his face. A soldier stepped on his head.
> When Plaintiff Ahmed begged for water because he was sweating and suffering from
> chest pains, a solder approached him, exposed his penis, told Plaintiff Ahmed to
> drink, and then unzipped Plaintiff Ahmed's pants. Soldiers shone a bright beam of
> light in Plaintiff Ahmed's face. During all these proceedings, soldiers videotaped
> and photographed Plaintiff Ahmed . . . .

Am. Compl. ¶ 209. These are only some of the many examples of abuse allegedly inflicted on

the plaintiffs, as described in their Amended Complaint. Each plaintiff avers that he suffered

various injuries resulting from the torture and abuse, both physical and psychological. Am.

Compl. ¶¶ 175, 179, 183, 187, 191, 196, 201, 206, 210.

The Iraqi plaintiffs filed lawsuits against former Secretary of Defense Donald Rumsfeld,

Colonel Thomas Pappas, who was Commander of the 105th Military Intelligence Brigade,

Lieutenant General Ricardo Sanchez, who was Commander of the Coalition Joint Task Force-7,

and Colonel Janis Karpinski, who was Commander of the 800th Military Police Brigade.[2] Pls.'
Opp'n Br. 3. The Afghani plaintiffs filed a lawsuit against Rumsfeld alone. *Id.* All claims
lodged against Rumsfeld seek to impose liability both individually and in his official capacity,
whereas the claims against the other defendants seek to impose only individual liability. *Id.*

The plaintiffs originally filed their lawsuits in four different jurisdictions in the United
States: the District of Connecticut, the Northern District of Illinois, the District of South
Carolina, and the Southern District of Texas. By an order of the Judicial Panel on Multidistrict
Litigation dated June 17, 2005, the cases were transferred to this Court for coordinated and
consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. On January 5, 2006, the
plaintiffs filed their Amended Complaint. Two months later, each of the four defendants filed a
separate motion to dismiss the Amended Complaint. In response, the plaintiffs filed a
consolidated opposition on May 19, 2006, to which the defendants replied on July 21, 2006. The
parties presented oral arguments in support of their respective positions on December 8, 2006.
The Court also authorized the filing of briefs *amici curiae* by concerned retired military officers
and military law and history scholars, as well as J. Herman Burgers and Theo van Boven. Both
briefs filed by *amici curiae* were submitted in support of the plaintiffs' opposition to the motions
to dismiss.[3]

---

[2]     Based on the facts asserted in the Amended Complaint and the legal briefs submitted by
the parties, it appears to the Court that these officials possessed the identified titles at the relevant
times the conduct occurred that gave rise to the plaintiffs' lawsuits. Am. Compl. ¶¶ 27-30;
Pappas' Mem. Supp. Mot. Dismiss 2. It is possible, if not likely, these titles have changed due to
subsequent reassignments, retirements, or other career-related events.

[3]     The military officers and scholars assert that they "have an interest in the
maintenance of the long and honorable tradition of the United States military of humane

6

The plaintiffs advance six causes of action, five of which are premised on tort liability for violations of (1) the Fifth Amendment right to due process, (2) the Fifth Amendment and Eighth Amendment prohibitions against cruel and unusual punishment, (3) the law of nations prohibition against torture, (4) the law of nations prohibition against cruel, inhuman or degrading treatment, and (5) the Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U. S. T. 3516, T. I. A. S. No. 3365 ("Geneva Convention IV").[4] Am. Compl. ¶¶ 235-263. The plaintiffs' sixth cause of action seeks declaratory relief for violations of the law of nations, Geneva Convention IV, and the United States Constitution. *Id.* at ¶¶ 260-63. With regard to the constitutional violations, the plaintiffs argue that the Court should infer causes of action for tort liability pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Am. Compl. 238, 243; Pls.' Opp'n Br. 35-58. The remaining tort claims involving violations of the law of nations and Geneva Convention IV are asserted pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, as well as directly under Geneva Convention IV. Pls.' Opp'n Br. 4. The plaintiffs assert that the defendants are liable for the

---

treatment of detainees captured in armed conflict and strict enforcement of military, domestic and international law requiring such treatment." Br. *Amici Curiae* of Concerned Retired Mil. Officers and Mil. Law and Hist. Scholars In Supp. of Pls.' Consol. Opp'n 1. Messrs. Burgers and van Boven stress that, because of their scholarship and work with international human rights organizations, they "have a significant interest in ensuring the enforcement of human rights norms, particularly the norm against torture and cruel, inhuman, or degrading treatment, in the United States and around the world." Br. of J. Herman Burgers and Theo van Boven as *Amici Curiae* In Supp. of Pls.' Opp'n to the Defs.' Mots. to Dismiss 1-2.

[4]      Although the plaintiffs originally asserted a cause of action under the Third Geneva Convention as well, they essentially abandoned that claim once it became clear that the government was not characterizing the plaintiffs as prisoners of war, albeit the plaintiffs sought to reserve argument on the matter in the event it later became an issue. Pls.' Opp'n Br. 77 n.65.

plaintiffs' injuries because the defendants "issued orders and authorizations that caused the widespread torture and – wholly independent of those orders – failed in their legal duty to stop and prevent the torture and abuse of detainees they knew or had reason to know were being committed by subordinates under their command." *Id.* at 1. According to the plaintiffs, "[e]ach Defendant had command and control over some or all of the military personnel who tortured and abused Plaintiffs."[5] *Id.* at 6.

The defendants seek dismissal of the plaintiffs' Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and failure to state claims upon which relief may be granted. Pappas' Mot. Dismiss 1; Rumsfeld's Mot. Dismiss 1; Karpinski's Mot. Dismiss 1; Sanchez's Mot. Dismiss 1. The defendants mount a multi-pronged attack, arguing that dismissal is warranted on the grounds that special factors counsel against recognizing a *Bivens* remedy for the alleged constitutional violations, the defendants are entitled to qualified immunity from liability for the alleged constitutional violations, the defendants are entitled to absolute immunity under the so-called Westfall Act for alleged violations of the law of nations and Geneva Convention IV, and Geneva Convention IV does not confer judicially enforceable rights on the plaintiffs. Pappas' Mem. Supp. Mot. Dismiss 13-40; Rumsfeld's Mem. Supp. Mot. Dismiss 3-33; Karpinski's Mem. Supp.

---

[5]    The plaintiffs claim that the defendants were directly and personally involved in establishing the interrogation procedures that "authorized abusive techniques and that foreseeably caused this torture and abuse." Pls.' Opp'n Br. 6 . The plaintiffs also claim that the defendants knew torture and abuse were occurring, were present at Abu Ghraib at times when officials under their command were committing the torture and abuse, and continued to permit the torture and abuse rather than preventing or punishing the conduct, which resulted in a "climate in which torture and detainee abuse were condoned." Pls.' Opp'n Br. 6-7.

Mot. Dismiss 10-34, 45; Sanchez's Mem. Supp. Mot. Dismiss 10-36. In addition to these

challenges, which were uniformly raised by each defendant, Karpinski and Sanchez also argue

separately that the plaintiffs' claims raise nonjusticiable political questions. Karpinski's Mem.

Supp. Mot. Dismiss 34-44; Sanchez's Mem. Supp. Mot. Dismiss 5-10. Rumsfeld further argues

that the plaintiffs lack standing to seek declaratory relief because they failed to show that they

face a real and imminent threat of detention in the future. Rumsfeld's Mem. Supp. Mot. Dismiss

36-38. Finally, Colonel Pappas argues that the *Bivens* tort claims against him should be

dismissed because the plaintiffs failed to connect him to the alleged constitutional violations and

all claims should be dismissed because the United States District Court for the District of

Connecticut lacks personal jurisdiction over him. Pappas' Mem. Supp. Mot. Dismiss 41-43.

<u>LEGAL STANDARDS</u>

When adjudicating the defendants' motions to dismiss pursuant to Rules 12(b)(1) and

12(b)(6) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction and failure

to state a claim, the Court assumes the truth of the facts alleged in the plaintiffs' complaint and

construes in the plaintiffs' favor all reasonable inferences drawn from those alleged facts.

*Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839, 844 (D.C. Cir. 2002); *Artis v.*

*Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998); *E.E.O.C. v. St. Francis Xavier Parochial*

*School*, 117 F.3d 621, 625 (D.C. Cir. 1997); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir.

1987). As the Supreme Court has explained:

> When a federal court reviews the sufficiency of a complaint, before the reception of
> any evidence either by affidavit or admissions, its task is necessarily a limited one.
> The issue is not whether a plaintiff will ultimately prevail but whether the claimant
> is entitled to offer evidence to support the claims. Indeed it may appear on the face

9

of the pleadings that a recovery is very remote and unlikely but that is not the test.
Moreover, it is well established that, in passing on a motion to dismiss, whether on
the ground of lack of jurisdiction over the subject matter or for failure to state a cause
of action, the allegations of the complaint should be construed favorably to the
pleader.

*Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The liberal construction afforded the plaintiffs'

complaint does not, however, require the Court to give credence to asserted inferences that lack

factual support or legal conclusions proffered in the guise of factual allegations. *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Furthermore, although the general

standards that apply to the Court's review of 12(b)(1) and 12(b)(6) motions are similar in most

respects, the rules implicate distinct legal challenges. "Rule 12(b)(1) presents a threshold

challenge to the court's jurisdiction, whereas 12(b)(6) presents a ruling on the merits with res

judicata effect." *Haase*, 835 F.2d at 906. Thus, a motion to dismiss a complaint for failure to

establish subject matter jurisdiction will be successful only if the plaintiffs fail to carry their

burden of showing by a preponderance of the evidence that the Court has the statutory and

constitutional power to adjudicate the claims. *Makarova v. United States*, 201 F.3d 110, 113 (2d

Cir. 2000). A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), on the

other hand, will be successful if the defendants show that the plaintiffs can prove no facts in

support of their claims that would entitle them to relief. *See, e.g., Conley v. Gibson*, 355 U.S. 41,

45-46 (1957); *Harris v. Ladner*, 127 F.3d 1121, 1123 (D.C. Cir. 1997).

10

DISCUSSION

I.    WHETHER THE COURT SHOULD INFER *BIVENS* REMEDIES FOR ALLEGED
      TORTS COMMITTED BY THE DEFENDANTS

The Court first considers the defendants' challenges to the plaintiffs' claims for

constitutional violations.  The plaintiffs seek to have this Court fashion new nonstatutory

damages remedies pursuant to *Bivens* for alleged torts committed in violation of the Fifth and

Eighth Amendments to the United States Constitution by military officials who detained them.[6]

The defendants counter that "special factors" counsel against inferring a *Bivens* cause of action

and qualified immunity shields them from liability.

In *Bivens*, the Supreme Court held that a plaintiff could invoke the federal question

jurisdiction of federal courts to recover money damages against federal officials who violated the

plaintiff's constitutional rights.  403 U.S. 397.  In that case, the plaintiff alleged that federal

agents violated his Fourth Amendment rights when they searched his home and arrested him

without probable cause and a lawful warrant, thereby subjecting him to humiliation and mental

suffering.  *Id.* at 389-90.  Although Congress had not expressly legislated authority for private

lawsuits against government officials who violated the Fourth Amendment, the Supreme Court

nonetheless inferred a cause of action and remedy directly under the Constitution based on the

principle that "'where legal rights have been invaded, and a federal statute provides for a general

---

[6]    The plaintiffs do not allege that the defendants personally tortured and abused them;
rather, the plaintiffs seek to impose liability on the defendants for the acts of their subordinates
under the "command responsibility" doctrine, which they argue "is an entrenched and central part
of military law and training."  Pls.' Opp'n Br. 14 (citing *Estate of Ford v. Garcia*, 289 F.3d 1283
(11th Cir. 2002), *In re Yamashita*, 327 U.S. 1 (1946), *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir.
1995), and *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996)).

11

right to sue for such invasion, federal courts may use any available remedy to make good the

wrong done.'" *Id.* at 396 (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)). *Bivens* therefore

stands for the proposition that a plaintiff who can establish the violation of a constitutional right

for which a damages remedy is an appropriate form of relief may invoke the authority of federal

courts to vindicate that right against the offending official. *Butz v. Economou*, 438 U.S. 478, 486

(1978) (stating that "*Bivens* established that compensable injury to a constitutionally protected

interested could be vindicated by a suit for damages invoking the general federal-question

jurisdiction of the federal courts").

Although inferring a *Bivens* cause of action serves the desired public policy of deterring

individual federal officials from violating the Constitution, it would be fair to say that

recognizing such a claim is clearly disfavored, as demonstrated by the fact that, in the 35 years or

so since *Bivens* was decided, the Supreme Court has "extended its holding only twice, to provide

an otherwise nonexistent cause of action against individual officers alleged to have acted

unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative

remedy for harms caused by an individual officer's unconstitutional conduct." *Correctional*

*Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) ("The pupose of *Bivens* is to deter individual

federal officers from committing constitutional violations.") (emphasis omitted).   Indeed, the

Supreme Court observed some time ago that its "decisions have responded cautiously to

suggestions that *Bivens* remedies be extended into new contexts." *Schweiker v. Chilicky*, 487

U.S. 412, 421 (1988).  Notwithstanding this sentiment, the plaintiffs ask the Court to extend

*Bivens* to claims asserted by nonresident aliens allegedly tortured and abused while detained by

12

the United States military in Iraq and Afghanistan during ongoing hostilities incident to war.[7]

A.   Whether the Plaintiffs Assert a Constitutionally-Protected Right

The threshold question for the purpose of a *Bivens* analysis is whether the plaintiffs assert a right protected by the Constitution. *See Davis*, 442 U.S. at 234 (stating that the analysis of whether a *Bivens* remedy is appropriate "proceeds in three stages[,]" the first of which asks whether the "petitioner asserts a constitutionally protected right"). The plaintiffs claim that the defendants violated rights protected by both the Fifth and Eighth Amendments to the Constitution. Am. Compl. ¶¶ 235-46. The defendants refute this claim and argue that the plaintiffs may not assert a right protected by the Fifth Amendment because that amendment does not apply extraterritorially to nonresident aliens detained in Iraq and Afghanistan where the United States lacks sovereignty and is engaged in a war.[8] Pappas' Mem. Supp. Mot. Dismiss 3-

---

[7]   In response to the September 11, 2001, terrorist attacks, "Congress passed a joint resolution authorizing the President to use 'all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks . . . or harbored such organizations or persons.'" *Rasul v. Bush*, 542 U.S. 466, 470 (2004) (quoting Authorization for Use of Military Force, Pub. L. 107-40, §§ 1-2, 115 Stat. 224) ("*Rasul I*"). "Acting pursuant to that authorization, the President sent U.S. Armed Forces into Afghanistan to wage a military campaign against al Qaeda and the Taliban regime that had supported it." *Id.* Little more than a year later, on October 16, 2002, Congress passed another joint resolution authorizing the President to "(1) defend the national security of the United States against the continuing threat posed by Iraq; and (2) enforce all relevant United Nations Security Council resolutions regarding Iraq." Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. 107-243, § 3, 116 Stat. 1498, 1501 (2002). There appears to be no dispute that, presumably in accordance with both authorizations, the United States has been enmeshed in ongoing wars in both Afghanistan and Iraq, and was engaged in active hostilities in both countries at the relevant times the plaintiffs allege they were detained and tortured. The plaintiffs argue, however, that they were "detained in prisons and detention facilities away from the exigencies of combat . . . ." Pls.' Opp'n Br. 37.

[8]   Pappas and Sanchez raised this argument as an independent ground for dismissal apart from the question of whether the defendants are entitled to qualified immunity. Pappas' Mem.

13

13; Pappas' Reply Br. 1-7; Rumsfeld's Mem. Supp. Mot. Dismiss 19-26; Rumsfeld's Reply Br.

5-9; Karpinski's Mem. Supp. Mot. Dismiss 28-36; Karpinski's Reply Br. 15-18; Sanchez's Mem.

Supp. Mot. Dismiss 11, 20-24; Sanchez's Reply Br. 13-17.   The defendants also argue that the

plaintiffs may not assert a right protected by the Eighth Amendment because that amendment

applies only to prisoners convicted of crimes, which is not the case here.  Pappas's Mem. Supp.

Mot. Dismiss 13; Rumsfeld's Mem. Supp. Mot. Dismiss 19; Rumsfeld's Reply Br. 6;

Karpinski's Mem. Supp. Mot. Dismiss 29 n.23; Sanchez's Mem. Supp. Mot. Dismiss 20-21.  If,

as the defendants claim, the plaintiffs cannot assert constitutionally-protected rights, then

creating a *Bivens* remedy is unwarranted.

No matter how appealing it might be to infer a *Bivens* remedy to vindicate injuries caused

by federal officials committing abuses as severe as those alleged here, which otherwise might not

be fully redressed, the reality is that several controlling cases compel the inescapable conclusion

that the plaintiffs in this case are not entitled to such a cause of action because the Fifth and

Eighth Amendments do not apply to them.  *Johnson v. Eisentrager*, 339 U.S. 763 (1950), *United*

*States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), *Zadvydas v. Davis*, 533 U.S. 678 (2001), and

the D.C. Circuit's recent decision in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), each

---

Supp. Mot. Dismiss 3-13; Pappas' Reply Br. 1-7; Sanchez's Mem. Supp. Mot. Dismiss 11, 20-
24; Sanchez's Reply Br. 13-17.  Rumsfeld and Karpinski discuss the question of whether the
Fifth Amendment applies to the plaintiffs only in the context of considering whether the
defendants are entitled to qualified immunity, perhaps because the legal standard for review of
the qualified immunity defense requires the Court to first assess whether the official's conduct
violated a constitutional right before proceeding any further.  *See, e.g., Saucier v. Katz*, 533 U.S.
194, 201 (2001).  Thus, the legal standard for review of the qualified immunity defense
essentially incorporates the very inquiry necessary to determine whether a *Bivens* remedy would
be available to the plaintiffs at all, although the qualified immunity inquiry takes the analysis one
step further by asking whether the asserted constitutional right was actually violated.

make clear that the Constitution's reach is not so expansive that it encompasses these nonresident aliens who were injured extraterritorially while detained by the military in foreign countries where the United States is engaged in wars.

*Eisentrager* is the most instructive of these cases because, like the instant case, it involved nonresident aliens detained abroad during a war and is the seminal case holding that the Fifth Amendment does not apply to such aliens. In *Eisentrager*, twenty-one German prisoners filed writs of habeas corpus in this jurisdiction challenging their imprisonment for violating the laws of war by failing to cease active hostilities after Germany surrendered. 339 U.S. at 765. They were tried and convicted in China by an authorized American military commission and repatriated to Germany to serve their sentences. *Id. at* 766. They filed habeas corpus petitions alleging that their trial, conviction, and imprisonment violated the Fifth Amendment, as well as the Geneva Convention that governs the treatment of prisoners of war, among other asserted legal infirmities. *Id.* at 767. The district court dismissed their petitions, *id.*, but the D.C. Circuit reversed and reinstated them after concluding that constitutional provisions "apply directly to acts of Government, or Government officials, and are not conditioned upon persons or territory." *Eisentrager v. Forrestal*, 174 F.2d 961, 965 (D.C. Cir. 1949), *rev'd on other grounds sub nom. Johnson v. Eisentrager*, 339 U.S. 763. From that conclusion followed the D.C. Circuit's determination that "a distinction between citizens and aliens cannot be made in respect to the applicability of constitutional restrictions upon the power of government." *Id.*

On appeal, the Supreme Court considered whether the Fifth Amendment applied to the German prisoners and flatly rejected the D.C. Circuit's rationale for reinstating their petitions

15

because that rationale "dispensed with all requirement of territorial jurisdiction based on place of residence, captivity, trial, offense, or confinement" and "gave our Constitution an extraterritorial application to embrace our enemies in arms." *Eisentrager*, 339 U.S. at 784. The Supreme Court first reasoned that:

> [E]ven by the most magnanimous view, our law does not abolish inherent distinctions recognized throughout the civilized world between citizens and aliens, nor between aliens of friendly and of enemy allegiance, nor between resident enemy aliens who have submitted themselves to our laws and nonresident enemy aliens who at all times have remained with, and adhered to, enemy governments.

*Id.* at 769. The Supreme Court went on to observe that the alien historically has been treated hospitably and "accorded a generous and ascending scale of rights as he increases his identity with our society." *Id.* at 770. The Supreme Court stated in no uncertain terms, however, that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." *Id.* at 771.

The Supreme Court also emphasized the peril in which the alien's status is placed by virtue of his nationality and allegiance to an enemy nation at war with the United States. *Id.* at 771-72. The Supreme Court recognized that "in war 'every individual of the one nation must acknowledge every individual of the other nation as his own enemy – because the enemy of his country.'" *Id.* at 772 (quoting *The Rapid*, 8 Cranch 155, 161 (1814)). As the Supreme Court explained, "[i]t is war that exposes the relative vulnerability of the alien's status. The security and protection enjoyed while the nation of his allegiance remains in amity with the United States

16

are greatly impaired when his nation takes up arms against us."[9]  *Id.* at 771.  The Supreme Court

further explained that:

> The alien enemy is bound by an allegiance which commits him to lose no opportunity
> to forward the cause of our enemy; hence the United States, assuming him to be
> faithful to his allegiance, regards him as part of the enemy resources.  It therefore
> takes measures to disable him from commission of hostile acts imputed as his
> intention because they are a duty to his sovereign.

*Id.*  The Supreme Court therefore set the enemy alien apart and acknowledged that nonresident

enemy aliens historically lacked any standing to maintain an action in United States courts for the

duration of ongoing hostilities.[10]  *Id.* at 776.

---

[9]      The Supreme Court also stated that, "[w]hile [the enemy alien's] lot is far more humane
and endurable than the experience of our citizens in some enemy lands, it is still not a happy
one."  *Id.* at 771-72.  Regrettably, the facts alleged in the plaintiffs' Amended Complaint stand as
an indictment of the humanity with which the United States treats its detainees.

[10]     In this regard, the Supreme Court observed that:

> The standing of the enemy alien to maintain any action in the courts of the United
> States has been often challenged and sometimes denied. The general statement was
> early made on combined authority of Kent and Story "That they have no power to sue
> in the public courts of the enemy nation."  Our rule of generous access to the resident
> enemy alien was first laid down by Chancellor Kent in 1813, when, squarely faced
> with the plea that an alien enemy could not sue upon a debt contracted before the
> War of 1812, he reviewed the authorities to that time and broadly declared that "A
> lawful residence implies protection, and a capacity to sue and be sued.  A contrary
> doctrine would be repugnant to sound policy, no less than to justice and humanity."
> A unanimous Court recently clarified both the privilege of access to our courts and
> the limitations upon it.  We said: "The ancient rule against suits by resident alien
> enemies has survived only so far as necessary to prevent use of the courts to
> accomplish a purpose which might hamper our own war efforts or give aid to the
> enemy.  This may be taken as the sound principle of the common law today."
>
> But the nonresident enemy alien, especially one who has remained in the service of
> the enemy, does not have even this qualified access to our courts, for he neither has
> comparable claims upon our institutions nor could his use of them fail to be helpful
> to the enemy.  Our law on this subject first emerged about 1813 when the Supreme
> Court of the State of New York had occasion, in a series of cases, to examine the

17

The Supreme Court ultimately concluded that the Fifth Amendment did not apply to the

German prisoners and offered the following discussion about the factors it found significant:[11]

> We are here confronted with a decision whose basic premise is that these prisoners
> are entitled, as a constitutional right, to sue in some court of the United States for a
> writ of habeas corpus. To support that assumption we must hold that a prisoner of our
> military authorities is constitutionally entitled to the writ, even though he (a) is an
> *enemy* alien; (b) has never been or resided in the United States; (c) was *captured
> outside of our territory* and there held in military custody as a prisoner of war; (d)
> was tried and *convicted* by a Military Commission sitting *outside the United States*;
> (e) for offenses against laws of war *committed outside the United States*; (f) and is
> at all times *imprisoned outside the United States*.

> We have pointed out that the privilege of litigation has been extended to aliens,
> whether friendly or enemy, *only because permitting their presence in the country
> implied protection*. No such basis can be invoked here, for these prisoners *at no
> relevant time were within any territory over which the United States is sovereign*, and
> the scenes of their offense, their capture, their trial and their punishment were *all
> beyond the territorial jurisdiction of any court of the United States*.

> foremost authorities of the Continent and of England. It concluded the rule of the
> common law and the law of nations to be that alien enemies resident in the country
> of the enemy could not maintain an action in its courts during the period of hostilities.
> *This Court has recognized that rule . . . and followed it . . . and it continues to be the
> law throughout this country and in England*.

*Id.* at 776-77 (internal citations omitted) (emphasis added). The argument could be made
that the Supreme Court's analysis in *Eisentrager* left this common law rule intact;
however, neither party addressed in their briefs the rule or the case law from which it
reportedly is derived. Albeit, at first glance the Supreme Court's more recent decision in
*Rasul I*, discussed *infra*, would appear to call into question the viability of the rule by
rejecting the notion that aliens detained in military custody lack the privilege of litigation
and by granting jurisdiction to review the habeas petitions and other "nonhabeas statutory
claims," that case involved petitioners who were nationals of countries that were not at
war with the United States and whose status as "enemies" was not yet proven. 542 U.S.
at 476. *But see Hamdan v. Rumsfeld*, 464 F. Supp. 2d 9, 17 (D.D.C. 2006) ("*Hamdan II*")
(stating that a detainee at Guantanamo Bay "has not become a part of the population
enough to separate himself from the common law tradition generally barring non-resident
enemy aliens from accessing courts in wartime").

[11]    In *Rasul I*, the Supreme Court described these facts as "critical." 542 U.S. at 475.

*Id.* at 777-78 (emphasis added). It is clear from this passage that the Supreme Court found the extraterritoriality of all events relating to the prisoners' status, as well as the fact that they were enemies of our country, to be *sine qua non*. Accordingly, the Supreme Court held that "the Constitution does not confer a right of personal security . . . upon an alien enemy engaged in the hostile service of a government at war with the United States." *Id.* at 785.

As the defendants correctly point out, two subsequent Supreme Court decisions reaffirmed the principle that the Fifth Amendment does not apply extraterritorially to nonresident aliens, regardless of whether they are considered enemies. In *Verdugo-Urquidez*, the Supreme Court endorsed *Eisentrager's* holding and noted that its "rejection of extraterritorial application of the Fifth Amendment was emphatic." 494 U.S. at 269. *Verdugo-Urquidez* involved Fourth Amendment violations asserted by a citizen of Mexico who was arrested there for various narcotics offenses and transported to the United States for prosecution. *Id.* at 262. After his arrest, agents of the United States Drug Enforcement Agency ("DEA") searched and seized property in Mexico without a warrant. *Id.* The Supreme Court declined to apply the Fourth Amendment extraterritorially to the nonresident alien and cited *Eisentrager* with approval. *Id.* at 269, 275 ("Indeed, we have rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States."). Although the plaintiff in *Verdugo-Urquidez* was held in the United States against his will, the Supreme Court stated that "this sort of presence – lawful but involuntary – is not the sort to indicate any substantial connection with our country." *Id.* at 271. Likewise, in *Zadvydas*,[12] the Supreme Court reiterated that "certain

---

[12]     *Zadvydas* involved appeals by resident aliens who challenged a federal statute authorizing the government to detain removable aliens indefinitely. 533 U.S. at 682, 684-86.

constitutional protections available to persons inside the United States are unavailable to aliens

outside of our geographic borders" and favorably cited both *Eisentrager* and *Verdugo-Urquidez*

for the proposition that the Fifth Amendment does not extend to nonresident aliens outside the

territorial boundaries of the United States. 533 U.S. at 693. Thus, at the very least, it is

considered settled law that nonresident aliens must be within the sovereign territory of the United

States to stake any claim to the rights secured by the Fifth Amendment.[13]

The D.C. Circuit's timely decision in *Boumediene*, which was issued last month, removes

any doubt about whether this Circuit views the Constitution as conferring any rights on

nonresident aliens detained abroad. In *Boumediene*, the D.C. Circuit addressed the question of

federal court jurisdiction over habeas petitions "filed by aliens captured abroad and detained as

enemy combatants at the Guantanamo Bay Naval Base in Cuba[.]" 476 F.3d at 984. After

summarizing the state of the law, the D.C. Circuit first determined that the recently-enacted

Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ("MCA"),

applied to the detainees' habeas petitions. *Id.* at 986-88. The D.C. Circuit next considered the

detainees' argument that the MCA provision barring federal court jurisdiction over their habeas

petitions was an unconstitutional violation of the Suspension Clause. *Id.* at 988-94. The D.C.

Circuit dispelled any notion that the detainees could invoke the Suspension Clause as a

constitutional right when it stated that "[p]recedent in this court and the Supreme Court holds

---

[13]    The D.C. Circuit indicated its adherence to the principle that nonresident aliens outside the territory of the United States have no constitutional rights in *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960), when it stated that "[t]he non-resident aliens here plainly cannot appeal to the protection of the Constitution or laws of the United States" and cited *Eisentrager* as support.

that the Constitution does not confer rights on aliens without property or presence within the United States." *Id.* at 991 (citing *Eisentrager* as "the controlling case").

The plaintiffs do not address *Eisentrager* or its progeny to any satisfaction;[14] instead, they latch on to the theory that nonresident aliens possess "fundamental rights"[15] under the Constitution in territories subject to the United States' control. Pls.' Opp'n Br. 16-24. For support, the plaintiffs rely principally on a line of cases known as the *Insular Cases*[16] and further argue that the correct test is whether recognizing a particular constitutional right would be "impracticable and anomalous," which the plaintiffs derive from Justice Harlan's concurrence in *Reid v. Covert*, 354 U.S. 1 (1957), a plurality decision in which the Supreme Court held that civilian wives who were citizens of the United States could not be subjected to courts martial for murdering their military husbands overseas during a time of peace. Pls.' Opp'n Br. 19-20; 354 U.S. at 40-41, 74. The plaintiffs further contend that this "impracticable and anomalous" test was recognized by Justice Kennedy in his concurring opinion in *Verdugo-Urquidez*, which was cited with approval in a footnote in *Rasul I*[17] and subsequently adopted by the district court in *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443 (D.D.C. 2005), *vacated and dismissed* ,

---

[14]    Rather than address the legal implications of *Eisentrager*, the plaintiffs simply disregard the analysis as mere dicta. Pls.' Opp'n Br. 32. As the D.C. Circuit emphasized in *Boumediene*, however, "[c]iting *Eisentrager*, we held in *Pauling v. McElroy*, 278 F.2d 252, 254 n.3 (D.C. Cir. 1960) (per curiam), that 'non-resident aliens . . . plainly cannot appeal to the protection of the Constitution or laws of the United States.'" *Boumediene*, 476 F.3d at 992.

[15]    The plaintiffs argue that "[t]he right not to be tortured is a fundamental right under any circumstance." Pls.' Opp'n Br. 23 n. 17.

[16]    *See De Lima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901).

[17]    542 U.S. at 484 n.15.

21

*Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007).  Pls.' Opp'n Br. 19-20 (arguing that "Justice

Harlan's crucial concurrence . . . set forth the analysis that should govern").

The Court is not persuaded that the plaintiffs' asserted "fundamental rights" standard and

"impracticable and anomalous" test hold sway.  As a preliminary matter, the *Insular Cases* are

truly historical cases decided predominantly at the beginning of the Twentieth Century and

generally involved islands the United States acquired as territories by annex or treaty, such as the

Philippines, Hawaii and Puerto Rico.  *Reid*, 354 U.S. at 14.  The Supreme Court summarized

these cases as follows:

> In a series of decisions that have come to be known as the Insular Cases, the Court
> created the doctrine of incorporated and unincorporated Territories, *e.g., De Lima v.
> Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong
> v. United States*, 182 U.S. 243 (1901); *Downes v. Bidwell*, 182 U.S. 244 (1901). The
> former category encompassed those Territories destined for statehood from the time
> of acquisition, and the Constitution was applied to them with full force. *See, e.g.,
> Rassmussen v. United States*, 197 U.S. 516 (1905); *but see Hawaii v. Mankichi*, 190
> U.S. 197 (1903). The latter category included those Territories not possessing that
> anticipation of statehood. As to them, only "fundamental" constitutional rights were
> guaranteed to the inhabitants. Although the question whether certain rights were or
> were not fundamental continued to provoke debate among the Members of the Court,
> it was clear that the Constitution was held not to extend ex proprio vigore to the
> inhabitants of Puerto Rico.

*Examining Bd. of Eng'rs, Architects & Suveyors v. Flores De Otero*, 426 U.S. 572, 601 n.30

(1976).  Accordingly, the fundamental rights analysis drawn from these cases has been applied

only to aliens residing in incorporated and unincorporated territories of the United States.  As the

D.C. Circuit explained in *Boumediene*, "in each of [the Insular] cases, Congress had exercised its

power under Article IV, Section 3 of the Constitution to regulate 'Territory or other Property

belonging to the United States,' U.S. Const., art. IV, § 3, cl. 2."  476 F.3d at 992.  No case was

22

brought to the Court's attention in which the fundamental rights analysis was applied to

nonresident enemy aliens lacking any voluntary territorial contact with our country.

Significantly, Justice Black's plurality opinion in *Reid*, which garnered the support of

four justices, announced in the most unmistakable terms the "judgment that neither the [*Insular*

*Cases*] nor their reasoning should be given any further expansion." 354 U.S. at 14. Furthermore,

Justice Black's opinion essentially rejected Justice Harlan's impracticable and anomalous

standard:

> The concept that the Bill of Rights and other constitutional protections against
> arbitrary government are inoperative *when they become inconvenient or when*
> *expediency dictates otherwise* is a very dangerous doctrine and if allowed to flourish
> would destroy the benefit of a written Constitution and undermine the basis of our
> Government. If our foreign commitments become of such nature that the
> Government can no longer satisfactorily operate within the bounds laid down by the
> Constitution, that instrument can be amended by the method which it prescribes. But
> we have no authority, or inclination, to read exceptions into it which are not there.

*Id.* (emphasis added). Admittedly, Justice Black's opinion is not binding[18] – and even less so is

Justice Harlan's concurrence – but it does signal an intent to limit the holdings in the *Insular*

*Cases*. It also is important to note that Justice Harlan's "impracticable and anomalous" test was

discussed only in the context of exercising power over *American citizens* abroad, not aliens:

> For *Ross* and the *Insular Cases* do stand for an important proposition, one which
> seems to me a wise and necessary gloss on our Constitution. The proposition is, of
> course, not that the Constitution "does not apply" overseas, but that there are
> provisions in the Constitution which do not *necessarily* apply in all circumstances in
> every foreign place. In other words, it seems to me that the basic teaching of *Ross*
> and the *Insular Cases* is that there is no rigid and abstract rule that Congress, as a
> condition precedent to exercising power over *Americans* overseas, must exercise it
> subject to all the guarantees of the Constitution, no matter what the conditions and

---

[18]     *See Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 300 (D.C. Cir.
2006) (acknowledging that a plurality opinion is nonbinding).

considerations are that would make adherence to a specific guarantee altogether impracticable and anomalous.

*Id.* at 74 (second emphasis added). So the plaintiffs' assertion that "six Justices categorically rejected any suggestion that the Constitution does not apply outside the United States" must be placed in its proper context. Pls.' Opp'n Br. 19. *Reid* dealt only with rights applicable to United States citizens overseas. Because the plaintiffs are not United States citizens, "[they] can derive no comfort from the *Reid* holding." *Verdugo-Urquidez*, 494 U.S. at 270. Moreover, Justice Harlan's concurrence suggests that even American citizens overseas may not be entitled to "all the guarantees of the Constitution," *Reid*, 354 U.S. at 74, which certainly does not bode well for nonresident enemy aliens, who most assuredly would have a more tenuous right to invoke the Constitution's protections, if they have any right at all. Again, as the D.C. Circuit stated in *Boumediene*, nonresident aliens "without property or presence in the United States" have no constitutional rights. No. 05-50636, slip op. at 18.

The citation to Justice Harlan's concurrence in *Reid* is only the first stop on the circuitous route that is the plaintiffs' argument in favor of an "impracticable and anomalous" standard. The plaintiffs next rely on Justice Kennedy's concurring opinion in *Verdugo-Urquidez*, which they urge "endorses" the *Insular Cases* and sets the stage for the majority opinion in *Rasul I*. Reliance on Justice Kennedy's concurrence also is unavailing, however, because in *Verdugo-Urquidez* a majority of the Supreme Court acknowledged that the fundamental rights guaranteed by the *Insular Cases* applied only to aliens in unincorporated territories of the United States, whereas aliens in foreign nations with no ties to the United States had an "even weaker" claim to the Constitution. 494 U.S. at 268. Thus, the majority in *Verdugo-Urquidez* intimated that

24

nonresident aliens lacking any territorial contact with the United States were entitled to
something less than the fundamental rights afforded by the *Insular Cases*. *Id.*

Nor is a vague footnote in *Rasul I* persuasive authority to support extending the
fundamental rights doctrine to extraterritorial nonresident aliens. The plaintiffs in *Rasul I*, like
several of the plaintiffs here, were detained by the United States military during ongoing
hostilities in Afghanistan. 542 U.S. at 470. Unlike the plaintiffs in the instant case, however, the
plaintiffs in *Rasul I* were not nationals of countries at war with the United States and were
detained at Guantanamo Naval Base, Cuba, a place over which the Supreme Court found the
United States exercised complete jurisdiction and control. *Id.* at 480. At issue in *Rasul I* was the
question whether "the habeas statute confers a right to judicial review of the legality of Executive
detention of aliens in a territory over which the United States exercises plenary and exclusive
jurisdiction, but not 'ultimate sovereignty.'" *Id.* at 475. The Supreme Court found that, because
the habeas statute drew "no distinction between Americans and aliens held in federal custody,
there is little reason to think that Congress intended the geographical coverage of the statute to
vary depending on the detainee's citizenship." *Id. at* 481. Because the Supreme Court's
examination of the issue resorted to the statutory authority for habeas petitions, and did not
involve a substantive constitutional analysis, the decision has little practical applicability to the
questions facing this Court, notwithstanding the plaintiffs' assertions that *Rasul I* effected a
limitation on *Eisentrager*. As one defendant observed, "plaintiffs attempt to create binding
Supreme Court precedent based solely on a footnote, citing to a concurring opinion that cites to
yet another concurring opinion." Pappas' Reply Br. 6. This Court agrees and notes that the

25

viability of the plaintiffs' theory would require the Court to wholly ignore binding precedent, which it is not willing to do.

Although the plaintiffs are correct that the district court in *In re Guantanmo Detainee Litigation* inferred from *Rasul I* that constitutional rights were available to detainees at Guantanamo Bay Naval Base, no other case supports that conclusion and, more importantly, that decision was vacated and dismissed by *Boumediene*, which also vacated and dismissed the decision in *Khalid v. Bush*, 355 F. Supp. 2d 311, 320-21 (D.D.C. 2005), where the district court rejected the detainees' attempt to "cling to an expansive interpretation of the Supreme Court's recent opinion in *Rasul* as authority for this novel proposition." The only other recent decision in this court that considered the issue was *Hamdan II*, in which the district court relied on *Eisentrager* to hold that a nonresident alien detained at Guantanamo Bay Naval Base had no constitutional right to the writ of habeas corpus because the detainee lacked "the geographical and volitional predicates necessary to claim a constitutional right to habeas corpus." 464 F. Supp. 2d at 18 (stating that "the detention facility lies outside the sovereign realm, and only U.S. citizens in such locations may claim entitlement to a constitutionally guaranteed writ") (internal citation omitted).

The plaintiffs' final argument in support of their claim to Fifth Amendment protection asks the Court to find that Iraq and Afghanistan are territories over which the United States exercises control sufficient to warrant extending constitutional rights to nonresident aliens there. Pls.' Opp'n Br. 24-29. The United States is presently engaged in a war in both countries, a fact of which this Court takes judicial notice. *See Ohio Bell Tel. Co. v. Public Utilities Comm'n*, 301

26

U.S. 292, 301 (1937) ("Courts take judicial notice of matters of common knowledge."). With the exception of various agreements and orders that govern the United States' military personnel, property and assets, and ensure freedom of action required to conduct military operations, the plaintiffs cite no authority for the proposition that the United States exercises plenary control or sovereign authority over Iraq or Afghanistan. Pls.' Opp'n Br. 24-29 (citing CPA Order No. 17 (Revised), Status of the CPA, MNFI, Certain Missions and Personnel in Iraq, § 2 (June 27, 2004) (originally issued June 26, 2003) and the Joint Declaration of the United States-Afghanistan Strategic Partnership, May 23, 2005). Daily news accounts reveal otherwise and the Court expresses skepticism about whether United States sovereignty can ever be established simply by virtue of our Armed Forces' presence in a country with which we are at war and where hostilities are ongoing and no victor has been declared. The plaintiffs' asserted facts show only that the United States military has secured control over its own resources and ability to conduct military operations. The Court finds this insufficient to demonstrate the exercise of sovereignty such that the Constitution should be extended to all Iraqi and Afghani nationals resident there. More to the point, the D.C. Circuit noted in *Boumediene* that the determination of sovereignty is reserved for the political branches. No. 05-5062, slip op. 20 (citing *Vermilya-Brown Co. v. Connell*, 335 U.S. 377, 380 (1948)).

Finally, with regard to the plaintiffs' assertion of a constitutional right under the Eighth Amendment, that claim fails not only because the plaintiffs are precluded from invoking the Constitution for the reasons already discussed, but also because the Eighth Amendment applies only to convicted criminals. *Ingraham v. Wright*, 430 U.S. 651, 664 (1977) ("An examination of

27

the history of the Amendment and the decisions of this Court construing the proscription against

cruel and unusual punishment confirms that it was intended to protect those convicted of

crimes."); *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979) (citing *Ingraham* and explaining that

the Eighth Amendment comes into play only after a formal adjudication of guilt, whereas the

Fourteenth Amendment covers the imposition of punishment absent such an adjudication);

*Whitley v. Albers*, 475 U.S. 312, 318 (1986) ("The Cruel and Unusual Punishments Clause 'was

designed to protect those convicted of crimes,' and consequently the Clause applies 'only after

the State has complied with the constitutional guarantees traditionally associated with criminal

prosecutions.'" (quoting *Ingraham*, 430 U.S. at 671 n.40)).  Even assuming the Eighth

Amendment applied to nonresident enemy aliens, the plaintiffs cannot avail themselves of that

amendment's prohibition against cruel and unusual punishment because they were never

convicted of a crime, whether a war crime or otherwise.  As a result, they have not asserted a

right under the Eighth Amendment that warrants the creation of a *Bivens* remedy.

       B.     Whether "Special Factors" Counsel Against Inferring a *Bivens* Remedy

      While the creation of a *Bivens* remedy is foreclosed when no constitutionally-protected

right is asserted, as is the case here, the same result also will obtain when there are "special

factors counselling [sic] hesitation in the absence of affirmative action by Congress."  403 U.S. at

396.  Special factors counseling hesitation "relate not to the merits of the particular remedy, but

'to the question of who should decide whether such a remedy should be provided.'"  *Sanchez-
Espinoza v. Reagan*, 770 F.2d 202, 208 (D.C. Cir. 1985) (quoting *Bush v. Lucas*, 462 U.S. 367,

380 (1983)).  According to this principle, courts should avoid creating a new, nonstatutory

28

remedy when doing so would be "plainly inconsistent" with authority constitutionally reserved

for the political branches. *Chappell v. Wallace*, 462 U.S. 296, 304 (1983). Moreover, even when

authority is not constitutionally reserved for the political branches, there nevertheless might be

reasons that favor allowing Congress, rather than the judiciary, to prescribe the scope of relief

available to the plaintiffs. *Bush*, 462 U.S. at 380-90. "Where, for example, the issue 'involves a

host of considerations that must be weighed and appraised,' its resolution 'is more appropriately

for those who write the laws, rather than for those who interpret them.'" *Sanchez-Espinoza*, 770

F.2d at 208 (quoting *Bush*, 462 U.S. at 380). In addition, "the concept of 'special factors

counselling hesitation in the absence of affirmative action by Congress' has proved to include an

appropriate judicial deference to indications that congressional inaction has not been

inadvertent." *Chilicky*, 487 U.S. at 423.

The defendants argue that special factors counseling hesitation exist in this case because

inferring a *Bivens* cause of action would interfere with "core" executive and legislative functions

by calling into question judgments made by the political branches regarding national security and

military affairs. Pappas' Mem. Supp. Mot. Dismiss 14-22; Rumsfeld's Mem. Supp. Mot.

Dismiss 7; Sanchez's Mem. Supp. Mot. Dismiss 11. The defendants claim that a *Bivens* remedy

would interfere with military decision-making by imposing judicial oversight on military strategy

and policies relating to the appropriate circumstances according to which enemy aliens are

detained during a war. Pappas' Mem. Supp. Mot. Dismiss 14-22; Rumsfeld's Mem. Supp. Mot.

Dismiss 15; Karpinski's Mem. Supp. Mot. Dismiss 23; Sanchez's Mem. Supp. Mot. Dismiss 13-

17. The defendants also note that the federal courts have refused to extend *Bivens* into other

29

forms of tort liability that are less sensitive and intrusive than would be the case here, and the

Supreme Court has only twice determined that the judiciary was in a better position than the

political branches to fashion a private cause of action under the Constitution. Pappas' Mem.

Supp. Mot. Dismiss 16-18; Rumsfeld's Mem. Supp. Mot. Dismiss 3-4; Karpinski's Mem. Supp.

Mot. Dismiss 17-18, 20-22; Sanchez's Mem. Supp. Mot. Dismiss 12. *See also Davis v.*

*Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980).

The plaintiffs, as well as *amici*, contest the notion that a *Bivens* remedy would impose

judicial oversight over military decision-making and chill military effectiveness on the

battlefield, arguing instead that "providing an effective remedy for the violation of Plaintiffs'

constitutional rights would be wholly consonant with longstanding military laws and regulations

and would not entangle the Court in any inappropriate inquiry." Pls.' Opp'n Br. 36. *See also* Br.

*Amici Curiae* of Concerned Retired Mil. Officers and Mil. Law and Hist. Scholars In Supp. of

Pls.' Consol. Opp'n 5-23.[21] The plaintiffs assert that Congress has not explicitly declared that

---

[21]     As *amici*, the retired military officers and scholars argue that military history,
doctrines and regulations afford officials no discretion to engage in torture and abuse so judicial
enforcement of the prohibitions against such conduct will not impinge on military affairs or
national security matters reserved for Congress or the Executive Branch. Br. *Amici Curiae* of
Concerned Retired Mil. Officers and Mil. Law and Hist. Scholars In Supp. of Pls.' Consol.
Opp'n 6-18. They also argue that treaties and legislation indicate that Congress and the
Executive Branch recognize the competence of federal courts to adjudicate violations of norms
prohibiting torture and abuse. *Id.* at 18-23. Although *amici* offer a cogent historical and legal
analysis to support their contentions, their argument overlooks the fact that the question before
the Court is not a general inquiry into the legality of the defendants' conduct but, rather, a
specific inquiry into whether a *Bivens* cause of action is appropriate in this case. Even if, in fact,
the defendants violated treaties or military law, it does not automatically follow that the plaintiffs
are entitled to a private cause of action for damages to remedy those illegalities under *Bivens*.
*Amici* appear to simply assume that if there is no discretion to engage in prohibited conduct then
judicial enforcement cannot possibly implicate military affairs or national security issues. But

30

plaintiffs are barred from recovering damages against military officials and there currently is no

comprehensive remedial scheme to redress their injuries. *Id.* The plaintiffs argue that they "seek

only the enforcement of the non-discretionary requirements of the Constitution in accord with the

laws and regulations that have constrained the conduct of U.S. military detention operations for

decades, and that manifestly prohibit the kinds of torture and abuse alleged here." *Id.* at 36-37.

The Court cautions against the myopic approach advocated by the plaintiffs and *amici*,

which essentially frames the issue as whether torture is universally prohibited and thereby

warrants a judicially-created remedy under the circumstances. There is no getting around the fact

that authorizing monetary damages remedies against military officials engaged in an active war

would invite enemies to use our own federal courts to obstruct the Armed Forces' ability to act

decisively and without hesitation in defense of our liberty and national interests, a prospect the

Supreme Court found intolerable in *Eisentrager*:

> Such trials would hamper the war effort and bring aid and comfort to the enemy.
> They would diminish the prestige of our commanders, not only with enemies but
> with wavering neutrals. It would be difficult to devise more effective fettering of a
> field commander than to allow the very enemies he is ordered to reduce to
> submission to call him to account in his own civil courts and divert his efforts and
> attention from the military offensive abroad to the legal defensive at home. Nor is

that logic does not stand in the face of decisions like *Chappell*, 462 U.S. 296, in which the
Supreme Court held that "enlisted military personnel may not maintain a suit to recover damages
from a superior officer for alleged constitutional violations." 462 U.S. at 305. Consequently,
even if an enlisted person alleged torture and abuse in violation of the Fifth and Eighth
Amendments, he could not pursue a *Bivens* remedy for the illegal conduct – regardless of
whether the military officers lacked discretion to torture or abuse him – because the Supreme
Court held that "the need for unhesitating and decisive action by military officers and equally
disciplined responses by enlisted personnel – would be undermined by a judicially created
remedy exposing officers to personal liability at the hands of those they are charged to
command." *Id.* at 304.

31

> it unlikely that the result of such enemy litigiousness would be a conflict between
> judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779. Although the Supreme Court's concern was voiced in the context

of granting writs of habeas corpus to enemy aliens, the same reasoning is equally applicable here.

The discovery process alone risks aiding our enemies by affording them a mechanism to obtain

what information they could about military affairs and disrupt command missions by wresting

officials from the battlefield to answer compelled deposition and other discovery inquiries about

the military's interrogation and detention policies, practices, and procedures. Military discipline

and morale surely would be eroded by the spectacle of high-ranking military officials being haled

into our own courts to defend against our enemies' legal challenges, which might leave

subordinate personnel questioning the authority by which they are being commanded and further

encumber the military's ability to act decisively. Commanders likely would hesitate to act for

fear of being held personally liable for any injuries resulting from their conduct. These are only

some of the many reasons why "[e]xecutive power over enemy aliens, undelayed and

unhampered by litigation, has been deemed, throughout our history, essential to war-time

security." *Id.* at 774.

Moreover, the Supreme Court advised in *United States v. Stanley*, 483 U.S. 669 (1987),

that it is irrelevant whether Congress has provided an adequate remedy for a plaintiff's injuries if

"congressionally uninvited intrusion into military affairs by the judiciary is inappropriate." 483

U.S. at 683. In both *Stanley* and *Chappell*, the Supreme Court held that the need for unhesitating

and decisive action by military officers, in conjunction with recognition of Congress'

constitutionally-vested authority over military affairs, required the judiciary to abstain from

32

inferring *Bivens* remedies against military officials for injuries arising out of, or in the course of, activities incident to military service.[22] *Stanley*, 483 U.S. at 683-84 (reaffirming *Chappell* and holding that the same special factors counseled against creating *Bivens* remedies for injuries arising out of activities incident to military service); *Chappell*, 462 U.S. at 304-305 ("The special nature of military life – the need for unhesitating and decisive action by military officers and equally disciplined responses by enlisted personnel – would be undermined by a judicially created remedy exposing officers to personal liability at the hands of those they are charged to command."). The D.C. Circuit has decreed that the same rationale applies when courts consider whether to infer *Bivens* remedies against military officials for constitutional violations involving aliens abroad. *See Sanchez-Espinoza*, 770 F.2d at 208-209.

In *Sanchez-Espinoza*, the D.C. Circuit considered on appeal claims filed by plaintiffs who were Nicaraguan citizens seeking redress against United States government officials, among others, for injuries inflicted by Contra forces fighting the Nicaraguan government. 770 F.2d at 204-205. The plaintiffs claimed the defendants violated the Fourth and Fifth Amendments by financing, supporting, and assisting the Contra forces' acts of terrorism, including torture, murder, rape, and summary execution. *Id.* at 205, 208. The D.C. Circuit concluded that the constitutional claims were properly dismissed by the district court because the claims involved

---

[22]    The Court agrees with the defendants that creating a *Bivens* remedy for these plaintiffs would result in an absurdity whereby remedies for constitutional violations that are denied our service men and women by the decisions in *Stanley* and *Chappell* would be available to the very enemies against whom those men and women risk their lives to defend our country's sovereignty. Rumsfeld's Mem. Supp. Mot. Dismiss 16. To borrow from the Supreme Court's decision in *Eisentrager*, "[i]t would be a paradox indeed if what [the cases] denied to Americans it guaranteed to enemies." 339 U.S. at 783.

considerations that rendered it more appropriate for Congress to decide whether a damages

remedy should be available:

> We have no doubt that . . . considerations of institutional competence preclude
> judicial creation of damage remedies here. Just as the special needs of the armed
> forces require the courts to leave to Congress the creation of damage remedies
> against military officers for allegedly unconstitutional treatment of soldiers, *see
> Chappell v. Wallace*, . . . *so also the special needs of foreign affairs must stay our
> hand in the creation of damage remedies against military and foreign policy officials
> for allegedly unconstitutional treatment of foreign subjects causing injury abroad.*
> The foreign affairs implications of suits such as this cannot be ignored – their ability
> to produce what the Supreme Court has called in another context 'embarrassment of
> our government abroad' through 'multifarious pronouncements by various
> departments on one question.' Whether or not the present litigation is motivated by
> considerations of geopolitics rather than personal harm, we think that as a general
> matter the danger of foreign citizens' [sic] using the courts in situations such as this
> to obstruct the foreign policy of our government is sufficiently acute that we must
> leave to Congress the judgment whether a damage remedy should exist.

*Id.* at 208-209 (internal citations omitted) (emphasis added). The same considerations are at play

in this case and counsel hesitation in the creation of *Bivens* causes of action and remedies against

the defendants.

It is established beyond peradventure that military affairs, foreign relations, and national

security are constitutionally committed to the political branches of our government and "the

propriety of what may be done in the exercise of this political power is not subject to judicial

inquiry or decision." *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918); *Schneider v.

Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) ("Absent precedent, there could still be no doubt

that decision-making in the fields of foreign policy and national security is textually committed

to the political branches of government."). Although it may be the case that standards

appropriate for judicial application are available to resolve whether certain acts constitute torture,

34

in the unique factual circumstances presented here that legal determination invariably would place the Court in the position of inquiring into the propriety of specific interrogation techniques and detention practices employed by the military while prosecuting wars. Some methods undoubtedly might be deemed improper and unlawful, but others might not – and still others might occupy a place on the periphery between the two. Military, executive, and congressional officials might arrive at a different conclusion from the judiciary about where on the spectrum a particular interrogation technique falls and whether it was, or is, properly used to obtain information about our enemies while conducting a war. It is at this point of divergence that the judiciary most risks intruding into military and foreign affairs. The hazard of such multifarious pronouncements – combined with the constitutional commitment of military and foreign affairs to the political branches and the Court's previously expressed concerns about hindering our military's ability to act unhesitatingly and decisively – warrant leaving to Congress the determination whether a damages remedy should be available under the circumstances presented here.[23]

---

[23]     The propriety of this approach is reinforced by the fact that Congress has twice issued legislation addressing detainee treatment without creating a private cause of action for detainees injured by military officials, which this Court takes to be some indication that Congress' inaction in this regard has not been inadvertent. Nat'l Def. Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, 119 Stat. 3136, 3474-75 (2006) ("codified at 42 U.S.C. § 2000dd) ("Detainee Treatment Act"); Ronald W. Reagan Nat'l Def. Authorization Act for Fiscal Year 2005, Pub. L. No. 108-375, 118 Stat. 1811, 2068-71 (2004) (codified at 10 U.S.C. § 801, stat. note §§ 1091-92) ("Reagan Act"). The mere fact that Congress has not expressly barred a cause of action does not suggest that inferring a judicially-created one is warranted, or even appropriate. Indeed, writing for the majority in *Schweiker*, Justice O'Conner stated that "[t]he absence of statutory relief for a constitutional violation . . . does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." 487 U.S. at 421-22.

C.     Whether the Defendants are Entitled to Qualified Immunity

The defendants insist they are entitled to qualified immunity from *Bivens* liability for any

constitutional violations claimed by the plaintiffs. Pappas' Mem. Supp. Mot. Dismiss 22;

Pappas' Reply Br. 13; Rumsfeld's Mem. Supp. Mot. Dismiss 16, 19; Rumsfeld's Reply Br. 9;

Karpinski's Mem. Supp. Mot. Dismiss 27; Karpinski's Reply Br. 14-15; Sanchez's Mem. Supp.

Mot. Dismiss 24; Sanchez's Reply Br. 17. The "threshold inquiry a court must undertake in a

qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional

violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002). Given the Court's determination that the

plaintiffs are not entitled to assert a constitutionally-protected right derived from either the Fifth

or Eighth Amendments, *supra* Part A(1), it logically follows that their allegations also fail to

establish the violation of constitutional rights, for there can be no constitutional violation where

no constitutional rights inure in the first place. Even assuming that the plaintiffs could establish

that they are entitled to assert rights under the Fifth and Eighth Amendments, the Court finds that

those rights were not clearly established at the time the alleged injurious conduct occurred.

The law recognizes that holding government officials liable for acts alleged to be an

abuse of office comes with potential social costs, such as "the expenses of litigation, the

diversion of official energy from pressing public issues . . . the deterrence of able citizens from

acceptance of public office" and "the danger that fear of being sued will 'dampen the ardor of all

but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of

their duties.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). To balance these social costs

with the interest in vindicating constitutional rights, government officials are afforded qualified

36

immunity, which shields them from "liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Id.* at 818. To determine whether a constitutional right was clearly established,

the Court must assess whether "it would be clear to a reasonable officer that his conduct was

unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "This is not to say that an

official action is protected by qualified immunity unless the very action in question has

previously been held unlawful . . . but it is to say that in the light of pre-existing law the

unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Court

looks to the state of the law at the time the alleged injuries occurred to determine whether

constitutional rights were clearly established:

> Because the focus is on whether the officer had fair notice that her conduct was
> unlawful, reasonableness is judged against the backdrop of the law at the time of
> the conduct. If the law at that time did not clearly establish that the officer's
> conduct would violate the Constitution, the officer should not be subject to
> liability or, indeed, even the burdens of litigation.

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

Determining whether the defendants' acts violated clearly established constitutional rights

need not require extended explication in this case because, as discussed at some length above,

Supreme Court precedent at the time the plaintiffs were injured established that the Fifth

Amendment did not apply to nonresident aliens outside the sovereign territory of the United

States. *See Eisentrager*, 339 U.S. at 784-85; *Verdugo-Urquidez*, 494 U.S. at 269; *Zadvydas*, 533

U.S. at 693. Furthermore, in March 2003, again before the plaintiffs allegedly were injured, the

D.C. Circuit issued its decision in *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003),

37

*rev'd sub nom. Rasul v. Bush*, 542 U.S. 466 (2004), which confirmed the view that basic

constitutional protections were unavailable to aliens abroad. 321 F.3d at 1141. As a colleague

on this court observed, "not until the Supreme Court decisions in *Hamdi v. Rumsfeld*, 542 U.S.

507 (2004) (granting Guantanamo detainees the right to counsel) and *Rasul v. Bush*, 542 U.S.

466 (2004) (granting federal courts jurisdiction to hear Guantanamo detainees' habeas petitions)

. . . were military personnel provided their first indication that detainees may be afforded a degree

of constitutional protection." *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 44 (D.D.C. 2006) ("*Rasul*

*II*").

     The plaintiffs seek to avoid this result by recasting the issue as whether it was clearly

established that torture was unlawful, not whether it was clearly established that the

constitutional right existed. Pls.' Opp'n Br. 54-56 (arguing that "[q]ualified immunity was never

meant to excuse knowing violations of the law based on a post hoc argument that the victim's

legal remedies were not certain"). But the cases make clear that what must be "clearly

established" is the constitutional right. *See, e.g., Harlow,* 457 U.S. at 818 (stating that officials

will be immune from liability when their "conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known"). The focus is on

whether "[t]he contours of the right [are] sufficiently clear that a reasonable official would

understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. This is the

formulation the Supreme Court has adopted and this Court must follow. This standard makes

sense given that a *Bivens* remedy is available only for constitutional violations, not for violations

of some other source of law, such as international law or treaties.

At the time the defendants committed the alleged violations, no constitutional right could be invoked by the plaintiffs; as a result, no reasonable official could have understood that what he was doing violated the Fifth Amendment as it applied to them, regardless of whether the defendants' conduct otherwise was illegal under some other source of law. Similarly, it also was not clearly established that the Eighth Amendment applied to nonresident aliens who were detained by the military but never convicted of a crime. The decisions in *Ingraham*, *Bell*, and *Whitley*, for example, which also were controlling law at the time the defendants allegedly injured the plaintiffs, clearly evinced a rule that the Eighth Amendment applied only after conviction. *Ingraham*, 430 U.S. at 664; *Bell*, 441 U.S. at 537 n.16; *Whitley*, 475 U.S. at 318. Accordingly, there being no violation of clearly established constitutional rights in this case, the defendants are entitled to qualified immunity from liability for the alleged constitutional torts.

II.    WHETHER THE WESTFALL ACT SHIELDS THE DEFENDANTS FROM LIABILITY

The plaintiffs' remaining tort claims assert liability pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, for violations of international law and Geneva Convention IV. Pls.' Opp'n Br. 4. The defendants contend that they are absolutely immune from liability for such violations by the Federal Employees Liability Reform and Tort compensation Act of 1988, Pub. L. No. 100-694 (codified at 28 U.S.C. §§ 2671, 2674, 2679), which is commonly referred to as the Westfall Act. The defendants take the position that absolute immunity is warranted because the Westfall Act applies to the plaintiffs' asserted international law claims and the defendants were acting within the scope of their employment. Pappas' Mem. Supp. Mot. Dismiss 34-38; Pappas' Reply Br. 13-18; Rumsfeld's Mem. Supp. Mot. Dismiss 26-31; Rumsfeld's Reply Br. 12-25; Karpinski's

39

Mem. Supp. Mot. Dismiss 10-16; Karpinski's Reply Br. 2-6; Sanchez's Mem. Supp. Mot.

Dismiss 25-34; Sanchez's Reply Br. 20-23. The plaintiffs challenge any such resort to the

Westfall Act on the grounds that (1) the Act does not cover "intentional, egregious torts in

violation of *jus cogens* norms such as the prohibition against torture and other cruel, inhuman or

degrading treatment," (2) the defendants were acting outside the scope of their employment, and

(3) the international law claims fall within the Westfall Act's exception for statutory violations.

Pls.' Opp'n Br. 60-61.

The Westfall Act affords federal employees absolute immunity from tort liability for

negligent or wrongful acts or omissions they commit while acting within the scope of their

employment. 28 U.S.C. § 2679(b)(1). The purpose of the Westfall Act is "to relieve covered

employees from the cost and effort of defending the lawsuit, and to place those burdens on the

Government's shoulders." *Osborn v. Haley*, 127 S. Ct. 881, 901 (2007). Accordingly, the

Westfall Act provides that, if the Attorney General or his designee certifies that a federal

employee was acting within the scope of his employment when an alleged act or omission

occurred, then the lawsuit automatically is converted to one against the United States under the

Federal Tort Claims Act, the federal employee is dismissed as a party, and the United States is

substituted as the defendant. 28 U.S.C. § 2679(d)(1); *Osborn*, 127 S. Ct. at 888. "The litigation

is thereafter governed by the Federal Tort Claims Act . . . ." *Osborn*, 127 S. Ct. at 888 (internal

citation omitted).

40

A.    Whether the Westfall Act Applies to Intentional Torts

The plaintiffs contest the notion that the Westfall Act applies to intentional torts that

violate *jus cogens* norms that are recognized by the law of nations and Geneva Convention IV.

Pls.' Opp'n Br. 62-66.  The plaintiffs arrive at this conclusion by arguing that the Westfall Act

statement that it applies to a "negligent or wrongful act or omission" is ambiguous. *Id.* at 62.  To

be specific, the plaintiffs take issue with the term "wrongful" – which is not defined in the statute

– and invite the Court to resort to the legislative history to discern what Congress intended by

this term. *Id.*  The defendants oppose this tactic by arguing that it would be improper to consider

the legislative history because the term "wrongful" should be interpreted according to its plain

meaning.  Pappas' Reply Br. 18; Rumsfeld's Reply Br. 12-14; Karpinski's Reply Br. 2.

The Court agrees with the defendants' approach.  It has long been a cannon of statutory

interpretation that courts will resort to legislative history only when there is an ambiguity to be

resolved. *See, e.g.*, *Bedroc Ltd v. United States*, 541 U.S. 176, 186 (counseling against an

approach that would depart with "longstanding precedents that permit resort to legislative history

only when necessary to interpret ambiguous statutory text").  Otherwise, in the absence of such

an ambiguity, the legislature is presumed to have intended what it plainly expressed. *See, e.g.*,

*United States v. Fisher*, 6 U.S. 358, 399 (1805) (2 Cranch) ("Where a law is plain and

unambiguous, whether it be expressed in general or limited terms, the legislature should be

intended to mean what they have plainly expressed, and consequently no room is left for

construction.").  The mere fact that a term is undefined does not, by default, indicate an

ambiguity that warrants resort to the statute's legislative history; to the contrary, an undefined

41

term typically is construed according to its ordinary meaning. *FDIC v. Meyer*, 510 U.S. 471, 476 (1994) ("In the absence of . . . a definition, we construe a statutory term in accordance with its ordinary or natural meaning.").

The term "wrongful" ordinarily means "having no legal sanction." Merriam-Webster's Collegiate Dictionary 1368 (10th ed. 1999). The Westfall Act therefore applies to a federal employee's acts or omissions that have no legal sanction. It is axiomatic that intentional torts are not legally sanctioned, so it follows that the Westfall Act applies to intentional torts. This interpretation comports with legal precedent, according to which other courts have recognized application of the Westfall Act in the context of intentional tort claims. *See Duffy v. United States*, 966 F.2d 307, 313 (7th Cir. 1992) ("We are unwilling to accept that intentional torts do not fall under the rubric of wrongful acts."); *Rasul II*, 414 F. Supp. 2d at 31-36; *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 13 (D.D.C. 2004), *aff'd on other grounds*, 445 F.3d 427 (D.C. Cir. 2006); *Waters v. United States*, 812 F. Supp. 166, 169 (N.D. Cal. 1993) ("By its terms, FTCA covers 'negligent or wrongful acts or omissions.' The courts have interpreted this language to encompass both negligent and intentional torts."); *Nadler v. Mann*, 731 F. Supp. 493, 495 n.6 (S.D. Fla. 1990), *aff'd in part and rev'd in part on other grounds,* 951 F.2d 301 (11th Cir. 1992) ("Certainly, if Congress intended to confine the Act to negligence claims, it would have written the Act in those terms. Moreover, while the legislative history quoted by Plaintiff emphasizes claims for negligence, the sponsor of the bill specifically referred to defamation as one of the torts covered by the Act.").

42

In light of the foregoing discussion, the plaintiffs' argument that the statute does not cover intentional torts is contrary to the plain meaning of the statute as well as precedent concluding otherwise. This Court therefore finds that the Westfall Act applies to the intentional torts alleged by the plaintiffs in their Amended Complaint.

> B.    Whether the Westfall Act Applies to Claims Asserting Violations of the Law of Nations and Geneva Convention IV

Although the Westfall Act broadly applies to negligent acts or omissions committed by federal employees during the scope of employment, there are two exceptions that preclude its application "when an injured plaintiff brings: (1) a Bivens action, seeking damages for a constitutional violation by a Government employee; or (2) an action under a federal statute that authorizes recovery against a Government employee." *United States v. Smith*, 499 U.S. 160, 166-67 (1991); 28 U.S.C. § 2679(b)(2). These are the only exceptions to the Westfall Act and the Supreme Court has indicated that it would be error to infer others. *Smith*, 499 U.S. at 167. Consequently, the absolute immunity provided by the Westfall Act cannot be invoked by a defendant to shield himself from claims involving a *Bivens* remedy or claims premised on a statute that authorizes a private lawsuit against a federal employee.

The defendants maintain that they are entitled to absolute immunity under the Westfall Act for all claims asserted by the plaintiffs under the Alien Tort Statute for violations of the law of nations and Geneva Convention IV because those claims do not fall within either of these two exceptions to the Act. Pappas' Mem. Supp. Mot. Dismiss 22; Pappas' Reply Br. 13; Rumsfeld's Mem. Supp. Mot. Dismiss 16, 19; Rumsfeld's Reply Br. 9; Karpinski's Mem. Supp. Mot. Dismiss 27; Karpinski's Reply Br. 14-15; Sanchez's Mem. Supp. Mot. Dismiss 24; Sanchez's

43

Reply Br. 17. In opposition, the plaintiffs attempt to avoid application of the Westfall Act by

defending their contrary approach, which argues that the claims for torture and abuse brought

under the Alien Tort Statute and Geneva Convention IV do fall within the Act's exception for

suits brought pursuant to a federal statute that authorizes recovery against a federal employee.

Pls.' Opp'n Br. 73-77.

The question whether the Alien Tort Statute falls within the statutory exception to the

Westfall Act was answered by the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542

U.S. 692, 724 (2004), where it held that "the ATS is a jurisdictional statute creating no new

causes of action." Accordingly, the plaintiffs cannot rely on the Alien Tort Statute to waive the

Westfall Act because the plaintiffs have no claim for a violation of that statute itself. In other

words, the Alien Tort Statute is not a federal statute that authorizes recovery against a federal

employee. Two recent decisions from this court reached the same conclusions. *See Rasul II*, 414

F. Supp. 2d at 38 ("The plain language of the ATCA . . . does not confer rights nor does it

impose obligations or duties that, if violated, would trigger the Westfall Act's statutory

exception."); *Harbury v. Hayden*, 444 F. Supp. 2d 19, 38-39 (D.D.C. 2006) (stating that "the

ATCA cannot be the subject of 'a violation' of a federal statute because the ATCA provides no

substantive rights that could be the subject of any claimed violation"). The plaintiffs, however,

ask the Court simply to ignore the Supreme Court's holding in *Sosa* because "at the time

Congress considered both the TVPA and the Westfall Act, it understood that the ATS provided a

substantive cause of action for violations of the law of nations or treaties of the United States."

44

Pls.' Opp'n Br. 75. This argument plainly is untenable given the binding effect *Sosa* has on this Court.

The plaintiffs' argument that Geneva Convention IV, a treaty, also falls within the statutory exception to the Westfall Act is equally unsound. Because the term "statute" is undefined, this Court will again resort to traditional cannons of statutory interpretation and look to the plain meaning of the word. *Meyer*, 510 U.S. at 476. In this case, the term "statute" is generally recognized to mean "a law enacted by the legislative branch of a government." Merriam-Webster's Collegiate Dictionary at 1149. The Westfall Act exception for violations of statutes further states that it applies to statutes "of the United States." 28 U.S.C. § 2679(b)(2)(B). Thus, taken as a whole, the Westfall Act's exception unmistakably applies to a law enacted by the legislative branch of the United States, *i.e.*, Congress. Treaties are not enacted by the legislative branch. Treaties are international agreements made by the President with the advice and consent of Congress pursuant to Article II of the Constitution. *See, e.g.*, Restatement (Third) of the Foreign Relations Law of the U.S. § 303 cmt. a (1987). *See also Whitney v. Robertson*, 124 U.S. 190, 194 (1888) (stating that "[a] treaty is primarily a contract between two or more independent nations, and is so regarded by writers on public law"). Because Geneva Convention IV is not a law enacted by Congress it does not fall within the Westfall Act's exception for statutes.[24]

---

[24]    The plaintiffs' citations to *Stevens v. Griffith*, 111 U.S. 48 (1884), and *American Fed'n of Labor v. Watson*, 327 U.S. 582 (1946), are inapposite because those cases defined the term "statute" in the context of legislation authorizing federal courts to act with regard to statutes of States. Thus, the legislation at issue in both cases were wholly distinct from the Westfall Act such that reference to them by analogy is not particularly helpful. The Supreme Court has described treaties in such a way as to distinguish them from statutes and explained that it is only

45

C.    Whether the Defendants were Acting within the Scope of Their Employment

The Westfall Act provides that the Attorney General may certify that an employee was

acting within the scope of his employment.  That certification is not conclusive, however.

*Osborn*, 127 S. Ct.  at 888 (citing *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995));

*Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 662 (D.C. Cir. 2006).  A plaintiff

may challenge the certification by requesting judicial review to verify its legitimacy.  *Id.*  The

plaintiffs have advanced such a challenge, so this Court now takes up that inquiry.

The D.C. Circuit has held that when the Attorney General's certification is challenged,

the law of the jurisdiction where the employment relationship exists will govern the "scope of

employment" analysis.  *Majano v. United States*, 469 F.3d 138 (D.C. Cir. 2006).  According to

District of Columbia law, the scope of employment is governed by the Restatement (Second) of

Agency, which states that employee conduct is within the scope of employment if (1) it is the

kind of conduct the employee is employed to perform, (2) the conduct occurs substantially within

the authorized time and space limits, (3) the conduct is actuated, at least in part, by a purpose to

serve the master, and (4) the intentional use of force is not unexpected by the master.  *Id.* at 141

(citing the Restatement (Second) of Agency § 228 (1957)).  "The test for scope of employment is

---

when a treaty is self-executing that it has the force and effect of legislation. *Whitney*, 124 U.S. at
194. Otherwise, congressional legislation is required to give effect to the treaty, in which case
the Court would be dealing with a *de facto* "statute" that rendered this discussion unnecessary.
*Id.* With regard to self-executing treaties, the Supreme Court has observed that such treaties are
"placed on the same footing, and made of like obligation, with an act of legislation." *Id.* Note,
however, that the Supreme Court went only so far as to say that treaties essentially are "like" a
statute, not that they are a statute. Absent some indication from Congress that the term "statute"
was intended to apply to treaties, this Court is not at liberty to craft a new exception to the
Westfall Act for claims raised under Geneva Convention IV. *Smith*, 499 U.S. at 167.

46

an objective one, based on all the facts and circumstances." *Weinberg v. Johnson*, 518 A.2d 985, 991 (D.C. 1986).

The parties do not dispute this legal standard. What the parties do dispute, however, is whether violations of *jus cogens* international law ever can be deemed to be within the scope of employment. The plaintiffs seek a *per se* rule that violations of *jus cogens* international law are never within the scope of employment and bank their entire argument on the first prong of the scope of employment analysis, which asks whether the conduct at issue is the kind of conduct the employee is employed to perform. Pls.' Opp'n Br. 67. The plaintiffs assert that the "[d]efendants' conduct cannot be deemed to be within the scope of employment because it is not foreseeable that the Secretary of Defense of the United States or high-ranking U.S. military commanders would authorize and tolerate torture and other cruel, inhuman or degrading treatment of detainees." *Id.* at 69. The defendants dispute this contention and argue that two other decisions of this court considered and rejected similar arguments in cases involving alleged human rights violations by government officials. *See Rasul II*, 414 F. Supp. 2d at 31-36; *Schneider*, 310 F. Supp. 2d at 264-67.

To determine whether conduct is of the kind an employee is employed to perform, the conduct either must be of the same general nature as that which he is authorized to perform or be incidental to authorized conduct. *Ballenger*, 444 F.3d at 664. As the D.C. Circuit explained in *Ballenger*, "[t]he proper inquiry in this case 'focuses on the underlying dispute or controversy, *not on the nature of the tort*, and is broad enough to embrace *any intentional tort* arising out of a dispute that was originally undertaken on the employer's behalf.'" *Id.* (quoting *Weinberg*, 518

47

A.2d at 992) (emphasis added). In that case, a congressman was sued for defamation by a pro-Islam nonprofit organization that alleged he engaged in a telephone conversation with a reporter during which he described the organization as a fund-raising arm for Hezbollah. *Id.* at 662. The organization argued that the statement exceeded the scope of the congressman's employment because making such a statement was not conduct of the kind he was supposed to perform. *Id.* The D.C. Circuit rejected framing the issue so narrowly and focused instead on whether the telephone conversation that resulted in the statement was the kind of conduct the congressman was employed to perform. The D.C. Circuit concluded that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* At 664.

Following this reasoning, the proper inquiry for this Court's purpose is whether detaining and interrogating enemy aliens were the kinds of conduct the defendants were employed to perform or were incidental to the conduct the defendants were employed to perform. The Court finds that they were. As military officials commanding Armed Forces serving our country during a war, there can be no credible dispute that detaining and interrogating enemy aliens would be incidental to their overall military obligations. The plaintiffs' Amended Complaint concedes as much by describing the defendants in terms of their command and control over United States military personnel and responsibility for detainees. Am. Compl. ¶¶ 26-30. The Court finds that, unlike many other cases where the scope of employment is properly a question of fact for the jury, in this case no reasonable jury could reach a different conclusion. The plaintiffs never argued that the detention and interrogation of aliens was outside the scope of the defendants'

48

employment but, instead, focused their entire argument on the nature of the tort, a tactic the D.C. Circuit expressly rejected in *Ballenger*.

Because the plaintiffs' challenge under the first factor of the scope-of-employment analysis fails, and they invoked no other factors to oppose the Attorney General's certification, the Court holds that the certification stands and the defendants are entitled to absolute immunity pursuant to the Westfall Act for the alleged international law violations. Accordingly, the plaintiffs' lawsuit is converted to one against the United States under the Federal Tort Claims Act, in which case Rumsfeld, Pappas, Karpinski and Sanchez shall be dismissed as parties and the United States shall be substituted as the sole defendant for all international law claims raised under the Alien Tort Statute.[25]

Anticipating that substitution might be upheld, the United States moved for dismissal under the Federal Tort Claims Act based on its assertion that the plaintiffs have not exhausted their administrative remedies as required by the statute. Rumsfeld's Mem. Supp. Mot. Dismiss 30-31. The Federal Tort Claims Act mandates that "[a]n action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). The plaintiffs never rebutted the United States' assertion that they failed to exhaust their administrative remedies. As a result, for lack of subject matter jurisdiction, the Court also will

---

[25]     The dismissal of all claims against Colonel Pappas renders his motion to dismiss for lack of personal jurisdiction moot.

49

dismiss without prejudice the international law claims that are now asserted against the United
States pursuant to the Federal Tort Claims Act.

III.     WHETHER GENEVA CONVENTION IV AFFORDS THE PLAINTIFFS A PRIVATE
         RIGHT OF ACTION

In addition to invoking the Alien Tort Statue as authority for a cause of action for money

damages to remedy alleged violations of Geneva Convention IV, the plaintiffs also assert that the

treaty itself provides a private right to sue.  Pls.' Opp'n Br. 77-84.  The plaintiffs point to Articles

3, 27, 31, 32, 118 and 119 of Geneva Convention IV as self-executing provisions and rely

principally on the decision in *Jogi v. Voges*, 425 F.3d 367 (7th Cir. 2005), to validate this

contention.  *Id.* at 79-80.  The defendants counter that the D.C. Circuit's decision in *Hamdan v.*

*Rumsfeld*, 415 F.3d 33, 39 (D.C. Cir. 2005), *rev'd on other grounds*, 126 S. Ct. 2749 (2006)

("*Hamdan I*"), as well as other cited precedent, forecloses any notion that Geneva Convention IV

affords private rights.  Pappas' Mem. Supp. Mot. Dismiss 38-39; Pappas' Reply Br. 20-21;

Rumsfeld's Mem. Supp. Mot. Dismiss 31-32; Karpinski's Mem. Supp. Mot. Dismiss 45;

Karpinski's Reply Br. 21-23; Sanchez's Mem. Supp. Mot. Dismiss 36.

The Court is not convinced that Geneva Convention IV is self-executing and establishes

individual rights that may be judicially enforced via private lawsuits in federal courts.  "Absent

authorizing legislation, an individual has access to courts for enforcement of a treaty's provisions

only when the treaty is self-executing, that is, when it expressly or impliedly provides a private

right of action."  *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 808 (D.C. Cir. 1984) (per

curium) (Bork, J., concurring).  First, the decision in *Jogi* is not as authoritative as the plaintiffs

would like it to be with respect to interpretation of the treaty provisions at issue here.  In *Jogi*, the

50

Seventh Circuit considered a foreign national's claim that he was deprived of his right under the Vienna Convention on Consular Relations to contact his country's consulate for assistance after he pled guilty to aggravated battery with a firearm and was imprisoned. 425 F.3d at 369-70. The Seventh Circuit's determination that the Vienna Convention provided a private right of action was premised on an article in the treaty that stated that a person could request that authorities notify his consulate about his arrest or detention and expressly mandated that the "authorities shall inform the person concerned without delay *of his rights*" to make such a request. *Id.* at 374 (emphasis added). None of the provisions of Geneva Convention IV contain any such express or implied language indicating that persons have individual "rights" that may be enforced under the treaty. Instead, the provisions of Geneva Convention IV state general obligations with regard to the treatment of protected persons that are imposed on signatory States.

Second, the Court's position on this issue is bolstered by the language of the treaty itself. Judge Bork's concurrence in *Tel-Oren*, 726 F.2d at 809, explained that "[a] treaty that provides that party states will take measures through their own laws to enforce its proscriptions evidences its intent not to be self-executing." In this case, Article 146 of Geneva Convention IV, which is located in Part IV titled "Execution of the Convention," states:

> The High Contracting Parties *undertake to enact any legislation* necessary to provide effective penal sanctions for persons committing, or ordering to be committed, any of the grave breaches of the present Convention defined in the following Article.
>
> Each High Contracting Party shall be under the obligation to search for persons alleged to have committed, or to have ordered to be committed, such grave breaches, and shall bring such persons, regardless of their nationality, before its own courts. It may also, if it prefers, and in accordance with the provisions of its own legislation, hand such persons over for trial to another High Contracting Party concerned, provided such High Contracting Party has made out a *prima facie* case.

51

> Each High Contracting Party *shall take measures necessary* for the suppression of
> all acts contrary to the provisions of the present Convention other than the grave
> breaches defined in the following Article.

6 U.S.T. 3516, art. 146.   In addition, it is the law of this circuit that a treaty is not self-executing

when the rights of individuals are intended to be vindicated through diplomatic recourse.

*Holmes v. Laird*, 459 F.2d 1211, 1222 (D.C. Cir. 1972).  Article 149 provides that any alleged

violation of the treaty shall be subject to an "enquiry" at the request of a party to the conflict,

which enquiry shall be undertaken according to procedures negotiated by the parties or

determined by an agreed-upon umpire.  *Id.* at art. 149.  If a violation of the treaty is established,

"the Parties to the conflict shall put an end to it and shall repress it with the least possible delay."

*Id.*  When considered as a whole, it is apparent from these provisions – which make clear that

enforcement of Geneva Convention IV is to be left to the legislation and laws of the parties or to

diplomatic enquiry – that the treaty is not intended to be self-executing, in which case the

plaintiffs are not entitled to pursue private lawsuits against the defendants for alleged violations.

This result is consonant with the recognized rule that "international agreements, even those

directly benefitting private persons, generally do not create private rights or provide for a private

cause of action in domestic courts."  Restatement (Third) of the Foreign Relations Law of the

United States § 907 cmt. a (1987); *Hamdan I*, 415 F.3d at 39.

Third, other courts that have passed on the question of whether provisions of Geneva

Convention IV are self-executing also concluded otherwise.  *See Huynh Thi Anh v. Levi*, 586

F.2d 625, 629 (6th Cir. 1978) (stating that general language in Geneva Convention IV offered no

evidence that the treaty "was intended to be self-executing or to create private rights or action in

52

the domestic courts of the signatory countries, in the absence of further domestic legislative action"); *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 439 n.16 (D.N.J. 1999 ) ("Had Iwanowa attempted to assert a claim under the Hague or Geneva Conventions, it would have been dismissed for lack of jurisdiction because only self-executing treaties, *i.e.*, those that do not require legislation to make them operative, confer rights enforceable by private parties."); *American Baptist Churches v. Meese*, 712 F. Supp. 756, 770 (N.D. Cal. 1989) (determining that Article I of Geneva Convention IV is not self-executing because it "does not impose any specific obligations on the signatory nations, nor does it provide any intelligible guidelines for judicial enforcement").

Fourth, the recently-enacted Military Commissions Act of 2006, 109 P.L. 366, 120 Stat. 2600, confirms the Court's view that Geneva Convention IV is not self-executing. Section 5 of the Act states that "[n]o person may invoke the Geneva Conventions or any protocols thereto in any habeas corpus or other civil action or proceeding to which the United States, or a current or former officer, employee, member of the Armed Forces, or other agent of the United States is a party as a source of rights in any court of the United States or its States or territories." However, given that the other stated grounds support the Court's conclusion that Geneva Convention IV is not self-executing, it is not necessary to address at this time whether the Military Commissions Act of 2006 has retroactive application to the plaintiffs' lawsuit.

Because Geneva Convention IV manifests an intent to be enforced through legislation or diplomacy, it is not a self-executing treaty that provides a private right for the plaintiffs to sue the

defendants for money damages. The plaintiffs' cause of action for violations of Geneva

Convention IV therefore fails to state a claim for relief and will be dismissed.

IV.     WHETHER THE PLAINTIFFS ARE ENTITLED TO A DECLARATORY JUDGMENT

The plaintiffs' final cause of action seeks a "judicial declaration that Defendant

Rumsfeld's conduct deprived them of their rights under the law of nations, provisions of the

Geneva Conventions, and the Fifth and Eighth Amendments to the U.S. Constitution." Am.

Compl. ¶ 262. Pappas, Karpinski, and Sanchez respond by arguing that the plaintiffs lack

standing, waived such claims by failing to allege them in the Amended Complaint, and may not

pursue a declaratory judgment against government officials in their individual capacities. Pappas

Reply Br. 21-22; Karpinski Reply Br. 23-25; Sanchez Reply Br. 23-24. Rumsfeld challenges

only the plaintiffs' standing to pursue a declaratory judgment. Rumsfeld Reply Br. 25.

According to the Declaratory Judgment Act, "in a case of actual controversy within its

jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations

of any interested party seeking such declaration, whether or not further relief is or could be

sought." 28 U.S.C. § 2201(a); *Medimmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007).

It is well established that "district courts possess discretion in determining whether and when to

entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies

subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 283 (1995).

"The fact that a court can enter a declaratory judgment does not mean that it should." *Hewitt v.*

*Helms*, 482 U.S. 755, 762 (1987). So, for example, a declaratory judgment should be declined

when it would serve only as a statement of law without any practical enforcement effect. *S.*

54

*Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch., Inc.*, 24 F.3d 427, 431 (2d Cir. 1994). Furthermore, to establish standing that satisfies the case-or-controversy requirement under Article III of the Constitution, the dispute that is the subject of the request for a declaratory judgment must "be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be 'real and substantial' and 'admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Medimmune*, 127 S. Ct. at 771. Thus, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

The plaintiffs' argue that they have standing to pursue a declaratory judgment based on their allegations that they are at risk of being re-arrested and injured again, several of the plaintiffs were arrested based on alleged false accusations by third parties that place them at risk for re-arrest, military officials threatened several of the plaintiffs with re-arrest if they discussed the treatment they received while in custody, and the United States military continues to exercise control over detainees in Iraq and Afghanistan, among other claims. Pls.' Opp'n Br. 85-86. The fundamental problem with the plaintiffs' assertion of standing is that Pappas, Karpinski, and Sanchez are no longer in positions of command in Iraq, a point the plaintiffs concede in their opposition brief. Pls.' Opp'n Br. 40. The same can be said for Rumsfeld, who resigned from his position as Secretary of Defense several months ago. Significantly, Congress also has passed the Detainee Treatment Act of 2005, 109 P.L. 148, 119 Stat. 2680, which establishes uniform

55

standards for interrogations and prohibits cruel, inhuman or degrading treatment of detainees. Section 6 of the newly-enacted Military Commissions Act also contains provisions directed at enforcing Geneva Convention IV prohibitions against torture and cruel or inhuman treatment. Since the defendants are no longer in positions to enforce policies permitting torture or abuse, Congress has taken action to prohibit such policies and provide remedies for violations, and the plaintiffs have been at liberty for more than two years without re-arrest, the plaintiffs have made an insufficient showing that they face a real and imminent threat of being wronged again in the future. *See Los Angeles v. Lyons*, 461 U.S. 95, 105-113. A declaratory judgment therefore would have no practical enforcement effect or serve as anything other than an opinion advising the plaintiffs what the law would be *if* they were re-arrested, *if* the military officials detaining them interrogated them again, and *if* the military officials violated federal law in doing so.

Even if the plaintiffs could establish standing, the defendants' argument that it would be improper to grant declaratory relief against them in their individual capacities is well taken under the circumstances. *See Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) (holding that "a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future -- can be obtained only from the defendants in their official capacities, not as private individuals"). The plaintiffs' request for declaratory relief is grounded on the "policies, practices and procedures that caused the torture and cruel, inhuman or degrading treatment" and their fear that they might be subjected to the same official policies in the future if they are rearrested. Pls.' Opp'n Br. 85-86. Because the challenged policies were carried out by the defendants in their capacities as military officials, however, the plaintiffs must seek

56

declaratory relief against them in their official capacities, which they have failed to do here. *Feit*, 886 F.2d at 858.

Because the plaintiffs lack standing to pursue a declaratory judgment against the defendants and, even if standing existed, the request for declaratory judgment is unavailable against the defendants in their individual capacities, this cause of action will be dismissed for lack of subject matter jurisdiction and failure to state a claim for relief.

## V.  WHETHER THE PLAINTIFFS' CLAIMS RAISE NONJUSTICIABLE POLITICAL QUESTIONS

Both Karpinski and Sanchez independently argued that the allegations leveled against them in the plaintiffs' Amended Complaint raise nonjusticiable political questions that deprive this Court of jurisdiction. Karpinski's Mem. Supp. Motion Dismiss 34-44; Sanchez's Mem. Supp. Mot. Dismiss 5-10. "Since [the Court] find[s] other bases for dismissing the suit – and bases which do not expand [the Court's] jurisdiction by resolving the assertedly political question on its merits," the Court will rest its judgment on those other bases and deny as moot Karpinski's and Sanchez's arguments that the plaintiffs' claims involve nonjusticiable political questions. *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206 (1985).

CONCLUSION

For the foregoing reasons, the Court will grant the defendants' motions to dismiss the plaintiffs' First and Second Causes of Action for failure to state claims upon which relief may be granted and on the ground that the defendants are entitled to qualified immunity. The Court also will grant each defendant's motion to dismiss the plaintiffs' Third, Fourth and Fifth Causes of Action for lack of subject matter jurisdiction and failure to state claims for relief. In addition,

57

pursuant to the Westfall Act, the United States having been substituted as the sole defendant for

those claims brought under the Alien Tort Statute, those claims shall be dismissed without

prejudice for lack of subject matter jurisdiction pending the exhaustion of all administrative

remedies. Lastly, the defendants' motions to dismiss the plaintiffs' Sixth Cause of Action will be

granted for lack of subject matter jurisdiction and failure to state a claim for relief. Because all

claims are dismissed against all parties, Colonel Thomas Pappas' motion to dismiss for lack of

personal jurisdiction is denied as moot and Colonel Janis Karpinski's and Lieutenant General

Ricardo Sanchez's motion to dismiss on the ground that the plaintiffs' Amended Complaint

raises nonjusticiable political questions also will be denied as moot. An appropriate order will

accompany this Memorandum Opinion.


March _27th_, 2007

Thomas F. Hogan
Chief Judge

58